## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-1077-KLM**

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

   Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

   Defendant.

---

## MOTION FOR PRELIMINARY INJUNCTION

---

   Plaintiffs submit the following Motion for Preliminary Injunction.

## I. INTRODUCTION

   This action is a challenge to the constitutionality of Senate Bill 23-169 enacted by the Colorado General Assembly and signed by Governor Polis on April 27, 2023 ("SB23-169"). SB-23-169 prohibits law-abiding adults over the age of 18 but under the age of 21 from purchasing a firearm of any type. As such, it is unconstitutional under the Second Amendment.

## II. NOTE REGARDING TIMING OF MOTION

   SB23-169 will become effective on August 4, 2023. Plaintiffs have not sought immediate relief through a temporary restraining order because the law is not currently effective. Plaintiffs submit this motion hoping that it will be briefed and

argued prior to the effective date of the law. However, they reserve the right to apply to the Court for a TRO if the matter remains pending in late July.

### III. FACTS

1.      Plaintiff RMGO is a nonprofit organization. Declaration of Dudley Brown, ¶ 3. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. *Id*. RMGO has members who reside in Colorado who are between the ages of 18 and 20. *Id*. RMGO represents the interests of these members.  *Id*. Specifically, RMGO represents the interests of those members who are affected by SB23-169's unconstitutional prohibition on law-abiding adults from purchasing firearms. *Id*. It is these members' present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in their home. *Id*., ¶ 4. These members are precluded from purchasing a firearm by SB23-169, which bars them from exercising their fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

2.      Plaintiff Mosgrove is a natural person, over the age of 18 but under the age of 21, and a citizen of Colorado and the United States. Declaration of Tate Mosgrove, ¶ 2. Mosgrove has never been charged with nor convicted of any misdemeanor or felony offense. *Id*. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id*. Mosgrove is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

3.      Plaintiff Pineda is a natural person, over the age of 18 but under the age of 21, and a citizen of Colorado and the United States. Declaration of Adrian Pineda, ¶ 2. Pineda has never been charged with nor convicted of any misdemeanor or felony offense. *Id*. It is his present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id*. Pineda is or soon will be precluded from purchasing a firearm by SB23-169, which bars him from exercising his fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment. *Id*.

4.      Defendant Jared S. Polis is the Governor of the State of Colorado. This action is brought against him in his official capacity. Defendant is enforcing or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

5.      SB23-169 states in relevant part: "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

## IV. STANDARD FOR OBTAINING RELIEF

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

In a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). This is because: (a) the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury; (b) when a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interests in having his constitutional rights protected; and (c) it is always in the public interest to prevent violation of a person's constitutional rights. *Id.* Indeed, in constitutional cases whether to grant the injunction often turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam).

### V. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

**A.      The Plain Text of the Second Amendment Covers Plaintiffs' Conduct**

The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*. In *Bruen*, the Court held: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the

4

Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

Plaintiffs desire to purchase firearms for lawful purposes (including defense of their homes). The right to keep arms necessarily implies the right to acquire arms. SB23-169 prohibits or soon will prohibit Plaintiffs from doing so. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen*, and SB23-169 is presumptively unconstitutional. The State may attempt to rebut the presumption of unconstitutionality by demonstrating that SB23-169 is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden, because there is no such historical tradition of firearms regulation in this Nation.

1.     **The Government Cannot Demonstrate That its Regulation is Consistent with the Nation's History and Tradition of Firearms Regulation**

There were no state laws governing the possession or purchase of firearms by minors prior to 1791 and only two states adopted them between the Constitution's ratification and 1867. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History in The United States And Second Amendment Rights*, 80 LAW & CONTEMP. PROB. 55, 58–59 (2017). Historical

materials "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *NRA v. BATFE*, 714 F.3d 334, 339-40 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). At the time of our nation's Declaration of Independence and the Revolutionary War, armed militias in the colonies were comprised of boys as young as sixteen, with thousands entering service while even younger. *See id*. George Washington's Continental Army consisted of thousands of young men under twenty-one and they regularly used firearms. *See id*. Young males were commonly required to possess firearms as part of their militia service. *Id*., James Madison, the "father of the Constitution" was only twenty-five on July 4, 1776, and ultimately served in George Washington's Continental Army along with others who were even younger. His contemporaries included an eighteen-year-old James Monroe and Charles Pinckney, along with a twenty-year-old Henry Lee III, John Trumbull, Aaron Burr, and John Marshall. Additionally, the French officer Marquis de Lafayette was only eighteen in 1776; yet he gained the rank of Major General in the Continental Army while leading battles including the Siege of Yorktown. Eighteen-year-olds regularly used, possessed, and traded pistols, ammunition, and other firearms at this time and these firearms continue to serve as the "most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *See Heller*, 554 U.S. at 628.

Following the ratification of the Bill of Rights on December 15, 1791, eighteen-year-olds were required by the 1792 Militia Act to be available for service and militia members were required to furnish their own weapons. Eighteen-year-olds must have

been allowed to "keep" firearms for personal use. *NRA*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc). Because they were within the "core" rights-holders at the founding, their rights cannot be infringed today. *Id.*

The laws prior to and immediately surrounding passage of the Second Amendment illuminate contemporary understanding. Sixteen was almost exclusively the minimum age for colonial militias for 150 years before the Constitution. *Id.* at 340. For example, in 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut to bear arms. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 3 (2004). Other colonies had similar laws, *id.* at 8, with Delaware's minimum age of seventeen as the exception. *Id.* At the time of the Second Amendment's passage and shortly thereafter, the minimum age for militia service in every state[1] became eighteen. Nearly every

[1] Alphabetically by state, these are the available minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792: **Connecticut**: 18 / Acts and Laws, 308 (1792); **Delaware**: 18/ Ch. XXXVI, An Act for Establishing the Militia In This State, 1134 (1793); **Georgia**: 18/ An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as contained in Digest of the Laws of Georgia, 460 (1792); **Maryland**: 18 / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793); **Massachusetts**: 18 / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793); **New Hampshire**: 18 / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792); **New Jersey**: 18 / Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792); **New York**: 18 / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793); **North Carolina**: 18 / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)); **Pennsylvania**: 18/ Ch. MDCXCVI, An Act for

state adopted the Militia Act of 1792 by reference and began using its age structure. *Id*. Historical data confirms that those eighteen and above had the right to keep and bear arms and this right was not coextensive with militia service, but it was intimately related. *Id*. Gun ownership was necessary for militia service, but militia service was not necessary for gun ownership. *Id*. Not only had the colonies employed sixteen-year-olds in the militia for more than a century prior to the Second Amendment's ratification, other gun laws in place at the time serve as indicia of the Founders' mindset. *Id*. While the age of majority was twenty-one during the Founding era, minors were nevertheless in the militia and were expected, if not required, to own and provide their own weapons.

Referring to permissible historic limitations on gun ownership, *Heller* never mentioned a minimum age for exercise of the right. On the contrary, to explain the "militia clause," the Court positively quoted the first federal Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). The Court explained that the right of able-bodied citizens to keep and bear arms for self-defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might

---

Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793); **South Carolina**: 18/ An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782-91)); **Virginia**: 18/ Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

do by taking away the citizens' arms. *Id*. at 599. Those subject to militia duty are therefore a subset of citizens entitled to be armed and the right was considered to be essential. To think the Founders would have permitted a federal limitation on the purchase of new, commonly used firearms by the same body that constituted the militia is fundamentally at odds with the Second Amendment. Not only does the conduct proscribed by SB23-169 fall squarely within the scope of what our Founders meant to protect, but a reading of early-American documents show that the Founders would have rejected such bans altogether. *See, e.g.*, Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican*, at 21, 22, 24 (Univ. of Alabama Press 1975) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them." (emphasis added)); *see also* Tench Coxe, "*A Pennsylvanian, No. 3*," Pennsylvania Gazette, Feb. 20, 1788 ("[T]he powers of the sword are in the hands of the yeomanry of America from 16 to 60 . . . . Their swords . . . are the birthright of an American.").

Finally, if the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so. *See, e.g.*, U.S. Const. Art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for holding office in Senate), Art. II, § 1 (minimum age of thirty-five for holding office as President). Further, if the People want to apply an age threshold, they know how to do so. *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year- olds with universal suffrage). The maxim *expressio unius est exclusio alterius* is applicable. *See,*

*e.g.*, *United States Term Limits v. Thornton*, 515 U.S. 779, 868 (1995) (Thomas, J., dissenting). "When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution." *Id*.

The State might argue that it can discriminate against 18-20 year-olds because the common law age of majority was twenty-one at the time of the Founding. But this would presuppose that the legal threshold of adulthood is the determinative factor for whether the Second Amendment applies, and as discussed above, it is not. Even assuming arguendo that this is true, however, the determination of who is an adult must rely on the generally recognized age of majority as established in a state at the time of the Court's inquiry. No one disputes that states are entitled to reduce the age of majority to 18, and all but three have. The age of majority in Colorado is 18. C.R.S. § 13-22-101. *See Jones v. Dressel*, 623 P.2d 370, 373 (Colo. 1981). Eighteen-year-old males have been required to register for Selective Service for over a century and eighteen-year-olds are treated as adults for criminal trials, jury service, and their emancipation from parental oversight. At eighteen, one can enter a binding contract, execute a will, work without restriction, vote, and be held responsible for his own taxes.

Since Bruen, courts have not hesitated to protect the right of young adults. In *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 3355339 (E.D. Va. May 10, 2023), the court struck down the federal law that makes it illegal for an 18-20-year-old person to acquire a firearms from a federally licensed firearms dealer.

The federal law challenged in *Fraser* is, for practical purposes, identical to SB23-169, and the court held that the federal statute violated the plaintiffs' Second Amendment rights. In particular, the Court held with respect to *Bruen's* "plain text" step: "given its ordinary, commonsense, and logical meaning the right to 'keep arms' (the right to 'have') of necessity includes the right, inter alia, to purchase arms. That then puts an end to the textual inquiry with the conclusion that the conduct at issue is protected by the plain text of the Second Amendment." *Id*., at *7.

Turning to *Bruen's* "history and tradition" step, after an exhaustive survey of the relevant history, the court concluded:

> Under the analytical framework established in *Bruen*, the Government simply has not met its burden to support the finding that restrictions on the purchasing of firearms by 18-to-20-year-olds is part of our Nation's history and tradition. Founding-era militia laws provide circumstantial evidence that 18-to-20-year-olds could purchase, own, and use arms. These militia laws and the cases interpreting them further support the finding that 18 was the age of majority for acquiring and possessing firearms in the Founding period. There is no direct evidence of age-based firearms restrictions. *The Government, the party which bears the burden, fails to point to any Founding-era laws to support the challenged law and implementing regulations.*

*Id*. at *22 (emphasis added).

In summary, the plaintiffs met their burden under the "plain text" prong and the government failed to meet its burden under the history and tradition prong. Therefore, the court granted summary judgment to the plaintiffs and declared the statute unconstitutional. *Id*. at *23. *See also Worth v. Harrington*, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) (there is no historical tradition supporting a statutory prohibition on 18-20-year-olds from carrying firearms in public); and *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) (same).

### B. *Bondi* Was Wrongly Decided

In *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), the court reached a different conclusion with respect to a Florida statute similar to SB23-169. In that case, the court held that the state's age restriction is consistent with the Nation's history and tradition of firearms regulation. *Id*. at 1325. The court was able to reach this conclusion, however, only because it considered certain mid- to late-19th-century laws as relevant analogues. *Id. See Fraser*, at *21, n. 44. But the court erred when it considered these later laws. *See Fraser* at *22 (pointing to laws from more than a half-century after ratification does not discharge the burden that *Bruen* imposes on the government).

*Fraser's* rejection of these later laws is consistent with *Bruen*, where the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id*., 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id*., 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). *Bruen* noted an "ongoing scholarly

debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id.*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, 142 S.Ct. at 2137 (citations omitted).

Thus, evidence from the second half of the 19th century is not relevant to an inquiry into the original public meaning of the Second Amendment, which was enacted six decades earlier. *Bruen,* 142 S. Ct. at 2153–54 ("As we suggested in *Heller*, [] late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). The Court expressed this concept even more forcefully in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), where it held that laws enacted in the second half of the 1800s – even if enacted by the overwhelming majority of states – are not relevant to the "history and tradition" inquiry regarding the scope of a provision of the Bill of Rights. In that case, the plaintiff challenged a Montana regulation that excluded religiously affiliated private schools from a state scholarship program for students attending private schools. The Court held that the law was unconstitutional because there was no founding era tradition supporting Montana's decision to disqualify religious schools from government aid. *Id.*, 140 S. Ct. at 2258. Far from prohibiting such aid, founding era laws actively encouraged it. *Id*. Significantly, Montana pointed

out that in the latter half of the 1800s the overwhelming majority of states (30) had enacted no-aid laws. *Id.*, 140 S. Ct. at 2259. The Court rejected Montana's argument, holding that "[s]uch a development, of course, cannot by itself establish an early American tradition. … [S]uch evidence may reinforce an early practice but cannot create one. … The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id.*

*Espinoza's* holding is unsurprising, because the Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–68 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

A second problem with *Bondi's* approach is that it leads to results that directly conflict with *Bruen's* admonition "that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* 142 S. Ct. at 2137. *See also McDonald*, 561 U.S. at 765 (incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment); and *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) ("incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when

asserted against the federal government"). As *Frasier* noted, there is absolutely no support for the age restriction in the founding era. *Id*. at *22. *Bondi* reached a different conclusion only by relying on laws enacted around 1868 when the 14th Amendment was ratified. *Id.,* 61 F.4th at 1325. *Bondi's* approach conflicts with *Bruen* because under the 11th Circuit's approach the text of the Second Amendment can mean one thing when applied to federal laws (as in *Fraser*) and the opposite thing when applied to state laws (as in *Bondi*). Surely, therefore, the Second Amendment right applicable to Florida as explicated in *Bondi* does not "have the same scope as against the Federal Government," and thus conflicts with *Bruen*. The founding era, not the 19th century, is key for understanding the scope of the Bill of Rights. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at bit.ly/3Xwtgze (last visited June 1, 2023), in which the author engages in an exhaustive analysis of the numerous Supreme Court cases regarding this issue.

C.    **Summary**

Plaintiffs have easily met their "plain text" burden. The State cannot meet its "history and tradition" burden because there are no founding-era analogues to its restriction on the right to keep and bear arms. *Bondi's* holding is incorrect, because its reliance on 19th-century laws as analogues conflicts with *Bruen* and *Espinoza* and numerous other Supreme Court cases holding that the founding-era is the appropriate time frame for the historical inquiry, and it also conflicts with *Bruen,*

*McDonald, Ramos* and other cases rejecting any result that would lead to a different meaning of the text when applied to the states as opposed to the federal government. Accordingly, Plaintiffs are likely to prevail on the merits.

## II.     The Other Preliminary Injunction Factors Favor Plaintiffs

In constitutional cases whether to grant the injunction often turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Since, as demonstrated above, Plaintiffs are likely to prevail on the merits, the Court could end its inquiry here.

Even if the Court were to consider the other three factors, however, the result would be the same, because all of the factors favor Plaintiffs. It is well-settled that a showing of the infringement of a constitutional right requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the court held that this principle applies in cases involving the infringement of Second Amendment rights. *Id.*, at 699 ("Infringements of [Second Amendment] right cannot be compensated by damages."). *See also Koons v. Platkin*, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023) (many decisions find that deprivation of Second Amendment rights is not easily remediable by monetary damages); *Spencer v. Nigrelli*, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (citing *Ezell*, infringement of Second Amendment rights cannot be compensated with damages);

*Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022); and *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

As for the balance of harms and public interest prongs, the State's interest in enforcing an unconstitutional law does not outweigh Plaintiffs' interest in having their constitutional rights protected. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Moreover, it is always in the public interest to prevent the violation of a party's constitutional rights. *Id.* (internal citation and quotation marks omitted).

Finally, this is not a case in which Plaintiffs must overcome a heightened standard to obtain a preliminary injunction. "Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo – that is, the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (internal citation and quotation marks omitted). The law has not gone into effect. Therefore, the current status quo is that Plaintiffs may exercise their Second Amendment rights. It is the State that seeks to disrupt the status quo, not Plaintiffs.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court to enter an order preliminary enjoining enforcement of SB23-169.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033

Voice: (303) 205-7870
Email: barry@arringtonpc.com

CERTIFICATE OF NOTICE TO THE OFFICE OF THE ATTORNEY GENERAL

The summons and complaint in this matter were served on the Attorney General on June 5, 2023. Undersigned counsel has been in contact with Assistant Solicitor General Grant Sullivan, who has indicated that he will be attorney handling this matter. On June 7, 2023, the undersigned email a copy of this motion to Mr. Sullivan at:

Grant.Sullivan@coag.gov

*/s/ Barry K. Arrington*
_____

Barry K. Arrington