**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS, *et. al*,
    Plaintiffs,
v.
JARED POLIS, in his official capacity as Governor of Colorado,
    Defendant.

---

### THE GOVERNOR'S RESPONSE TO
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Firearms are now the leading cause of death for 18-to-20-year-olds in Colorado and America, whether by accident, suicide, or homicide.[1] In response to this unprecedented crisis, Colorado's General Assembly made the commonsense decision to raise the minimum age to purchase firearms from 18 to 21.

Senate Bill 23-169 ("SB23-169") prohibits licensed gun dealers in Colorado from selling firearms to those under 21 and will become effective on August 8, 2023. It does not prohibit the *possession* or *use* of firearms in self-defense by an 18-to-20-year-old, only the commercial sale to such an individual. Thus, SB23-169 targets the *unchecked* commercial firearm purchases by 18-to-20-year-olds that have become so deadly in modern times, including when an 18-year-old purchased three of the four guns used to murder twelve students and one teacher at Columbine High School on April 20, 1999.

Plaintiffs, two 18-to-20-year-old Coloradans and a gun advocacy group, seek to preliminarily enjoin SB23-169 even before it becomes effective on August 8. Their motion

---

[1] CDC, WONDER, Underlying Cause of Death, Injury Mechanism & All Other Leading Causes, 2020-21, Ages 18–20, http://wonder.cdc.gov/ucd-icd10-expanded.html

asserts that it is "impossible" for Colorado to justify this new law under the Second Amendment. Dkt. 12 at 5. But Plaintiffs come well short of showing that a preliminary injunction should issue here. The U.S. Constitution does not leave Colorado helpless to address the recent unprecedented rise in youth gun deaths. Rather, the U.S. Supreme Court has repeatedly assured that the Constitution leaves States with various tools to address such threats to the public health, safety, and welfare. Among these presumptively lawful tools are State statutes that place conditions and qualifications on the commercial sale of firearms.

And age-restrictions on firearms purchasers like the one imposed by SB23-169 are nothing new. Our Nation has a well-established historical tradition of limiting sales of firearms to 18-to-20-year-olds, further demonstrating that age-related qualifications have never been understood to violate the Constitution. By the end of the 19th century, 18 States and the District of Columbia had enacted laws restricting the sale of firearms to those under 21. Just earlier this year, the Eleventh Circuit upheld a similar Florida law based on this well-established tradition. Plaintiffs' Motion fails to wrestle with these facts.

The Court should also reject Plaintiffs' Motion for more fundamental reasons. Plaintiffs have presented no textual-historical analysis supporting their view that the Second Amendment was publicly understood to create a right for 18-to-20-year-olds to commercially purchase firearms. Moreover, in their rush to the courthouse, Plaintiffs have not demonstrated any actual or imminent irreparable harm justifying preliminary relief. SB23-169 is not currently effective and therefore nothing prohibits Plaintiffs from following through on their alleged "present intention and desire to lawfully purchase a firearm." Dkt. 9 at 2–3. Nor would SB23-169 remove Plaintiffs' possession of guns they lawfully purchase before August 8, 2023. In the absence of an

injunction, Plaintiffs may still currently acquire the firearms they desire, and may lawfully possess them after SB23-169 takes effect. The Motion should be denied.[2]

## BACKGROUND

On April 28, 2023, Governor Polis signed SB23-169 into law. *See* Dkt. 1-1, S.B. 169, 74th Gen. Assemb., 1st Sess. (Colo. 2023). Federal law already prohibits licensed gun dealers from selling a shotgun or rifle to anyone under 18-years-old, and the sale of all other firearms to anyone under 21. 18 U.S.C. § 922(b)(1). Colorado's SB23-169 would raise this age from 18 to 21 for all firearms, by regulating sales by licensed gun dealers in the State. *See* Dkt. 1-1 at § 3 (C.R.S. § 18-12-112.5(1)(a.5)). It also will regulate private gun sales by prohibiting firearm purchases by minors until they turn 21. *See id.* at § 2 (C.R.S. §§ 18-12-112(2)(e) and (2)(f)).

But SB23-169 neither prohibits anyone's *possession* or *use* of firearms, nor prevents 18-to-20-year-olds from acquiring firearms outside of commercial or private sales. *See* C.R.S. § 18-12-112(6). For example, 18-to-20-year-olds may still possess and use firearms they acquire, borrow, inherit, or receive as gifts from a family member. *Id.* SB23-169 also exempts from the age-restriction anyone who is on duty as an active member of the Armed Forces, on duty as a peace officer, or a P.O.S.T. Board certified individual. *Id. See* Dkt. 1–1 at §§ 2 and 3.

---

[2] The Governor, sued here in his official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending SB23-169 from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

## LEGAL STANDARD

### I.  Legal standard for preliminary injunctions.

A preliminary injunction is an "extraordinary remedy" granted only where a plaintiff establishes (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019). The last two factors merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The burden of proof is on Plaintiffs to demonstrate that each factor tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). Plaintiffs' requested injunction is also disfavored because it seeks "substantially all the relief [Plaintiffs] could feasibly attain after a full trial on the merits." *Sgaggio v. Weiser*, No. 22-cv-01791-PAB, 2022 WL 3700723, at *2 (D. Colo. Aug. 26, 2022) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir 2005)). Thus, Plaintiffs "must make a strong showing with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

### II.  Legal standard for Second Amendment claims.

States are "bound to respect the [Second Amendment] right to keep and bear arms because of the Fourteenth Amendment." *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2137 (2022). When a State law is alleged to violate this right, the court applies a two-part test. *First*, the court must determine if the "Second Amendment's plain text covers" the individual's conduct. *Id.* at 2129–30. The "right secured by the Second Amendment is not unlimited" and individual self-defense

is "the central component." *District of Columbia v. Heller*, 554 U.S. 570, 599, 626 (2008). *Second*, if the conduct is covered by the Second Amendment's plain text, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. When a State law exists to address "unprecedented societal concerns" not present at the Nation's founding, the "lack of a distinctly similar historical regulation" is not dispositive. *Id.* at 2131-32. Instead, a court must "reason[] by analogy" whether "how and why" a modern law burdens armed self-defense is consistent with "how and why" historical firearm regulations burdened this right. *Id.* at 2132–33. This test is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133.

## ARGUMENT

For three reasons, Plaintiffs have not satisfied the requirements for obtaining the extraordinary remedy of a preliminary injunction. *First*, Plaintiffs cannot show they are substantially likely to succeed on the merits. At *Bruen*'s first step, Plaintiffs have not shown that the Second Amendment's text covers their conduct. Plaintiffs' claims also fail at *Bruen*'s second step, because the Governor can demonstrate that SB23-169 is consistent with this Nation's historical tradition of firearm regulation. *Second*, Plaintiffs cannot show they will suffer an irreparable injury absent a preliminary injunction. SB23-169 is not yet effective and Plaintiffs are free to lawfully purchase the firearms they want today. Plaintiffs do not presently need an injunction to get the relief they seek. *Third*, Plaintiffs cannot show the equities or public interest weigh in their favor. A preliminary injunction would prevent Colorado from adopting a commonsense measure to reduce youth gun deaths in the State, and Plaintiffs have not demonstrated any clear constitutional injury.

5

I.    **Plaintiffs have not shown they are substantially likely to succeed on the merits of their claim.**

    A.    **Plaintiffs' proposed conduct is not covered by the Second Amendment's plain text.**

Plaintiffs cannot show they will succeed on *Bruen*'s first step[3], which requires them to demonstrate that the Second Amendment's "plain text covers [their] conduct" and that they "are part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2126, 2134. However, Plaintiffs' claims fail for three reasons. *First*, they have not shown through a textual-historical inquiry that the Second Amendment prohibits States from regulating commercial sales to 18-to-20-year-olds. *Second*, SB23-169 regulates commercial firearms sales, which is a category of regulation that the Supreme Court has repeatedly assured is "presumptively lawful," *Heller*, 554 U.S. at 627 n.26. *Third*, Plaintiffs have not shown that 18-to-20-year-olds were part of "the people" the Second Amendment protected, without referencing late-20th century understandings that came two-hundred years after the amendment was adopted.

    1.    **Plaintiffs fail to show that the Second Amendment covers their conduct.**

The Supreme Court has never held that the Second Amendment reaches the commercial or private sale of firearms at issue here. The Supreme Court has repeatedly emphasized the "narrowness" of its Second Amendment decisions. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015). *Heller* found the amendment's text covered possession of handguns in the home for self-defense, and only after an extensive review of 17th, 18th, and 19th century sources

---

[3] In contrast to *Bruen*'s second step, which explicitly lodges the burden with the government, the Court did not discuss the allocation of the burden for the threshold inquiry. 142 S. Ct. at 2126. Accordingly, the "default rule" prevails—Plaintiffs "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

of how the words "keep" and "bear" were popularly understood. 554 U.S. at 581–86. "Keep" referred to "possessing arms." *Id.* at 583. "Bear" meant to "carry" arms for confrontation. *Id.* at 584. *Bruen* concluded from the same historical understandings that the text also covers carrying firearms for self-defense outside the home. 142 S. Ct. at 2134.

Plaintiffs' Motion devotes only one sentence of argument to *Bruen*'s first step, stating that "[t]he right to keep arms necessarily implies the right to acquire arms." Dkt. 12 at 5. This falls far short of showing that the Second Amendment's text covers commercial sales to 18-to-20-year-olds. Indeed, in the only known legal challenge to early State laws prohibiting firearm sales to 18-to-20-year-olds, the Tennessee Supreme Court rejected this very argument verbatim, stating the Second Amendment right to "keep arms" *did not* "necessarily impl[y] the right to buy or otherwise acquire" a pistol by a minor or imply the "right in others to give, sell, or loan" the pistol to the minor. *Tennessee v. Callicutt*, 69 Tenn. 714, 716 (Tenn. 1878).

To the extent Plaintiffs are attempting to establish a new "right to purchase" firearms by 18-to-20-year-olds under the Second Amendment, they fail to engage in the required textual-historical inquiry. *Heller*, 554 U.S. at 581–619. Plaintiffs have not shown how that proposed right is rooted in the "normal and ordinary" meaning of the text as judged by "ordinary citizens in the founding generation." 554 U.S. at 576–77 (internal quotation omitted). They also have not shown how their proposed right is consistent with post-ratification interpretations. *Id.* at 606–19. Plaintiffs have not established, for example, that the Second Amendment was historically understood to reach commercial or private sales to 18-to-20-year-olds—*Callicutt* suggests the opposite. The Court's job is not to "resolve historical questions in the abstract" but "to resolve *legal* questions presented in particular cases" and "based on the historical record compiled by the

7

parties." *Bruen*, 142 S. Ct. at 2130 n.6. At the first step, Plaintiffs provide no historical record at all on whether they fall within the right's scope as delineated at the Nation's founding.

Nor have Plaintiffs demonstrated how SB23-169 would limit their right to self-defense, "the *central component*" of the Second Amendment. *Bruen*, 142 S. Ct. at 2133. To the extent Plaintiffs claim that SB23-169 burdens the rights announced in *Heller* or *Bruen*, their threadbare declarations provide none of the facts needed. All three declarations simply repeat a legal conclusion that they "desire to purchase a firearm … and [they are] or soon will be precluded from purchasing a firearm by SB23-169." Dkts. 12-1; 12-2; 12-3. This is not enough to preliminarily enjoin the law or even establish standing. *Colo*. *Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) (remanding Second Amendment challenge where plaintiffs' speculations they "some day" may violate the law failed to establish injury-in-fact). For example, Plaintiffs have not stated whether they already possess firearms for self-defense, what guns they wish to purchase and from whom, whether federal law also prohibits their desired purchases, if they can purchase a firearm prior to SB23-169's effective date, or whether they can obtain a firearm for self-defense outside of a commercial or private sale—such as through an intrafamilial transfer. In the absence of any well-pled, nonconclusory facts, Plaintiffs fail to show that SB23-169 will burden their right to self-defense. *See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222,1227 n.1 (10th Cir. 2010) (A court "need not accept [the complaints'] unsupported conclusory allegations" as true).

### 2.  SB23-169 is part of a State's "presumptively lawful" tools to combat youth gun deaths.

Plaintiffs' Motion also fails because, by restricting firearms sales, SB23-169 falls within the "longstanding" and "presumptively lawful" category of regulations that are not covered by

the Second Amendment. *Heller*, 554 U.S. 627 n.26. *Heller* made clear that "[t]he Constitution leaves [the States] a variety of tools for combating" the modern problems of gun violence. *Id*. at 636. Among the tools *Heller* expressly mentioned were state laws that place "conditions and qualifications on the commercial sale of arms." *Id*. at 626–27. One tool is a State's authority to set the appropriate age an individual is qualified to purchase firearms. SB23-169 does just that. The bill limits commercial and private purchases to combat modern problems of youth accidental death, suicide, and homicide that these unchecked sales create. *See also Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1074 (D. Colo. 2014) (the "same power to regulate [commercial sales] should extend to non-commercial transactions, lest the loophole swallow the regulatory purpose.") (vacated and remanded on other grounds). SB23-169 does not prevent interfamilial transfers of firearms. The law is also not a "total[] ban" on possession. *Heller*, 554 U.S. at 628. This carve-out is also broadly consistent with the "commonsense distinction" for other constitutional rights where the Court creates different rules when States regulate commercial conduct already "traditionally subject to government regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (first amendment speech) (quotations omitted).

Pre-*Bruen*, some courts looked to *Heller*'s "conditions and qualifications" carve-out when deciding that the Second Amendment does not reach commercial age-based restrictions, *see, e.g.*, *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489 (W.D. Pa. 2021); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 994 (W.D. Wash. 2020) (vacated and remanded); *NRA v. BATFE*, 700 F.3d 185, 206 (5th Cir. 2012) (abrogated on other grounds), while some courts did not, *see Hirschfeld v. BAFTE*, 5 F.4th 407, 416 (4th Cir. 2021) (vacated as moot).

However, the Tenth Circuit has stated it is "bound" to apply the *Heller* carve-outs when deciding Second Amendment's scope. *Bonidy*, 790 F.3d at 1125. The repeated use of the same language in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) demonstrates that courts cannot disregard *Heller*'s carve-outs. *Bonidy*, 790 F.3d at 1125. *Bruen* did not change this directive. *See Bruen*, 142 S. Ct. at 2133 (discussing "longstanding" restrictions in "sensitive places"). Instead, three of the five justices who joined the *Bruen* decision—a plurality of the majority—issued separate concurrences reemphasizing the importance of these "presumptively lawful" categories. *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring). Justice Alito went as far to state that *Bruen* "decides nothing about … the requirements that must be met to buy a gun." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Plaintiffs ignore this issue entirely. The Court should not ignore the Supreme Court's repeated assurance in *Heller*, *McDonald*, and *Bruen,* or the Tenth Circuit's gloss in *Bonidy*. States have at their disposal various tools that fall outside the scope of the Second Amendment's plain text, including setting the minimum age to buy a gun.

### 3. Plaintiffs do not demonstrate that 18-to-20-year-olds were part of "the people" under the Second Amendment.

Plaintiffs also do not establish that the individual Plaintiffs fall within "the people" whom the Second Amendment protects. *See Bruen*, 142 S. Ct. at 2134. *Heller* did not clearly answer who falls within "the people" under the Second Amendment and "the question seems large and complicated." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168–69 (10th Cir. 2010). In *Huitron-Guizar*, the Tenth Circuit abstained from resolving the question, among other reasons, because a court "must" answer what the words "the people" meant by looking at the

"understanding of the age of 1787" through a "textual-historical inquiry," and the parties had not compiled a full record on that issue. *Id.* at 1169.

In this case, the record is clear that 18-to-20-year-olds were minors without full legal rights when the Second Amendment was adopted. *See* Ex. 1, Cornell Decl. at 19–23. They were considered "infants" subject to intense State regulation. *Id.* Only in the late 20th century did our Nation recognize 18-to-20-year-olds' role in the political community with First Amendment protection and the right to vote under the Twenty-Sixth Amendment. *Id* at 23–24; *Morse v. Frederick*, 551 U.S. 393, 410–11 (2007) (Thomas, J., concurring) (History "suggests that the First Amendment, as originally understood, does not protect student speech in public schools.").

Plaintiffs concede that the age of majority was 21 during the founding era. Dkt. 12 at 10. However, Plaintiffs argue, without support, that the Court must look to "the generally recognized age of majority as established in a state at the time of the Court's inquiry" rather than a textual-historical inquiry. *Id.* At the outset, Plaintiffs are wrong about Colorado law, *id.* at 10, which sets the default age of majority at 21. *See* C.R.S. § 2-4-401(6) ("'Minor' means any person who has not attained the age of twenty-one years."). Prior to this statute, Colorado used the common law age of 21 from its earliest days. *See* 1861 Colo. Terr. Sess. Laws p.35 (adopting Common Law of England). While Colorado statutes have lowered certain age-related privileges to 18, nothing prevents Colorado from using its long-held age of majority at 21 for firearm purchases.

Plaintiffs cannot have it both ways. They assert the Court must look only to the founding era when interpretating the scope of some Second Amendment words, "keep" and "bear." Dkt. 12 at 12–15. But they also insist the Court look at late-20th century interpretations to understand what is meant by "the people"—nearly 200 years after the Second Amendment was adopted—

and, as explained below, nearly 100 years after States enacted laws restricting firearm sales to 18-to-20-year-olds. The Court should instead use the "textual-historical inquiry" in both instances. *Huitron-Guizar*, 678 F.3d at 1169.

Plaintiffs rely extensively on *Fraser v. BATFE*, a recent district court case invalidating a federal age restriction. However, the *Fraser* court made the exact historical errors the Supreme Court has warned against. *See Fraser v. BATFE*, --- F. Supp. 3d ---, 2023 WL 3355339, at *11 (E.D. Va. 2023). In *Fraser*, the court declined to interpret "the people" through a textual-historical inquiry because it purportedly "would remove Second Amendment protections for vast swaths of the American population." *Id.* But this is not a result of *Heller*'s textual-historical inquiry but the *Fraser* court's decision to exclude from consideration the history after the founding era. *Id.* at 19–20. Had *Fraser* looked to the Second Amendment's understanding after the Fourteenth Amendment, as *Heller* did, it easily could have concluded that "the Second Amendment gave freed blacks the right to keep and bear arms." *Heller*, 554 U.S. at 614–26. *Fraser* reached its result through a "logical inconsistency" that did not apply the precedent of *Heller* or *Bruen*. 2023 WL 3355339, at *12 n.15. *Fraser* demonstrates an unsound method of historical inquiry that occurs when a court artificially limits what history is considered. It therefore should be rejected by this Court as a roadmap for a textual-historical analysis.

In sum, there is no dispute that 18-to-20-year-olds did not enjoy significant legal rights at the founding. To the extent Plaintiffs assert that the scope of the Second Amendment must be interpreted only on "founding-era analogues," Dkt. 12 at 15, then the individual Plaintiffs clearly fall outside of "the people" the Second Amendment protects. And, if the Court looks to

understandings of rights for 18-to-20-year-olds in the late-20th century, the Court must also look at what came first—our Nation's extensive history of age-related firearm regulations, *infra* I.B.1.

**B.   SB23-169 is consistent with this Nation's past history of firearm regulation.**

If Plaintiffs' claim survives *Bruen*'s first step, the Governor will demonstrate that SB23-169 "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The Governor does not need to point to a "dead ringer" of a law that existed at the founding. *Id*. at 2133. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Instead, the Governor's burden is to demonstrate SB23-169 has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. The Court considers whether modern and historical regulations are "relevantly similar," including across at least two metrics: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added).

**1.   This Nation has a longstanding history of placing age-restrictions on firearm purchases.**

A review of this Nation's historical regulations shows that firearm age-restrictions have always been understood as consistent with the Second Amendment. The one federal court of appeals to consider the question post-*Bruen* has already held that "the states have never been without power to regulate 18-to-20-year-olds' access to firearms." *NRA v. Bondi*, 61 F.4th 1317, 1332 (11th Cir. 2023); *see also Reese v. BAFTE,* No. 6:20-CV-01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022) (holding that "discussion of the historical record in [*NRA v. BAFTE,* 700 F.3d 185 (5th Cir. 2012)] satisfies the *Bruen* test").

i.   English common law

As *Heller* did, the Court should start its historical analysis with English common law. 554 U.S. at 592. In 18th century England, 18-to-20-year-olds were not considered full adults but "minors" and "infants." Ex. 1 at 12–13; 20. Colonial America continued to recognize that 18-to-20-year-olds lacked full legal rights and were subject to their parent's authority. *Id.* at 21. One founding era jurist wrote that "[p]ersons within the age of twenty-one, are, in the language of the law denominated infants" and could be bound by contract only for "necessaries" like food, clothing, and lodging. *Id.* at 21–22. Early American courts protected minors contracting independently from their parents by voiding contracts that went against the minor's interest. *Id.* Thus, founding era States regulated a minor's commercial relations for their own protection. It is hard to see how 18-to-20-year-olds could be understood to have an unfettered right to purchase firearms at the founding when they did not have full contractual rights. History from the time the Second Amendment was adopted supports that they did not have this right. Ex. 1 at 12; 64.

ii.   Founding era restrictions and early public colleges

"[G]un safety regulation was commonplace in the colonies" including various safety laws regulating gun storage and "who in the community had guns." *NRA*, 700 F.3d at 200. "American legislators had determined that permitting [certain] persons to keep and bear arms posed a potential danger." *Id.* As a result, "revolutionary and founding-era gun regulations" are noteworthy for "target[ing] particular groups for safety reasons." *Id.* Early examples include the disarmament of those refusing to swear an oath of allegiance to the Nation or those who participated in Shays' Rebellion. *Id.*

Colleges in the founding era likewise restricted 18-to-20-year-olds' ability to use and possess firearms. Ex. 2, Spitzer Decl. at 14. This is noteworthy because early college campuses were one of the few places in founding era society where 18-to-20-year-olds lived outside of direct parental authority. *Id.* Before the American Revolutionary War, Harvard College and Yale College, both private institutions, adopted policies that prohibited their students from possessing guns on campus. *Id.* at 15. Public colleges created after the founding quickly adopted similar provisions, including at the University systems of North Carolina (1799, 1838), Georgia (1810), Virginia (1824), College of William and Mary (Virginia, 1830), the College of New Jersey (1871), the University of Mississippi (1878), and the University of Kentucky (1890-1891). *Id.* Some of these restrictions, like at the University of Georgia, appear to have also prohibited possession off campus. *Id.* Appx. C (prohibiting "any gun [or] pistol … in College or elsewhere"). Thomas Jefferson and James Madison were part of the Board of Visitors at the University of Virginia that adopted the policy that "[n]o Student shall, within the precincts of the University … keep or use weapons or arms of any kind, or gunpowder." *Id.* Early public college prohibitions show that our Nation already had a tradition of restricting firearms to 18-to-20-year-olds shortly after the Second Amendment's adoption, especially when unsupervised by a parent.

### iii.  Founding era militias

Plaintiffs place great emphasis on militia service during the founding era. *See* Dkt. 12 at 5-8. But the government's burden at *Bruen*'s second step is not to show 18-to-20-year-olds *never* had access to firearms in this Nation's history. Instead, the government must point to "a well-established and representative historical analogue" where the State imposed "a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Past militia service also does not demonstrate that the Second Amendment prohibited State regulation of firearm *purchase*s by minors for personal use. Plaintiffs conflate the legal *obligations* the States placed on minors with an understanding of their constitutional *rights* against government regulation. *See Bondi*, 61 F.4[th] at 1331–32 ("the historical record shows that merely being part of the militia did not entitle 18-to-10-year-olds to enjoy the same political and civil rights as adults."); Ex. 1 at 37–41. This distinction was also understood by the courts of the day. *United States v. Bainbridge*, 24 F. Cas. 946, 950 (C.C. D. Mass. 1816) (Story, J.) (U.S. Constitution grants "power to enlist minors in naval service" in derogation of common law parental rights). Militia obligations instead demonstrate the extensive control that States had over 18-to-20-year-olds in early America. Ex. 1 at 34–37. States imposed fines and punishments on those who failed to muster. *Id.* The also specified the type of firearms required for militia service and made the weapons subject to inspection. *Id.* The State's broad police power to compel military service cannot be understood to create a restriction on a State's police power today.

Minors participating in militias also did so under the supervision of parents and other adults. Ex. 1 at 25-27. Militia law often required the minor's parent to supply the firearm, including in Delaware, (1785); New Hampshire (1792); Massachusetts (1793); Vermont (1797); and North Carolina (1806). Ex. 1 at 37, Table 1. Militia members were subject to disciplinary order and possessed firearms in the coordinated and rigorous military service, distinct from everyday civilian life. *Id.* at 36. Early militia service does not support that minors had rights to purchase firearms. They show States conscripted minors for State purposes.

iv.  Pre-Civil War restrictions

Cities and States also adopted restrictions on the use of firearms by minors shortly after the founding. In 1803, the City of New York prohibited the fire or discharge of any gun or pistol and made parents responsible for any unlawful discharge by a minor. Ex. 2 at 7-8. Similar restrictions were adopted by cities in Delaware (1812), South Carolina (1817), Connecticut (1835), and Kentucky (1853, 1859, 1860). *Id.* at 8. The three Kentucky laws prohibited sales of pistols and gunpowder to a minor. *Id.* at 8–9.

In 1856, Alabama prohibited "anyone who shall sell or give or lend" a pistol to a minor statewide. *Id.* at 9. Two years later, in 1858, Tennessee enacted a similar law prohibiting selling, giving, or lending to a minor a pistol, fighting knife or "like dangerous weapon." *Id.* In both States, the age of majority was 21. *Bondi*, 61 F.4 at 1326.

v.  Post-Civil War restrictions

Numerous States adopted restrictions like Alabama and Tennessee after the Civil War. Ex. 2 at 9. From 1855 to 1900, 18 States and the District of Columbia adopted laws regulating firearm sales to those under 21-years-old. Ex. 5 ("State Historical Analogues for Restrictions on 18-to-20-year-old Firearm Sales"). By the early-20th century, some 45 States had enacted nearly 100 State laws restricting the sale of firearms to minors. Ex. 2 at 9–10.

These State laws varied, but generally prohibited gun transfers (through commercial sales or otherwise) to minors, especially pistols along with other dangerous weapons. *Id.* at 10. For example, Missouri's law made it unlawful to, without the parent's consent, "directly or indirectly sell or deliver, loan or barter to any minor" weapons, defined as "any kind of fire arms, bowie knife, dagger, slung-shot, or other deadly weapon." *Id.* Appx. A at 17–18. The specific age limit

varied with each State law, although 21 was the most widely used age of majority. Ex. 2 at 10. And consistent with earlier understandings, many of these statutes accounted for parental supervision. For example, Texas made it unlawful for anyone to "knowingly sell, give or barter … to any minor, any pistol" or other types of weapons "without the written consent of the parent or guardian." *Id.* Appx. A at 30.

The public's understanding on age-restrictions was also reflected in the contemporaneous legal commentary of the time. *See Bruen*, 142 S. Ct. at 2128 (discussing use of post-ratification history). Thomas Cooley—a 19th century scholar whose "massively popular 1868 Treatise on Constitutional Limitations" was cited favorably in *Heller*, 554 U.S. at 616–17—wrote in the same work that "the State may prohibit the sale of arms to minors" under the State's police power. Thomas M. Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883).

There is only one known contemporary challenge to this wave of age-restriction laws in the mid- and late- 19th century, a fact which itself "suggests that the public understanding at the time of the ratification considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330. The previously mentioned *Callicutt* case in Tennessee rejected a Second Amendment challenge brought by a defendant charged with selling a pistol to a minor. 69 Tenn. 714. The minor was likely 18-to-20-years-old, as the court suggested the minor was "subject to military duty." *Id.* at 716. The court rejected that the right to keep arms "implies the right to buy or otherwise acquire" a pistol by a minor. *Id.* The court "regard[ed] the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.* at 716–17.

vi.  <u>Colorado's SB23-169</u>

With this survey of our Nation's tradition of age-related restrictions, the Court should hold that SB23-169 is "relevantly similar." *Bruen*, 142 S. Ct. at 2132. It has close "representative analogues," *id.* at 2133, in the laws restricting sales of firearms to 18-to-20-year-olds adopted by 18 States and D.C. prior to 1900. Ex. 5. By the early 20th-century, 46 States had placed some age restriction on firearms. Ex. 2 at 9–10. These laws were "well-established," not "localized restrictions" or "outliers." *Bruen*, 142 S. Ct. at 2133; 2153–54.

These laws also did not contradict earlier public understandings. *See id.* at 2154. They were consistent with and merely codified early safety restrictions at public colleges and an English common law tradition regulating 18-to-20-year-olds' conduct. These 19th century laws also emerged due to dramatic societal changes, unprecedented violence, and evolution in firearm technology, manufacturing, and distribution. *See* Ex. 3, Rivas Decl. at 4; Ex. 1 at 43–54; Ex. 2 at 12–14. States adopted laws to protect minors from these deadlier and more accessible weapons. Ex. 3 at 15–28. Our understanding of the Second Amendment did not change, rather 19th century States had a greater need to use their longstanding power to set a minimum age for firearm sales.

The "how and why" of these historical laws closely mirror the "how and why" of SB23-169. *Bruen*, 142 S. Ct. at 2133. With respect to the "how," SB23-169 does not burden the right of armed self-defense any more than these historical regulations. Like 19th century regulations, SB23-169 primarily acts on gun dealers by making it unlawful to sell firearms to those under 21. Some historical regulations were more burdensome than SB23-169, prohibiting any transfer of the weapon to a minor. That these historical regulations often restricted the transfer (not just sale) of handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—further

underscores the burden that was historically accepted on an 18-to-20-year-olds' firearm access. Other past State laws permitted the transfer of firearms with the parent's consent, much like SB23-169's exception for the acquisition of a firearm through an intrafamilial transfer. And while historical regulations varied in their age limit, 21 was the most common age used as the qualification to purchase firearms. These laws are a close "historical *twin*" for SB23-169, more than "analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133; *see Bondi*, 61 F.4[th] at 1131 (upholding Florida law based on same analogues); Ex. 5. They show it was well understood in our Nation's history that governments could use their police power to restrict sales of firearms to 18-to-20-year-olds.

With respect to the "why," SB23-169 was adopted for the same reasons as these historical analogues—public safety. As these historical regulations show, our Nation understood that the ends of public safety "justified" age-related sales restrictions, *id.*, even if these laws placed some burden on a right to self-defense. *See* Ex. 3 at 24–28.

SB23-169 is also consistent with early founding era understandings that limited guns among people who posed a public danger to society. *See NRA*, 700 F.3d at 200. Our understanding of human brain development has changed over the last two decades. Ex. 4, Steinberg Decl. at 7–8. Modern neuroscience now accepts that the brain is still maturing until at least age 21. *Id*. 18-to-20-year-olds are more like younger teens neurobiologically than adults. *Id.* They engage in riskier and impulsive behavior. *Id.* When mixed with firearms, this behavior leads to tragic outcomes. Suicidal ideation and attempted suicide are higher during this period of life, and firearms are used in more than half of all suicide attempts. *Id.* at 16-17. Data also indicates that violent crime peaks during this time of life and 18-to-20-year-olds are more likely

to use weapons to commit crimes than older adults. *Id.* at 17. Colorado can adopt a new minimum age for firearm purchases based on a modern understanding of adolescent brain development. Doing so does not upset the Second Amendment and is consistent with other longstanding safety measures. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J. dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns" for the public good.).

Plaintiffs also claim that the Second Amendment's lack of an express age limitation prohibits the States from adopting one. Dkt. 12 at 9–10. This argument misstates how our federal system works and the dissenting opinion it cites. Under the Tenth Amendment, "the States can exercise all powers that the Constitution does not withhold from them." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 848 (1995) (Thomas J., dissenting). Thus, we are told not "to read constitutional provisions to preclude state power by negative implication." *Id.* at 870. Instead, in the absence of any express age restriction, the Constitution leaves to the States the power to set the appropriate minimum age for firearm purchases. SB23-169 does just that by relying on modern understandings of 18-to-20-year-old brain development. *See* Ex. 4 at 18–20.

In short, Plaintiffs are not *substantially* likely to succeed on the merits. Even if Plaintiffs could show their conduct is covered by the Second Amendment's text, SB23-169 does not violate it. SB23-169 is consistent with our Nation's historical tradition of firearm regulation.

### 2. Mid- to late-19th Century history "is relevant" to understanding the Second Amendment's scope.

The Court should also reject Plaintiffs' request to limit what history and traditions may be considered in defining the Second Amendment's scope. Likely because mid- to late-19th century

firearm regulations are so analogous to SB23-169, Plaintiffs argue courts should treat this history as "not relevant." Dkt. 12 at 12–15. Plaintiffs are wrong for three reasons.

    *First*, *Heller* and *Bruen* do not command a court to ignore 19th century history. *Heller* looked to how the text was "interpreted from immediately after its ratification through the end of the 19th century." 554 U.S. at 605. To "determine *the public understanding*," *Heller* found post-ratification history "a critical tool of constitutional interpretation." *Id. Heller* cited late 19th century legal sources for support, including the same legal jurist who wrote that States may regulate sales to minors. *See Id.* at 616–17; *supra* at 18. *Bruen* ultimately declined to decide the issue. *Bruen* chose not to adopt a rule concerning whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified." 142 S. Ct. at 2138. *Bruen* found that unnecessary because it determined the "public understanding of … public carry" was the same in 1791 and 1868. *Id.* What *Bruen* cautioned against is using "late-19-century evidence … when it *contradicts* earlier evidence." *Id.* at 2154 (citing *Heller*, 554 U.S. at 614) (emphasis added).[4]

    *Second*, and with that in mind, Plaintiffs have not demonstrated that age-based restrictions adopted in the late 19th century *contradict* an early understanding. *Fraser* erred for the same reason by failing to consider whether late-19th century laws were consistent with evidence from the founding era. 2023 WL 3355339, at *21. The history should therefore be reviewed and considered. As described above, these 19th century laws were *consistent* with what

---

[4] *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), cited by Plaintiffs, merely makes this same point. The Court disregarded 19th century laws prohibiting state support for religious schools when those laws were inconsistent with founding-era laws that provided such support. 140 S. Ct. at 2258. The holding in *Espinoza* simply does not support Plaintiffs' sweeping position that all 19th century evidence "is not relevant." *See* Dkt. 12 at 13.

came before, including the understanding in English common law on the status of 18-to-20-year-olds and early 19th century restrictions at the Nation's first colleges. *Bondi* also held the public understanding was always consistent. 61 F.4th at 1332 ("the states have never been without power to regulate 18-to-20-year-olds' access to firearms."). Thus, as in *Bruen*, the Court does not need to resolve whether the public understandings from the founding or the Fourteenth Amendment control. The Second Amendment's scope and the States' power were the same in 1791 as they were in 1868 or 2023. *See Reese*, 2022 WL 17859138, at * 10 (firearm age-restrictions are consistent because "the Founders likely would not have been of the opinion that [18-to-20-year-olds] enjoy the full scope of rights encompassed in the Second Amendment.").

     *Third*, Plaintiffs' position is hard to square with actual history. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 142 S. Ct. at 2136, and States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," *id.* at 2137. In 1791, the land now known as Colorado was not part of the United States. Colorado gained its sovereignty as a State eight years *after* the Fourteenth Amendment was adopted, and after several other States had already passed laws restricting firearm sales to minors. The popular understanding of the Second Amendment from this time period is certainly relevant to understanding the scope of the right.

## II.    Plaintiffs have not shown that they will suffer an irreparable injury.

     Plaintiffs' Motion for a pre-enforcement injunction also fails because they have not shown any irreparable injury. Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *N.M. Dep't of Game & Fish v. U.S.*, 854 F.3d 1236, 1249 (10th Cir. 2017) (quotation omitted). "To constitute irreparable harm, an injury must be certain,

great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Moreover, Plaintiffs must show that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quotations omitted).

Plaintiffs assert that the "showing of the infringement of a constitutional right" necessarily satisfies Plaintiffs' burden "of showing irreparable injury." Dkt. 12 at 16. However, Plaintiffs must first make it "clear [] that [constitutional] interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiffs have not shown SB23-169 currently impairs their right to keep and bear arms. SB23-169 does not become effective until August 8, 2023. The individual Plaintiffs both declared on June 2, 2023, that they had "a present intention and desire to lawfully purchase a firearm." Dkt. 12-2, ¶ 2; Dkt. 12-3, ¶ 2. SB23-169 is not currently preventing Plaintiffs from following through on that intention. In the absence of injunctive relief, Plaintiffs still have over a month to purchase a firearm. Nor would an injunction in this case change federal law, which prohibits the commercial sale of handguns to those under 21. *See* 18 U.S.C. § 922(b)(1). Once effective, SB23-169 does nothing to prevent Plaintiffs' *possession* or *use* of firearms they may purchase before the law's effective date. Plaintiffs therefore face no actual, great, or imminent injury from SB23-169 that would justify a clear and present need for preliminary relief.

## III.   The balance of the equities and public interest weigh heavily in Colorado's favor and against Plaintiffs.

Plaintiffs have not shown that the balance of equites and public interest weigh in their favor. Plaintiffs' requested pre-enforcement relief would enjoin Colorado from enforcing a law enacted by its elected representatives and aimed at addressing an unprecedent rise in gun

24

violence, teen suicide, and mass shootings. *See generally Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). By enacting SB23-169, Colorado's General Assembly determined it would serve the public interest and promote public safety if the minimum age to purchase firearms was raised to 21. Risk taking peaks in the late teens and early 20s because the human brain is still developing before 21. Ex. 4 at 17. Unchecked firearm purchases by this group can threaten public safety. Coloradans will be harmed by an injunction that delays enforcement of SB23-169 while this litigation is pending.

On the other side, Plaintiffs have not shown their interests should outweigh Colorado's public interest. Plaintiffs are not substantially likely to succeed on their claim and have not demonstrated that their interests are covered by the Second Amendment's plain text. Moreover, Plaintiffs have a clear method of mitigating any alleged injury during the pendency of this litigation by purchasing the firearms they intend to acquire before August 8, 2023.

## CONCLUSION

The Court should deny Plaintiff's Motion for Preliminary Injunction.

Dated: June 29, 2023

PHILIP J. WEISER
Attorney General

*s/ Matthew J. Worthington*
*Grant T. Sullivan*, Assistant Solicitor General*
*Michael Kotlarczyk,* Senior Assistant Attorney General*
*Matthew J. Worthington*, Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov; matt.worthington@coag.gov
*Attorneys for Defendant Governor Jared Polis*
*Counsel of Record

25

## CERTIFICATE OF SERVICE

   I hereby certify that on June 29, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

*s/ Carmen Van Pelt*
Carmen Van Pelt
