IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

    Defendant.

---

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

**I.    Plaintiffs' Conduct is Covered by the Plain Text of the Second Amendment**

The State argues for the implausible proposition that the Second Amendment's plain text does not extend to the acquisition of firearms. Resp. 7. This is not correct. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to keep and bear arms obviously implies the right to acquire them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."), *quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).

1

## II.     "Obliterate" and "Infringe" Do Not Mean the Same Thing

The State argues that Plaintiffs' Second Amendment rights have not been infringed because it has not completely foreclosed their access to arms. Resp. 8. The point of the State's argument seems to be that unless it completely obliterates a person's Second Amendment rights, it has not even infringed on those rights. This is not correct. *Bruen* did not require a law to completely obliterate a Second Amendment right to implicate the text. Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S Ct. 2111, 2134 (2022). Thus, even though New York did not completely bar the practice but instead subjected it to a discretionary licensing regime, the text was nevertheless implicated. In this case, the State has not completely barred all avenues for acquisition of firearms by 18-20-year-olds, only the most important one – purchase from a commercial gun seller. This burden on their right to keep and bear arms certainly implicates the text of the Second Amendment. *Cf. D.C. v. Heller*, 554 U.S. 570, 629 (2008) (leaving options open in one area "is no answer" to closing them in another).

## III.    Regulating Commercial Sales is Not the Same as Banning Purchases by Certain People

The State argues SB23-169 is "presumptively lawful" because it imposes "conditions and qualifications on the commercial sale of arms." Resp. 9, *quoting District of Columbia v. Heller*, 554 U.S. 570, 626–27, n.26 (2008). *Heller's* "presumptively lawful" language must, however, be read in light of *Bruen*, which

2

clarifies the test for assessing all Second Amendment claims. No part of that test involves presuming lawfulness. *See Bruen*, 142 S. Ct. at 2126, 2130. Instead, once the plain text is implicated, it is the Government's burden to justify the law, not Plaintiffs' to undermine it. That does not mean *Bruen* altered *Heller*. *Bruen* simply made clear that *Heller* was only stating that it presumed restrictions of the type it listed would be found lawful to some extent when the proper analysis was conducted. This does not mean the analysis need not be conducted at all.

Furthermore, SB23-169 is not only a commercial sale regulation of the sort contemplated by *Heller*. SB23-169 also makes it unlawful for 18-20-year-olds to *purchase* arms. C.R.S. §18-12-112(2)(f). As the Fourth Circuit, has noted,

> [a] condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records. . . . Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21.

*Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 34 F.4th 14 F.4th 322 (emphasis in original). Thus, the State's attempt to conflate the acquisition of an arm by a law-abiding individual with the commercial sale of an arm by a business fails.

### IV.   18-20-Year-Olds are Among "the People'

The State argues that a category of law-abiding adults may be excluded from the protections of the Constitution (Resp. 10-13). This argument fails. As the Supreme Court held in *Heller*, "the Second Amendment right is exercised individually

3

and belongs to *all Americans.*" *Id.*, 554 U.S. at 581 (emphasis added). The Court quoted with approval *Nunn v. Georgia*, 1 Ga. 243, 250 (1846), which held that "[t]he right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear *arms* of every description . . . shall not be *infringed*, curtailed, or broken in upon, in the smallest degree." *Quoted* at 554 U.S. at 612–13. In *Bruen* it was undisputed that law-abiding, adult citizens are part of "the people" whom the Second Amendment protects. *Id.*, 142 S. Ct. at 2119.

Furthermore, as noted in the opening brief, where the Constitution contemplates an age limit, it sets it forth expressly. Mot. 9-10. Thus, "the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421. And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally – the First and the Fourth Amendments – the rights extend to 18-year-olds. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). It would make no sense to interpret the phrase "the people" in the Second Amendment to have a different meaning than the identical phrase in the First and Fourth Amendments.

Importantly, the "prefatory clause" of the Second Amendment states: "[a] well regulated Militia, being necessary to the security of a free State . . . ." "Logic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577. Thus, if an individual would have been a member of the "militia," he must have been part of "the people" protected by the Second Amendment. And at the

4

Founding, the "militia" was widely understood to refer to "all able-bodied men," *id*. at 596. This included all men of at least 18 years of age. *Jones v. Bonta*, 34 F.4th 704, 718–19 & App'x 2 (9th Cir. 2022) (collecting post-ratification state militia laws), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124. Indeed, the Militia Act (subd. ch. 33 § 1, 1 Stat. 271) passed by the Second Congress just months after the Second Amendment was ratified, "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719, *quoting Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (cleaned up). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right vests by age 18. Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. There was thus a consensus in the entire Nation that by the age of 18 individuals were required (and hence entitled) to bear arms. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019). Thus, "any argument that 18-to-20-year-olds were not considered at the time of the founding to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n, Inc. v. BATFE*, ("*NRA II*") 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental).

5

## V. The State's Historical Analysis is Flawed

### A. The Unanimous Practice of the Founding Era Was to Permit 18-to- 20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans

As discussed above, in the period immediately following ratification "every state's militia law obliged" 18-to-20-year-olds "to acquire and possess firearms." *Jones*, 34 F.4th at 719. As Judge Jones explained in *NRA II*, although sixteen was the minimum age before the Constitution was ratified, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." *Id.* 714 F.3d at 340 (Jones, J., dissental) (emphasis added). After exhaustively surveying historical gun regulations related to firearm purchasing by 18-to-20-year-olds, the Fourth Circuit in *Hirschfeld* concluded that it was not until 1856 that *any* state restricted the ability of 18-to-20- year-olds to "possess or purchase weapons." *Id.*, 5 F.4th at 437.

In *Bondi*, the Court asserted that the fact that the Founding era militia acts required 18-to-20-year-olds to acquire arms does not mean they had the right to acquire arms. *Id.*, 61 F.4th at 1331. But *Bondi* turns the *Bruen* analysis on its head. Under *Bruen*, the issue for purpose of the historical analysis is whether there was any Founding era analogue that *prohibited* 18-to-20-year-olds from acquiring firearms. Because the militia acts *mandated* that all 18-to-20-year-olds acquire arms, we can know for a certain fact no such analogue existed. This means that the search for a Founding era analogue to SB 23-169 is hopeless.

6

The State points out certain historical restrictions based on minority status that were applicable to 18-to-20-year-olds in 1791, such as the right to vote. Resp. 10. But there is no justification for extending those restrictions to 18-to-20-year-olds today, because they are legal adults who have a constitutional right to vote.

The State places great emphasis on the fact that certain colleges prohibited firearms on their premises. Resp. 15, 23. Under *Bruen*, the relevant inquiry is into historical governmental regulations, not the rules of institutions, which obviously have more latitude regarding conduct on their premises than the government has in the general exercise of its police powers. Thus, these proposed regulations are not analogous because they are not regulations in the relevant sense at all. None "appears to be the product of a legislative body elected by founding-era voters." *Worth v. Harrington*, 2023 WL 2745673, at *13 (D. Minn. Mar. 31, 2023). Moreover, restrictions on students at universities are inapplicable because the basis for these restrictions (i.e., the "why" question mandated by *Bruen*) was not the authority of government to curtail the exercise of constitutional rights but the *in loco parentis* authority of schools charged with the care of their students, a concept that made particular sense at the time given the very young age of the students. *See* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1136 n.5. (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of age and younger."). In this capacity, schools could require other things of their students that would, if commanded by the

7

government outside the *in loco parentis* context, violate their constitutional rights. *See*, e.g., Chapel History, Tate Student Ctr. At Univ. of GA, https://bit.ly/3XIzv4v (last accessed July 7, 2023) (explaining that UGA chapel hosted mandatory daily religious services beginning in 1832). These rules were not targeted at students because of their age, but because they were students. "Indeed, they would not have prevented a person under the age of 21 who was not a student at one of the schools from possessing or carrying a firearm, and they undoubtedly applied with equal force to students older than 21." *Worth*, 2023 WL 2745673, at *13.

### B. Even the Nineteenth Century Precedent Advanced by the State Does Not Satisfy its Burden Under the History and Tradition Test

The unanimous practice in the Founding era was for the federal government and the states to treat 18-to-20- year-olds as having full Second Amendment rights. Later, inconsistent laws cannot overcome or alter this precedent. *Bruen*, 142 S. Ct. at 2137. *Heller's* interest in "mid- to late-19th-century commentary was secondary. *Heller* considered this evidence only after surveying what it regarded as a wealth of authority for its reading – including the text of the Second Amendment and state constitutions. In other words, this 19th-century evidence was treated as mere confirmation of what the Court thought had already been established." *Id.* (internal citations and quotation marks omitted). There is not a shred of evidence from the Founding era of any "historical analogue" that attempted to constrain 18-to-20-year-olds' exercise of their Second Amendment rights in the way SB23-169 does. Any later evidence in support of SB23-169 can only contradict this earlier evidence. Therefore,

this Court should end its analysis here with the unanimous practices of the Founding era. *Bruen*, 142 S. Ct. at 2137. But even if the much later 19th-century laws the State identifies were considered on their face, they would still be unavailing.

The State's list of purported analogues is attached as Exhibit 5 to its Response.[1] The State lists only two pre-civil war laws from Alabama and Tennessee.[2] These relatively late southern laws do not come close to establishing a national historical tradition of firearm regulations, and the fact that the State's evidence is so scanty actually supports Plaintiffs, not the State. Moreover, "[i]t would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440.

The State cites 17 post-civil war laws. But one of the laws (Nev. Rev. Stat. § 4864) did not prevent purchase of handguns at all; it merely forbade them to be carried concealed, so it did not burden the exercise of the right to the same degree as the State's total ban on sales. One law comes from Kansas (1883 Kan. Sess. Laws 159), which was singled out by *Bruen* as an example of a state that during this time "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," 142 S. Ct. at 2155. *Bruen* was also dismissive of overly restrictive firearm laws in the western territories, which "were rarely subject to

---

[1] The State also mentions certain municipal restrictions in its brief, but these should be disregarded because they were "irrelevant" to most of the country. *Bruen*, 142 S. Ct. at 2154.

[2] In its brief the State mentions a racist Kentucky statute (Resp. 17) but does not include it in its list. It is unsurprising the State excluded the statute given that it would obviously be held grossly unconstitutional today. Racist laws like this one were given no weight by *Bruen*.

judicial scrutiny" and deserving of "little weight." *Id.* at 2121. The State's Wyoming law (1890 Wyo. Sess. Laws 1253) should be disregarded for this reason. Several other laws come from states with no Second Amendment analogue and so were passed by legislatures that did not consider themselves bound to respect their citizens' right to bear arms. Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 193-204 (2006). These laws include 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; 1884 Iowa Acts 86; 1882 Md. Laws 656; 1890 La. Acts 39; 1882 W. Va. Acts 421–22; and Wisc. Rev. Stat. 4397(b). If the purpose of the historical inquiry is to determine whether a law is consistent with the "historical understanding" of the right to keep and bear arms (*Bruen*, 142 S. Ct. at 2131) laws from states that did not take that right into account can hardly be said to bear on that question at all.

That leaves just seven laws all enacted a century after the Second Amendment was ratified, in the last quarter of the nineteenth century (from 1875 in Indiana to 1897 in Texas). Of those, six explicitly singled out only "minors." D.C. (27 Stat. 116–17 (1892)); Georgia (1876 Ga. Laws 112); Mississippi (1878 Miss. Laws 175–76); Missouri (Mo. Rev. Stat. § 1274 (1883)); North Carolina (1893 N.C. Sess. Laws 468–69); and Texas (1897 Tex. Gen. Laws 221–22). And the law that did not specifically state it applied to minors (but instead referenced an age cutoff) did in fact, apply to persons considered minors. Indiana (1875 Ind. Acts 86). These laws are not appropriate analogues to SB23-169 because they are predicated on a status (legal minority) that does not apply to 18- to-20-year-olds today. This critical distinction was ignored by the Eleventh Circuit in *Bondi*, and as a result that case

10

reached the wrong conclusion about the relevance of these laws. *Bruen* requires asking both "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern comparator is "comparably justified." *Bruen*, 142 S. Ct. at 2132–33. To the extent these laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. That is no longer the case. Plaintiffs are legal adults. The State has not pointed out any law from any potentially relevant time frame that singled out the firearm rights of legal adults for special restrictions based on their being younger than other legal adults. *See* John Bouvier, 1 Institutes of American Law 148 (1851) (explaining that upon reaching the age of majority, "every man is in the full enjoyment of his civil and political rights."). Thus, these laws are not comparably justified and do not satisfy the State's burden.

### C. Cooley and *Callicutt* Do Not Save the State's Ban

The State cites a late nineteenth-century treatise which states in a footnote that a state may prohibit the sale of arms to minors. Resp. 18, *citing* Thomas M. Cooley, Treatise on Constitutional Limitations, 740 n.4. First, Plaintiffs are not minors, and Cooley's statement about minors is not applicable to them. Moreover, the authority Cooley identified in the footnote to support the statement is clearly no longer good law. Cooley cited *State v. Callicutt*, 69 Tenn. 714 (1878), a case upholding a conviction for selling pistols to minors. In reaching this conclusion, *Callicutt* cited *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198

11

(1871), both of which have been abrogated. *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" which was not adopted by the Court. *Id*. 554 U.S. at 613. *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. But *Heller* made clear that the Second Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. Thus, *Callicutt* cannot be reconciled with *Heller*. Therefore, it has nothing informative to say about the appropriate scope of the Second Amendment.

### D.     The Founders Were Familiar With Young Men

*Bruen* noted that the historical inquiry is fairly straightforward in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and a "lack of a distinctly similar historical regulation addressing that problem [provides] relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*, 142 S. Ct. at 2131. The State has singled out 18-to-20-year-olds for differential treatment from other adults because it believes they pose a "public danger" and are too young to be trusted with the right to purchase and possess a firearm. Resp. 20. Yet the Founders knew all about the foibles of 18-to-20-year-olds, but they never took any step to disarm them. Instead, they required them to possess firearms in good working order and to know how to use them so that they could be ready to serve as members of the militia if the need arose. They never enacted a single "distinctly similar" ban on their acquisition of firearms. As Judge Jones remarked in *NRA II*:

12

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment include[s] individuals eighteen to twenty[.] . . . The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.

*Id.*, 714 F.3d at 342 (Jones, J., dissental) (internal citation omitted).

In summary, this is an easy case. The only possible analogues for the State's arms ban are from too late a date to overcome the text of the Second Amendment and the unanimous practice at the Founding. And even the later laws cited by the State do not serve to establish a National tradition. Therefore, the State cannot satisfy its burden under the historical inquiry.

## VI. The Court Must Reject the State's Attempt to Inject Means-End Scrutiny Into This Case

The State argues that "modern neuroscience" has concluded it is a good idea to strip 18-to-20-year-old adults of their Second Amendment rights. Resp. 20. The State assures the Court that the means it has chosen (depriving this group of an important aspect of the right to keep and bear arms) is justified by the end its seeks to advance (increased public safety). But this Court must reject the State's attempt to sneak back in the old interest balancing emphatically rejected by *Bruen*. Indeed, *Bruen* warned inferior court to be on the lookout for interest balancing posing as historical analysis. *Id.*, 142 S. Ct. at 2133 n.7. That is exactly what the State's argument amounts to.

The State does not have carte blanche to declare groups outside the protective scope of the Second Amendment on "public safety" grounds. The fundamental holding

13

of *Bruen* is that any law that limits conduct covered by the Second Amendment will pass constitutional muster *only* if it is consistent with the Nation's historical tradition of firearms regulation. *Id.,* 142 S. Ct. at 2126. The State may not simply "posit that the regulation promotes an important interest." *Id*.

## VII.  The Other Preliminary Injunction Factors Favor Plaintiffs

The State argues that because the law is not effective until August 8, 2023, the Plaintiffs are not at this moment entitled to a preliminary injunction. Resp. 24. Plaintiffs do not disagree, as they explained in their motion (Mot. 1). Plaintiffs filed their motion prior to the effective date of the statute so that the issues would be fully briefed prior to that date so that the Court would be able to proceed in a more deliberate fashion rather than all at once on August 8. Obviously, Plaintiffs will require an injunction to vindicate their constitutional rights when the statute does become effective. The point of the State's argument is thus unclear.

Plaintiffs state that an injunction in this case would not change federal law which prohibits the sale of handguns to Plaintiffs. Resp. 24. But the federal law to which the State alludes has been declared unconstitutional. *See Fraser v. BATFE*, 2023 WL 3355339 (E.D. Va. May 10, 2023).[3]

Finally, the State makes one last run at interest balancing under the guise of its "equities" and "public interest" analysis. For the reasons set forth above, the State's interest balancing argument is no more successful in this section of its brief than it was in the earlier section.

---

[3] Moreover, the federal law which prohibits the purchase only of handguns is much narrower than Colorado's ban on the purchase of all firearms.

14

SB23-169 is an innovation. In the 147 years from August 1, 1876, to August 8, 2023, no such law has appeared in Colorado's statute books. Plaintiffs do not seek to overturn a longstanding statutory settlement. Instead, they seek to prevent a newly enacted law that infringes on their constitutional rights from becoming effective in the first place. "The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case." *Vreeland v. Huss*, 2021 WL 4544077, at *1 (10th Cir. Oct. 5, 2021), *quoting Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). Plaintiffs request the Court to ender an order maintaining that status quo while this case is pending.

## IV. Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order preliminarily enjoining SB23-169.

/s/ Barry K. Arrington
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

/s/ Barry K. Arrington
_____
Barry K. Arrington

15