IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action 23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS,
ADRIAN S. PINEDA, and
MATTHEW M. L. NEWKIRK,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs move for summary judgment. As grounds for this motion, they state:

### I. PRELIMINARY STATEMENT

This Court granted Plaintiffs' motion for preliminary injunction on August 8, 2023 [ECF 37]. The Tenth Circuit reversed the Court's order in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) ("*RMGO*"). Rulings as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court. *Fish v. Schwab*, 957 F.3d 1105, 1140 (10th Cir. 2020) (internal citations and quotation marks omitted). However, a "fully considered" appellate ruling on an issue of law made on a preliminary injunction appeal becomes the law

1

of the case for further proceedings in the trial court on remand. *Id.* (internal citations and quotation marks omitted). Plaintiffs acknowledge that the Tenth Circuit's decision in *RMGO* was "fully considered" for purposes of this rule. Accordingly, *RMGO* is law of the case on remand to this Court, and Plaintiffs concede that the relief they seek is foreclosed by *RMGO*. Nevertheless, they seek to preserve their arguments for further review. See *United States v. Herrera-Perez*, 38 F. App'x 532, 534 (10th Cir. 2002) (citing *McKnight v. Gen. Motors Corp.*, 511 U.S. 659, 660 (1994)).

Two additional circuit court opinions were issued in early 2025, and the Tenth Circuit is now in the minority of a 3-1 circuit split on the central issue in this case. In *RMGO*, the court ruled that 18-to-20-year-olds do not have Second Amendment rights. In *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583 (5th Cir. 2025) ("*Reese*"), *Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025) ("*Lara*"), and *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) ("*Worth*"), the courts ruled that they do. Plaintiffs intend to argue on appeal that the law of the case doctrine does not apply because *RMGO* was clearly erroneous, as evidenced by this circuit split. See *Fish v. Schwab*, *supra* (law of the case doctrine does not apply when prior decision is "clearly erroneous and would work a manifest injustice"). Even if a subsequent Tenth Circuit panel holds that the law of the case doctrine applies, Plaintiffs seek to preserve their augments for en banc and/or Supreme Court review. See *Herrera-Perez*, *supra*.

2

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. This case concerns Colorado Senate Bill 23-169 ("SB 23-169"). Colo. Gen. Assemb. 23-169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023).

2. Plaintiff Pineda will turn 21 in 2026. Tenth Cir. Suppl. App. [Tenth Cir. ECF 170] ¶ 2.

3. Pineda has never been charged with nor convicted of any misdemeanor or felony offense. Declaration of Adrian Pineda, ¶ 2.

4. When this case was filed it was Pineda's present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id.*

5. Pineda is precluded from purchasing a firearm by SB23-169. *Id.*

6. Plaintiff Newkirk is over 18 and will turn 21 in 2027. Declaration of Matthew M. L. Newkirk, ¶ 2.

7. Newkirk has never been charged with nor convicted of any misdemeanor or felony offense. *Id.*

8. As of January 2025, when he became a party to this case, it was Newkirk's present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in his home. *Id.*

9. Specifically, Newkirk would like to purchase a Ruger American Rifle within the next year. *Id.*, at ¶ 3. This is a bolt-action rifle chambered in 30.06, with a barrel length of 22 inches and a capacity of four rounds. *Id.*

10.     Newkirk is precluded from purchasing this or any other firearm by SB23-169. *Id.*, at ¶ 2.

11.     Defendant Jared S. Polis is the Governor of the State of Colorado. This action is brought against him in his official capacity.

12.     The Court previously found that Defendant "possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute" because "[t]he Colorado Constitution states that the 'supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.'" ECF 37, page 16 (citing *Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013) (quoting Colo. Const. Art. IV, § 2), *aff'd in part sub nom. Colo. Outfitters Ass'n*, 823 F.3d at 554-55.). The Tenth Circuit concurred with the Court's finding. *RMGO*, 121 F.4th at 111.

13.     Defendant has explicitly waived his Eleventh Amendment immunity from suit. Answer [ECF 77] ¶ 6.

14.     This Court has previously held that this waiver is effective, and the Tenth Circuit concurred. Order, ECF 37, page 16 and *RMGO*, 121 F.4th at 106.

15.     Defendant has never disavowed any intention of invoking SB 23-169 against Plaintiffs.

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

A court must grant summary judgment to a party if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### B. Permanent Injunction Standard

Plaintiffs seek a permanent injunction against the enforcement of SB 23-169. To obtain a permanent injunction, a plaintiff must show: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (internal citation and quotation marks omitted).

## IV. ARGUMENT REGARDING MERITS

### A. The Provisions of SB 23-169

SB 23-169 adds the following two provisions to C.R.S. § 18-12-112: (1) "A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age," and (2) "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm." C.R.S. §§ 18-12-112(2)(e), (2)(f). Violating either of these provisions constitutes a class 2 misdemeanor. C.R.S. § 18-12-112(9)(a). Additionally, the offender would be prohibited from possessing a firearm for two years, starting from the date of conviction. *Id*.

5

SB 23-169 adds the following two provisions to C.R.S. § 18-12-112.5: (1) "A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age," and (2) "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm." C.R.S. §§ 18-12-112.5(1)(a.3), (a.5). Transferring or selling a firearm in violation of these provisions is a class 1 misdemeanor, while purchasing a firearm in violation of these provisions is a class 2 misdemeanor. C.R.S. § 18-12-112.5(1)(b), (c).

**B.   Standing**

To establish standing at the summary judgment stage, Plaintiffs must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true. *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). And to prevail at summary judgment on standing grounds, Defendant must show that the record is devoid of evidence raising a genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing. *Day v. Bond*, 500 F.3d 1127, 1132 (10th Cir. 2007) (citations omitted).

The Tenth Circuit held that the facts previously established by Plaintiff Pineda "demonstrated by clear proof" that he has standing. *RMGO*, 121 F.4th at 112. That is the same record that is before the Court now. Therefore, *RMGO* is law of the case as to Pineda's standing. Plaintiff Newkirk has established a practically identical record regarding his standing. Thus, his standing should be upheld for the same reason as Pineda's.

## C. The *Bruen* Standard

To ascertain the constitutionality of a law burdening an individual's exercise of a right protected by the Second Amendment, the Court must apply the two-part standard set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *RMGO*, 121 F.4th at 113. At step one, Plaintiffs have the burden of establishing that the Second Amendment's plain text covers the conduct they intend to engage in. *Bruen*, 597 U.S. at 17. If plaintiffs meet their burden, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The burden then shifts to the government to justify its regulation by demonstrating that it is "consistent with the principles that underpin our" Nation's historical tradition of firearm regulation. *RMGO*, 121 F.4th at 113 (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). In other words, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U. S. at 24).

## D. The Text of the Second Amendment

The Second Amendment to the United States Constitution reads in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Thus, at step one of the *Bruen* test, Plaintiffs must demonstrate that (1) 18- to-20-year-olds fall within "the people," (2) the arms they wish to purchase constitute protected "arms," and (3) purchasing a firearm is encompassed by the right to "keep and bear" arms. *RMGO*, 121 F.4th at 114.

7

Courts' understanding of these elements is anchored to the Second Amendment's original meaning *at the time of the Founding*. *Id.* (emphasis added) (citing *D.C. v. Heller*, 554 U.S. 570, 634-35 (2008)). Therefore, the elements are given their "[n]ormal meaning ... [as] known to ordinary citizens in the founding generation." *Id.* (quoting *Heller*, 554 U.S. 576-77). *RMGO's* holding on these issues is law of the case. In her concurrence in *RMGO*, Judge McHugh relied on numerous late nineteenth- and twentieth-century regulations. The *RMGO* majority rejected this approach. 121 F.4th at 121 (concurrence's approach is "hard to square with *Bruen's* originalist underpinnings"). *RMGO's* rejection of these later laws is also law of the case.

E.  **Plaintiffs Are Part of the People**

"The people" referred to in the Second Amendment denotes a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community. *RMGO*, 121 F.4th at 114-15 (quoting *Heller*, 554 U.S. at 580). It "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* (quoting *Heller* at 580). As such, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* (quoting *Heller* at 581). Given these principles, *RMGO* held that 18- to-20-year-olds are part of "the people" for purposes of the Second Amendment. *Id.*, 121 F.4th at 116. That holding is law of the case.

8

**F.     The Lawful Firearms Plaintiffs Wish to Purchase are "Arms"**

The term "arms" within the Second Amendment encompasses "all instruments that constitute bearable arms," regardless of their existence at the time of the Founding. *RMGO*, 121 F.4th at 116 (quoting *Heller*, 554 U.S. at 581–82). Plaintiffs seek to purchase lawful firearms. UMF 4, 8, 9.[1] Lawful firearms of this type fall within the protection of the text of the Second Amendment. *RMGO*, 121 F.4th at 117. This is law of the case.

**G.     The Right to Keep and Bear Arms Includes the Right to Acquire Arms Through Purchase**

In *RMGO*, the Tenth Circuit held that while the text of the Second Amendment does not expressly state a right to purchase arms, constitutional rights may implicitly protect acts necessary to their exercise. 121 F.4th at 118. However, the court declined to decide whether the right to keep and bear arms includes a right to acquire arms. Other circuit courts have not been so reticent. See *Reese*, 127 F.4th at 590 ("the right to 'keep and bear arms' surely implies the right to purchase them"); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to possess firearms implies a corresponding right to acquire them); and *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (same).

**H.     Summary of Plain Text Analysis**

In summary, under step one of the *Bruen* test: (1) 18-to-20-year-olds fall within "the people;" (2) the firearms Plaintiffs wish to purchase constitute protected "arms;" and (3) purchasing a firearm is encompassed by the right to "keep and bear" arms.

---

[1] "UMF" refers to Plaintiffs' Undisputed Material Facts" set forth above.

Thus, Plaintiffs have met their burden to demonstrate that the plain text covers their conduct. Therefore, their conduct is presumptively protected by the Second Amendment, and the burden shifts to the government to show that its regulation is consistent with the Nation's history and tradition of firearms regulation. Plaintiffs acknowledge that *RMGO* holds otherwise. As stated above, they make these arguments to preserve them for further review.

I.   **SB 23-169 is Not Consistent With the Nation's History and Tradition of Firearms Regulation**

Last month, the Fifth Circuit upheld a Second Amendment challenge to 18 U.S.C. §§ 922(b)(1) and (c)(1), which together prohibit federal firearms licensees from selling handguns to 18-to-20-year-olds. *Reese*, 127 F.4th at 600. The Third and Eighth Circuits have also recently struck down state laws limiting the Second Amendment rights of 18-to-20-year-olds. *Lara.*, 125 F.4th at 446; *Worth*, 108 F.4th at 698. A common theme running through all of these cases is that laws limiting the Second Amendment rights of 18-to-20-year-olds are not consistent with the Nation's history and tradition of firearms regulation.

At the Founding, "the 'militia' in colonial America consisted of a subset of 'the people' – those who were male, able bodied, and within a certain age range." *Reese*, 127 F.4th 583 (quoting *Heller*, at 580, 595–97); The Federalist No. 46, pp. 329, 334 (B. Wright ed. 1961) (J. Madison) ("near half a million of citizens with arms in their hands"); Letter to Destutt de Tracy (Jan. 26, 1811), in *The Portable Thomas Jefferson* 520, 524 (M. Peterson ed. 1975) ("the militia of the State, that is to say, of every man in it able to bear arms")). Article I gives Congress the power to call forth the Militia.

10

U.S. Const. art. I, § 8, cl. 15. Militiamen were expected to appear bearing arms supplied by themselves and of the kind in common use at the time. *United States v. Miller*, 307 U.S. 174, 179 (1939). The Second Congress enacted the Militia Act of 1792, which stated, in part:

> That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein excepted) shall severally and respectively be enrolled in the militia .... That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, ... [and] a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock; ... or with a good rifle, ... [and] twenty balls suited to the bore of his rifle ....

Act of May 8, 1792, 1 Stat. 271, 271.

Thus, the 1792 Militia Act required eighteen-year-olds to enroll in the militia, and militia members were required to furnish their own weapons. *Reese*, 127 F.4th at 596. Certainly, therefore, eighteen-year-olds must have been allowed to keep firearms for personal use and were within the core rights-holders at the founding. *Id.* (internal citations and quotation marks omitted). To satisfy its burden, the government must, therefore, overcome this clear and germane evidence that 18-to-20-year-olds enjoyed the same Second Amendment rights as their twenty-one-year-old peers at the Founding. *Id.* In *Lara*, the court reached a similar conclusion, stating: "Still, the Second Militia Act is good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed, especially considering that the [government] *cannot point to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns.*" *Id.*, 125 F.4th at 444 (emphasis added).

11

The government has not come remotely close to overcoming the evidence of the Militia Act. The historical inquiry contemplates that a court will ascertain whether a modern law is "relevantly similar" to laws that our tradition is understood to permit. *Rahimi*, 602 U.S. at 692. The "why and how" the historical regulation burdens the right are central to this inquiry. *Id*. As *Lara* noted, there is not a single founding-era statute of general applicability imposing restrictions on the freedom of 18-to-20-year-olds to carry guns. 125 F.4th at 444. Resolutions passed in 1810 and 1824, respectively, prohibiting firearm possession by public university students at the Universities of Georgia and Virginia are too different in both the "how" and the "why" to establish compelling historical analogs for modern restrictions. *Reese*, 127 F.4th at 596. Actions taken *in loco parentis* say little about the general scope of constitutional rights and protections. *Id*.

The government has previously argued that 18-to-20-year-olds may be stripped of their Second Amendment rights because, as a category, they present a special danger of misuse. This argument is foreclosed by *Rahimi*, which held that historical laws disarming certain persons "appl[y] *only* once a court has found that *the defendant* 'represents a credible threat to the physical safety' of another." *Reese*, 127 F.4th at 597-98 (emphasis in original) (citing *Rahimi*, 602 U.S. at 699). SB 23-169 requires no judicial determination of whether a particular defendant likely would threaten or had threatened another with a weapon. *Rahimi* expressly rejected the contention that, under its historical analysis, a person may be disarmed simply

12

because he is not "responsible." *Reese*, 127 F.4th at 598 (citing *Rahimi*, 602 U.S. at 701).

Moreover, contrary to the government's expression of concerns about the "irresponsibility" of those under twenty-one, in the Founding era, young individuals were expected to keep the peace rather than disturb it. *Reese*, 127 F.4th at 598. An 18-to-20-year-old man could be obliged to join the *posse comitatus*, for which the minimum age was often fifteen or sixteen,[2] and bring "such arms or weapons as they have or can provide". *Id.* (quoting David B. Kopel and Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U. L.J. 119, 534, n.235 (2018)). Instead of refusing to arm young Americans for fear of their irresponsibility, founding-era regulations affirmatively required them to *be* armed to secure public safety. *Id.* (emphasis in the original).

Twenty-two jurisdictions, including nineteen states, the District of Columbia, and two municipalities, passed laws between 1856 and 1897 that limited the Second Amendment rights of eighteen-to-twenty-year-olds. *Reece*, 127 F.4th at 599 and n.17 (collecting regulations). As noted above, there are zero analogous regulations from the Founding era, and *RMGO* limits the historical inquiry to that era. *Id.*, 121 F.4th at 121. Thus, the existence of these regulations is irrelevant to the Court's resolution of this motion. Even if *RMGO* had not expressly rejected using nineteenth and twentieth-century regulations as part of the inquiry, *Bruen* cautioned that "not all

---

[2] The issue of whether 15-to-16-year-olds have Second Amendment rights by virtue of the possibility of *posse comitatus* duty is not before the Court, and the Court need not address it. *Reese*, 127 F.4th at 598. In contrast, the evidence supporting the rights and duties of 18-to-20-year-olds is wide-reaching and compelling. *Id.*

13

history is created equal." 597 U.S. at 34. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. The history that matters most is the history surrounding the ratification of the text, and history that long postdates ratification does not serve that function. *Rahimi*, 602 U.S. at 737–38 (Barrett, J., concurring). See *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614) ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"). While nineteenth-century regulations that *confirm* the original understanding of the Constitution are relevant, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. *Bruen*, 597 U.S. at 36 (citations and internal quotation marks omitted). "[T]he scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. "The limitation of these late 19th century analogs is not in the 'how' or the 'why' of regulation, but rather that the laws were passed too late in time to outweigh the tradition of pervasively acceptable firearm ownership by eighteen-to-twenty-year-olds at the crucial period of our nation's history." *Reese*, 127 F.4th at 599 (internal citation and quotation marks omitted). See also *Lara*, 125 F.4th 441 ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"); and *Worth*, 108 F.4th at 693 (same). *RMGO* was

14

undoubtedly correct when it excluded these later-in-time regulations from its analysis.

Finally, the government has argued that 18-to-20-year-olds do not have Second Amendment rights because, for many purposes, they were considered minors in the Founding era. "This argument is incompatible with Second Amendment precedent, nonsensical when considered against the backdrop of American suffrage, and contradicted by the history of firearm use at the founding." *Lara*, 127 F.4th at 592. See also *Worth*, 108 F.4th at 690 (argument borders on the frivolous); and *Lara*, 125 F.4th at 437 (government's position is "untenable").

### J.    SB 23-169 is Not Saved as a Commercial Regulation

Plaintiffs acknowledge that *RMGO* forecloses the arguments in this section. They assert them to preserve them for further review.

The State's argument that all regulations of commercial firearms sales are exempt from the *Bruen* test surely proves too much because the argument has no limiting principle. To suggest that commercial sales are wholly exempt from the *Bruen* analytical framework proposes a world where citizens' Second Amendment right do not include the most prevalent, accessible, and safe market used to exercise the right. *Reese*, 127 F.4th at 590. The baleful implications of limiting the right in this way are obvious; "step by step, other limitations on sales could easily displace the right altogether." *Id*. Plaintiffs agree that such an approach commits a category error. *Id*., n.2. See also *Teixeira*, 873 F.3d at 688 ("if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial

15

sale of firearms, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms").

Moreover, SB23-169 is not merely a commercial regulation of the sort contemplated by *Heller*. The statute prohibits **non-commercial** as well as commercial sales. C.R.S. § 18-12-112(2)(e). More importantly, as the Fourth Circuit noted in a similar case, it is not a condition or qualification of "sale" to begin with.

> A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records. . . . Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21.

*Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), vacated as moot, 34 F.4th 14 F.4th 322 (emphasis in original) (citing *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)).

The statute is not saved by *Bruen* footnote 9 (i.e., 597 U.S. at 38, n.9). Relying on footnote 9, the government argues that it has not abused its powers by adopting a reasonable minimum age limit to ensure gun purchases only by *responsible* adult citizens. *Rahimi* expressly rejected such an analysis:

> Finally, in holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not "*responsible*." "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

16

*Id.*, 602 U.S. at 701 (internal citations omitted; emphasis added).

*Rahimi* explained that when the Court used the term "responsible" in *Bruen* it was merely describing citizens who "undoubtedly enjoy" Second Amendment rights. *Id*. It never intended to give the government a license to disarm entire categories of citizens it deems to be not "responsible." As discussed above, SB 23-169 is wholly untethered from the "dangerousness" principle set forth in *Rahimi*. The law does not require an individualized determination of dangerousness. Nor does the law apply to a category of people who pose a "special danger" to society. The overwhelming majority of people affected by SB 23-169 have committed no crime, and there is no reason to believe that any but a small fraction of them ever will. SB23-169 does not operate against presumably dangerous people. It does just the opposite. It operates against presumably law-abiding citizens.

Finally, the government's argument that SB 23-169 is a valid exercise of its police power because scientific evidence suggests that 18-to-20-year-olds are not sufficiently "responsible" to purchase firearms is pure interest-balancing of the type precluded by *Bruen*. 597 U.S. at 26. The argument also runs afoul of *Rahimi's* holding that the government may not disarm people merely because it believes they are not responsible. 602 U.S. at 701.

## V. ARGUMENT REGARDING REMAINING FACTORS

After the merits inquiry, the final three factors for issuance of a permanent injunction are: (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4)

17

the injunction, if issued, will not adversely affect the public interest. *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (internal citation and quotation marks omitted).

Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805–06 (10th Cir. 2019), citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976), and 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.). "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill." *Free the Nipple*, 916 F.3d at 806. Thus, in a constitutional case, this principle collapses the first and second injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury. *Id.*

*Free the Nipple* applied this "well-settled" rule in the Equal Protection context, but it applies in the Second Amendment context as well. In other words, if a plaintiff makes a showing of actual success on the merits of his claim that his Second Amendment rights have been infringed, that showing is sufficient to establish irreparable injury. See *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (applying the principle in Second Amendment case); and *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (same).

The third factor involves balancing whether the injury outweighs the harm that the injunction may cause the opposing party.[3] The loss of a constitutional right usually trumps any harm to the defendant. *Free the Nipple*, 916 F.3d at 806, citing Wright *et al.*, *supra*, § 2948.2 & n.10. The last factor requires that the injunction not adversely affect the public interest. It is always in the public interest to prevent the violation of a party's constitutional rights. *Free the Nipple*, 916 F.3d at 806.

The injunction factors do not formally collapse into the merits inquiry in constitutional cases. Still, as *Free the Nipple* shows, the merits factor is clearly the most important factor to be considered, and the merits determination heavily influences the remaining factors. Accord *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018) (merits is "first and most important" factor).

## VI. CONCLUSION

Plaintiffs have presented the foregoing arguments to preserve them for further review.

*/s/ Barry K. Arrington*

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

---

[3] Where the government is the opposing party, the balance-of-harms factor merges with the public interest factor. *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 843 (D. Colo. 2020), *aff'd in part, dismissed in part sub nom*. *Church v. Polis*, 2022 WL 200661 (10th Cir. Jan. 24, 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington