IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB-NRN

ROCKY MOUNTAIN GUN OWNERS,
ADRIAN S. PINEDA, and
MATTHEW M. L. NEWKIRK,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor for the State of Colorado,

    Defendant.

**THE GOVERNOR'S MOTION FOR SUMMARY JUDGMENT**

# INTRODUCTION

Guns are "the leading cause of death in Colorado among [18-to-20-year-olds]." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 128 (10th Cir. 2024) (hereinafter "*RMGO*"). In 2023, Colorado's General Assembly exercised its police power to protect the public health, safety, and welfare of Colorado citizens by enacting Senate Bill 23-169, Colo. Rev. Stat. §§ 18-12-112; 18-12-112.5 ("the Minimum Age Law"). Consistent with Colorado's long-held view that the age of 21 is the default age of majority, the law sets 21 as the minimum age for the sale of guns. Critically, the Minimum Age Law does not prohibit anyone from possessing or using guns for self-defense. Coloradans under the age of 21 may still possess guns they already own, and they may acquire guns as gifts, including from family members. And persons under the age of 21 still may purchase firearms if they are active-duty members of the military, are active-duty peace officers, or are P.O.S.T.-certified. §§ 18-12-112(2)(g)(I)-(III); 18-12-112.5(1)(a.5)(I)-(III).

What the Minimum Age Law does is recognize that dramatic changes in both firearm technology and the scientific understanding of adolescent brain development have underscored the unique threat posed by guns in the hands of 18-to-20-year-olds. By prohibiting gun dealers or private sellers from selling guns to this demographic, Colorado has aligned its laws with the longstanding recognition—dating back to the Founding—that a minor's access to firearms should be carefully regulated and overseen by their parents.

Last year, the Tenth Circuit held that the Minimum Age Law is a presumptively lawful "condition or qualification on the sale of arms," and thus "falls outside the scope of the Second Amendment's right to 'keep and bear' arms." *RMGO*, 121 F.4th at 119-20. That determination of law remains binding not only in this proceeding, but throughout the Tenth Circuit.

1

Accordingly, on remand the parties agreed to adopt the preliminary injunction record as the factual record on the merits and proceed directly to summary judgment. *See* Proposed Scheduling Order [Docket No. 71]. Now, because the Minimum Age Law does not regulate conduct that falls within the text of the Second Amendment, the Governor respectfully requests that the Court enter summary judgment in favor of the Governor.

## LEGAL STANDARD

### I. Summary judgment standard.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994) (movant's burden to show absence of dispute of material fact). After that, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518. Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23 (quotations omitted).

Because Plaintiffs bring a facial challenge, Am. Compl. [Docket No. 74], ¶¶ 1, 16, 24; Order [Docket No. 37], p 17 & n.10, they "bear a heavy burden," *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quotations omitted). A facial challenge is the "most difficult challenge to mount successfully." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting

2

*United States v. Salerno*, 481 U.S. 739, 745 (1987)). To succeed, Plaintiffs must "establish that no set of circumstances exists under which the [statute] would be valid." *Id.* (citing *Salerno*, 481 U.S. at 745). To defeat a facial challenge, the government need only demonstrate that the challenged statute "is constitutional in some of its applications." *Id*. "Facial challenges to statutes are generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the Supreme Court sparingly and only as a last resort.'" *Golan*, 609 F.3d at 1094 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). Courts "presume that a state statute is constitutional," *Eaton v. Jarvis Prods. Corp.*, 965 F.2d 922, 929 (10th Cir. 1992), so when "legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict," *Rahimi*, 602 U.S. at 701 (quoting *United States v. Hansen*, 599 U.S. 762, 781 (2023)) (brackets in original).

II.   **Second Amendment standard.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022) (Second Amendment "protect[s] an individual's right to carry a handgun for self-defense."). But "'the right secured by the Second Amendment is not unlimited'"; it is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Rahimi*, 602 U.S. at 690-91 (quoting *Heller*, 554 U.S. at 626); *accord Bruen*, 597 U.S. at 20-23 (reiterating limits of Second Amendment protections discussed in *Heller*); *Bruen*, 591 U.S. at 72 (Alito, J.,

3

concurring) (stating *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (citation omitted)).

*Bruen* detailed a two-part test to assess Second Amendment claims. *Id.* at 24. Under step one, the plaintiffs must establish that the Second Amendment's text, "as informed by history," encompasses the conduct in which they seek to engage. *Id.* at 17, 19; *accord RMGO*, 121 F.4th at 113.[1] In this case, that conduct means the purchase of firearms by persons under 21 years old. This is a "textual analysis." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-78). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, the analysis concerns the "'normal and ordinary' meaning of the Second Amendment's language" at that time, *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-78). Courts thus give the Second Amendment text its meaning as "known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576-77. If plaintiffs do not establish that the plain text covers the proposed course of conduct, the law does not infringe on the Second Amendment and the inquiry ends. *RMGO*, 121 F.4th at 114 (inquiry ends because government can regulate the conduct "without infringing upon the Second Amendment"); *accord Bruen*, 597 U.S. at 18 ("regulated activity is categorically unprotected" if it regulates activity outside the Second Amendment's scope as originally understood).

---

[1] It also asks whether the challenger is part of "the people" the Second Amendment protects and whether the item at issue is an "arm" that is in common use today for self-defense. *Bruen*, 597 U.S. at 31-32; *RMGO*, 121 F.4th at 114. Those considerations are not at issue here.

If plaintiffs satisfy their burden under step one, the burden shifts to the government in step two to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This historical inquiry involves "reasoning by analogy," *id.* at 28, specifically an assessment of "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29. Courts must ask (i) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (ii) whether it is "comparably justified." *Id.* This inquiry requires only "a historical *analogue*, not a historical *twin*" or "dead ringer." *Id.* at 30 (emphasis in original). *Bruen*'s test does not instruct the Court to independently research and examine history. Rather, the Court is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 25 n.6; *see also id.* ("In our adversarial system of adjudication, we follow the principle of party presentation." (quotation omitted)).

The Court, and individual justices, have repeatedly emphasized the "limits" of the Supreme Court's Second Amendment decisions. *Id.* at 71 (Alito, J., concurring); *id.* at 79 (Kavanaugh, J., concurring). And states retain latitude to impose reasonable regulations based on unique factors to their jurisdictions. *McDonald*, 561 U.S. at 785 ("State and local experimentation with reasonable firearms regulations will continue under the Second Amendment."); *id.* (the Second Amendment "*limits* (but by no means eliminates) [States'] ability to devise solutions to social problems that suit local needs and values") (emphasis in original).

### III. Presumptively lawful measures.

Starting in *Heller*, and again in *Bruen* and *Rahimi*, the Supreme Court has repeatedly affirmed that its Second Amendment framework should not be read to "cast doubt on

5

longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see also Rahimi*, 602 U.S. at 699; *Rahimi*, 602 U.S. at 735 (Kavanaugh, J. concurring (recognizing same); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (recognizing same); *McDonald*, 561 U.S. at 786; *accord RMGO*, 121 F.4th at 118-19 (synthesizing same and explaining that "[b]ecause the 'presumptively lawful regulatory measures' language . . . has not been abrogated, it remains good law"). On the contrary, such laws are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 n.26; *accord Rahimi*, 602 U.S. at 699.

The Tenth Circuit determined that firearms regulations that are "presumptively lawful regulatory measures" are a recognized "safe harbor" category appropriately located in *Bruen* step one. *RMGO*, 121 F.4th at 119-21. In reviewing the preliminary injunction in this case, the Tenth Circuit held that SB23-169, the Minimum Age Law, fits into the "safe harbor" for presumptively lawful measures. *RMGO*, 121 F.4th at 119-27. First, the Tenth Circuit held that the Minimum Age Law was an "age-based condition or qualification on the sale of arms . . . and, as such, falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." *Id.* at 119-120. The court held that this analysis of presumptive lawfulness occurs at *Bruen*'s first step, not the second step. *Id.* at 120. Second, it concluded that the Minimum Age Law's presumptive lawfulness was sustained because nothing in the record suggested it was being employed to "abusive ends." *Id.* at 122-23.

6

Accordingly, the Tenth Circuit held that "[l]aws or regulations imposing conditions or qualifications—such as a minimum purchase age of 21—on the commercial sale or purchase of arms, when not employed for abusive ends, remain outside the scope of the Amendment's protections under . . . *Bruen* step one." *Id.* at 128. This legal determination that the Minimum Age Law is a valid commercial regulation outside the plain text of the Second Amendment was unrelated to the procedural posture in which the question arose. On remand, it is the law of the case. *See McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000) (law of the case provides that courts should not reconsider previously decided legal rulings at subsequent stages in the same case).

## ARGUMENT

**I.   The Minimum Age Law falls outside the scope of the plain text of the Second Amendment.**

"[A]n age-based condition or qualification on the sale of arms, [like] SB23-169, . . . falls outside of the scope of the Second Amendment's right to 'keep and bear' arms" and enjoys a presumption of legality as a law imposing conditions and qualifications on the commercial sale of arms. *RMGO*, 121 F.4th at 119-20. The Minimum Age Law thus "do[es] not implicate the plain text of the Second Amendment." *Id*. at 120.

**A.   The Minimum Age Law is a presumptively lawful commercial sale regulation.**

Laws that "impos[e] conditions and qualifications on the commercial sales of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26.[2] Just last year,

---

[2] The Supreme Court has repeatedly identified a non-exhaustive list of firearms regulations as presumptively lawful, including (i) prohibitions on carrying concealed weapons, (ii) prohibitions on the possession of firearms by felons and the mentally ill, (iii) laws forbidding the carrying of

7

the Supreme Court reaffirmed the government's ability to regulate commercial activity involving firearms. *See Rahimi*, 602 U.S. at 699 (reaffirming that the "many [] prohibitions" listed in *Heller* are "presumptive lawful") (quoting *Heller*, 554 U.S. at 626-27 & n.26). This includes "'laws imposing conditions and qualifications on the commercial sale of arms' [as] presumptively constitutional." *Id*. at 735 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27); *accord Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.). And on appeal in this case, the Tenth Circuit confirmed the government "may still lawfully regulate firearms, as it has done for centuries." *RMGO*, 121 F.4th at 113 (citing *Rahimi*, 602 U.S. at 680).

The Tenth Circuit rejected the argument that commercial regulations should be assessed under *Bruen* step two, as the laws—and specifically the Minimum Age Law—apply to both sellers and purchasers alike and do not implicate the plain text of the Second Amendment. *Id*. at 120. The Tenth Circuit concluded that that safe harbor was properly addressed under step one for multiple reasons, including that (i) placing a presumption of legality for commercial regulations in step two made little sense, where on one hand the presumption would *favor* the regulation (which plaintiffs would have to disprove) but on the other hand still place the burden on the government to prove historical analogues—thus creating a confusing two-step analysis within step two, something wholly apart from *Bruen*'s explicit test, *id.* at 121; (ii) nothing in *Bruen* required assessing "regulations potentially covered by the presumption" to be analyzed under

---

firearms in sensitive places like schools and government buildings, (iv) "shall-issue" licensing regimes, and (v) laws imposing conditions and qualifications on the sale of guns. *Heller*, 554 U.S. at 626-27 & n.26; *RMGO*, 121 F.4th at 118-19 (explaining *Rahimi*, *Bruen*, and *McDonald* reaffirmed these presumptively lawful categories). Here, only the latter category is at issue.

step two, *id.*; (iii) it was "inconsistent" to make step one a textual analysis but then apply an "expansive view" under step two "to infer concomitant rights" not present in the Second Amendment's language, *id.*; and (iv) since such laws presumptively do not implicate the text of the Second Amendment they do not require further inquiry into historical analogues, *id.* at 120.

Consequently, the "most reasonable interpretation of that passage [carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *Id.* at 120 (quoting *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024)); *accord id.* at 121 ("[T]he best reading is that [the Minimum Age Law" is presumptively lawful because the aged-based condition or qualification on the conduct is proscribes falls outside the scope of the plain text of the Second Amendment."). Neither do the Supreme Court's cases discussing regulations imposing conditions and qualifications on the sale of guns require being analyzed under step two. *Id.* at 120-21. Thus, the Minimum Age Law, as a commercial sale regulation, is analyzed as a presumptively lawful regulation under step one. *Id.* at 120-21, 128.

**B. Because the Minimum Age Law is a presumptively valid commercial regulation, it does not fall under the Second Amendment's plain text.**

To prevail on the merits, Plaintiffs must establish that the Minimum Age Law falls within the plain text of the Second Amendment. This they cannot do: the Tenth Circuit explicitly held that SB23-169, the Minimum Age Law, was a presumptively lawful regulation imposing conditions and qualifications on the commercial sale of firearms; that this exception arises under *Bruen* step one; further, it held that as a presumptively lawful commercial regulation, the age-based condition or qualification falls outside the Second Amendment's plain text. *RMGO*, 121 F.4th at 120-21. It further held that the Minimum Age Law was a straightforward regulatory

9

measure enacted to ensure firearms are sold to law-abiding responsible individuals, consistent with states' long-standing authority to regulate commercial transactions. *Id*. at 122-23.

The Tenth Circuit confirmed that the Minimum Age Law neither employed "abusive ends" that would disqualify it from being presumptively lawful nor applied discretionary or subjective factors that would prevent uniform application to all potential sellers and buyers—which potentially could have triggered concerns of abuse, but that the uniform application prevented. *Id*. The court recognized that "almost all 50 states, and the District of Columbia," have a minimum age law, that the necessity of some minimum age requirement is "widely accepted," and that the age of 21 as that minimum age requirement was a proper exercise of legislative authority that was not abusive. *Id*. at 123-24.

In coming to this decision, the Tenth Circuit:

(1) noted the consensus of states not only with minimum age laws, but of the 20-or-more states with a minimum purchase age of 21, *id.* at 124;

(2) highlighted Justice Alito "strongly allud[ing] to the constitutionality of a minimum purchase age of 21" in his *Bruen* concurrence, *id.* (citing *Bruen*, 597 U.S. at 73 (Alito, J., concurring));

(3) rejected the argument that the age for purchasing firearms should mirror the minimum voting age, *id.*;

(4) recognized that "at the Founding most states set the age of majority at 21," which continued "well into the 20th century," *id.* at 124-25 (collecting authorities);

(5) relying on the Governor's undisputed scientific evidence, explained how brain maturation continues "until at least the age of 21" and that persons in their late teens and early

10

20s "are less mature than adults" in several notable areas, *id.* at 126-27 (collecting authorities); and

(6) confirmed that state legislatures "have the authority and prerogative" of setting and adjusting the age of majority as fit for the public good, *id.* at 125 (citations omitted). Given all the above, the Tenth Circuit held that the Minimum Age Law was an appropriate regulation on the commercial sale of firearms that was not being put towards abusive ends, and that the Minimum Age Law does not implicate the right to keep and bear arms under the Second Amendment. *Id*. at 127-28.

In short, "SB23-169 is presumptively lawful because the aged-based condition or qualification on the conduct it proscribes falls outside the scope of the plain text of the Second Amendment." *Id.* at 121; *id.* at 128 (as appropriate condition or qualification on commercial sale or purchase of arms, the law remained "outside the scope of the Amendment's protections"). As such, it does not burden anyone's Second Amendment rights, and Plaintiffs' challenge necessarily fails. *See id*. at 127-28. Thus, "the prohibition on conduct contained within [the Minimum Age Law] does not require [the court] to proceed beyond *Bruen* step one." *Id*. at 120.

**II.    Even assuming the Minimum Age Law falls under the Second Amendment's plain text, it still satisfies *Bruen*'s step two.**

Because the Tenth Circuit held that the Minimum Age Law does not fall within the plain text of the Second Amendment, this Court need not—and should not—proceed to the second step of the *Bruen* analysis. But if the Court does progress to step two, the unrebutted record establishes that the Minimum Age Law is consistent with a longstanding history and tradition of limiting the rights of persons under the age of 21, including their unfettered and unregulated access to firearms.

11

Under step two, the question is whether the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This involves "reasoning by analogy" to assess "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 28-29. Courts evaluate whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did and whether it is "comparably justified." *Id*. at 29. A "historical twin" or "dead ringer" is not required. *Id.* at 30. The undisputed, material facts show that the Minimum Age Law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

As the Tenth Circuit recognized, in the colonies and through the Founding the age of majority was 21; those below that legal age "were entirely subsumed under the authority of their parents (usually their fathers) or guardians," while those "between the ages of eighteen and twenty . . . were considered 'minors' or 'infants' from the time of the nation's founding up through the latter half of the twentieth century." *RMGO*, 121 F.4th at 124-25 (citations omitted); *see also* Defendant's Statement of Undisputed Material Facts ("DSUMF") ¶¶ 1-3, 5; Ex. B (Cornell Decl.) at 4, 19-23. Numerous privileges and rights were withheld from those under the age of 21, including the inability to alienate their lands, execute binding deeds, enter into legally binding contracts, or sue or be sued without a guardian. *RMGO*, 121 F.4th at 125 (citations omitted).

Consistent with this understanding of their limited rights, from the Founding through the late-19th century, states repeatedly and consistently took steps to limit access to firearms for people under the age of 21. Indeed, "gun safety regulation was commonplace in the colonies,"

12

including safety laws regulating gun storage and "who in the community had guns." *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds by Bruen*; *accord* Thomas M. Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883) ("State may prohibit the sale of arms to minors").[3]

By the early 20th century, 46 states and the District of Columbia had enacted nearly 100 state laws restricting the sale of firearms to minors. DSUMF ¶¶ 13-15; *see also* Ex. F, Historical Analogues.[4] Even colleges restricted the use and possession of firearms by 18-to-20-year-olds—notable, since college was one of the few places 18-to-20-year-olds lived free from direct parental control. DSUMF ¶¶ 6-7; Ex. C (Spitzer Decl.) at 14-17.

States continued to adopt these laws as dramatic changes in both firearm technology and societal norms led to increased gun violence involving late-adolescents. DSUMF ¶ 16. The Minimum Age Law fits neatly into this historical tradition. The Minimum Age Law also reflects recent science concerning brain development. For most of the 20th century, scientists believed

---

[3] The Supreme Court approvingly discussed Cooley's treatise in *Heller*. 554 U.S. at 616-17.

[4] For example, an 1855 Alabama law prohibited selling or giving a bowie knife, air gun, or pistol to a male minor, which meant under the age of 21; an 1856 Tennessee law prohibited selling, loaning, or giving a pistol, bowie knife, or like weapon to a minor, which meant under the age of 21, except for hunting or defense while traveling; an 1875 Indiana law prohibited selling, bartering, or giving a pistol, bowie knife, or other combat weapons to a person under 21; an 1876 Georgia law prohibited the same for minors under 21; and an 1881 Illinois law preventing the same. DSUMF ¶ 13; Ex. F at 1-3. Additional laws prohibiting the sale of guns or knives to those under the age of 21 include an 1882 Maryland law, an 1883 Kansas law, an 1884 Iowa law, an 1890 Louisiana law, an 1890 Wyoming law, an 1892 District of Columbia law, an 1893 North Carolina law, and an 1897 Texas law. DSUMF ¶ 13; Ex. F at 4-8.

Several state laws prohibited minors under the age of 21 from even carrying weapons like a pistol or revolver, including an 1881 Nevada law, an 1882 West Virginia law, an 1882 Wisconsin law, and an 1883 Missouri law. DSUMF ¶ 14; Ex F at 4-6.

13

that brain development ended during late childhood. DSUMF ¶ 18. During this time, Colorado only had restricted possession of firearms to persons under 18 years old. *See generally* § 18-12-108.5(1)(a).

But recent developments in scientific understanding have proven that key brain structures, particularly related to self-regulation, continue to develop through at least the age of 21. DSUMF ¶ 19; *see also RMGO*, 121 F.4th at 125-26 (collecting authorities). And as scientific understandings evolve, so too should laws—especially those that fall within a state's core police power to keep its citizens safe. That is exactly what the Colorado General Assembly determined: that the state's firearm laws needed updating to reflect scientific reality. That a state may have chosen a different approach, under different understandings, is not evidence that its updated tack is unconstitutional. *See Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (noting that such a "'use it or lose it' view of legislative authority" is incompatible with *Bruen*'s test).

In short, the Minimum Age Law is similar, on multiple fronts, to Founding and Reconstruction era laws and societal views on minors—including (i) viewing those under the age of 21 as minors subject to restrictions for being below the age of majority now and (ii) specific prohibitions on the sale or transfer—and even on the use or possession—of pistols, revolvers, firearms, and other dangerous weapons. These are not "outliers," and the Minimum Age Law does not contradict this Founding era or Reconstruction era understanding. *See Bruen*, 597 U.S. at 30, 65-66. Moreover, the Minimum Age Law properly reflects an evolved understanding of a minor's developing brain, including the need to protect minors from deadly weapons and to better protect state citizens. DSUMF ¶¶ 11-12, 16; Ex. C at 12-14; DSUMF ¶¶ 18-24; Ex. E (Steinberg Decl.) at 5-6, 13-20; *accord RMGO*, 121 F.4th at 126-27 (discussing evolving

14

understanding of brain development for late teens and early 20-year-olds, including increased risk-taking behaviors). Put simply, the "how and why" of the Minimum Age Law closely mirrors the "how and why" of historical laws. *Bruen*, 597 U.S. at 29; *accord Rahimi*, 602 U.S. at 750.

\* \* \*

The state of the record and of the law establishes that there is no genuine dispute as to any material fact. Moreover, Plaintiffs have not made any showing sufficient to establish the existence of any element essential to their case that the Minimum Age Law is not a valid commercial regulation or that it falls under the plain text of the Second Amendment, as required by *Bruen*, *Rahimi*, and *RMGO*. *See Celotex Corp.*, 477 U.S. at 322. Nor have Plaintiffs carried their "heavy burden," *Golan*, 609 F.3d at 1094, of establishing facial invalidity of the Minimum Age Law—particularly because, here, courts can "seek harmony, not [] manufacture conflict" when assessing the Minimum Age Law as a valid commercial regulation, *see Rahimi*, 602 U.S. at 701; *see also RMGO*, 121 F.4th at 119-27 (determining the Minimum Age Law is a valid commercial regulation that does not fall under the Second Amendment's plain text). Because Plaintiffs bear this burden of proof at trial and provide no evidence to establish these elements, this renders all other facts immaterial and compels summary judgment against Plaintiffs. *See Celotex Corp.*, 477 U.S. at 322-23; *see also* Fed. R. Civ. P. 56(a).

## CONCLUSION

The Governor is entitled to summary judgment on Plaintiffs' claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs have not developed an evidentiary record. Because of that choice, the evidentiary record developed by the Governor in this case is wholly undisputed.

15

Consistent with the Court's practice standards, the Governor includes a Statement of Undisputed Material Facts, each of which is accompanied by "a specific reference to material *in the record* which establishes that fact." Brimmer Practice Standard III.F.3.b.ii (emphasis added). But even this list is not exhaustive, because *every fact* in the evidentiary record compiled by the Governor is unrebutted by any contrary fact established by Plaintiffs.

The undisputed record shows that the Minimum Age Law is a presumptively lawful, commonsense regulation that does not trigger the Second Amendment's protections. Even if it did, it is nonetheless consistent with the nation's history and tradition of weapons regulation. Because this record is undisputed, the Court should enter summary judgment for the Governor.

1. During the colonial era, 18-to-20-year-olds lacked full legal rights and were subject to their parents' authority. Ex. B, Decl. of Saul Cornell, at 21.

2. The age of majority during the Founding era was 21. Pls.' Mot. for Prelim. Inj. [Docket No. 12] at 10; Ex. B at 4.

3. Persons aged 18-20 were considered "infants" or "minors" under the law in the Founding era. Ex. B at 19.

4. The default age for majority in Colorado has been 21 since 1861. *See* Colo. Rev. Stat. § 2-4-401(6); 1861 Colo. Terr. Sess. Laws p. 35 (adopting Common Law of England).

5. Following the American Revolution, minors enjoyed narrower contractual freedom than people over the age of 21, and were thus subject to greater state supervision in buying and selling goods. Ex. B at 22.

6. During the Founding era, many colleges restricted 18-to-20-year-olds' ability to use and possess firearms. Ex. C, Decl. of Robert Spitzer, at 14-17; *see also* Ex. C, Appx. C.

16

7. Among public universities, the state university systems of North Carolina (1799, 1838), Georgia (1810), Virginia (1824), College of Willliam and Mary (1830), the College of New Jersey/Rutgers College/Drew University (1871), the University of Mississippi (1878, 1892), and the University of Kentucky (1890-1891) all adopted strict measures against having, keeping, firing, and/or carrying weapons in the century following the Founding era. Ex. C at 15-16.

8. In early America, states exercised extensive control over persons serving in the militia. Ex. B at 34-37.

9. During the Founding era, minors serving in the militia did so under the supervision of parents and other adults. Ex. B at 25-27.

10. Militia laws at the Founding often required a minor's parent to supply the minor with a firearm. Ex. B at 37, Table 1.

11. In the late-1700s and early-1800s, many states and cities enacted laws and ordinance pertaining to minors and weapons. Ex. C at 7-9.

12. In the late-1800s, more states enacted such laws, and between 1855 and 1900, 18 states and the District of Columbia adopted laws that set 21 as the relevant age limit for possessing or purchasing firearms. Ex. C at 9-10.

13. Numerous laws prohibited the sale of guns or knives to those under the age of 21: Alabama (1855); Tennessee (1856); Indiana (1875); Georgia (1876); Illinois (1881); Maryland (1882); Kansas (1883); Iowa (1884); Louisiana (1890); Wyoming (1890); District of Columbia (1892); North Carolina (1893); and Texas (1897). Ex. F (Historical Analogues) at 1-8.

17

14. Several states even prohibited minors under the age of 21 from carrying a pistol, revolver, or other dangerous weapons. Ex. F at 4-6.

15. By the early-20th century, 46 states had enacted nearly 100 state laws restricting the sale of firearms to minors. Ex. C at 9-10.

16. These laws arose in response to dramatic societal changes, unprecedented violence, and evolutions in firearm technology, manufacturing, and distribution. Ex. D, Decl. of Brennan Rivas, at 4-14; Ex. B at 43-54; Ex. C at 12-14.

17. Although the specific age limit varied by state, 21 was the most widely used age of majority in these laws. Ex. C at 10.

18. For most of the 20th century, scientists believed that brain maturation ended during late childhood. But that conclusion began to be challenged in the late-1990s. Ex. E, Decl. of Laurence Steinberg, at 7.

19. Now, scientists understand that key brain systems and structures, especially those involved in self-regulation and higher-order cognition, continue to mature until at least the age of 21. Ex. E at 7.

20. Several aspects of brain development affecting judgment and decision-making continue at least until age 21. Ex. E at 7.

21. In many respects, including as to self-control under conditions of emotional arousal, individuals between 18 and 20 are more neurobiologically similar to younger teenagers than persons in their mid-20s. Ex. E at 8, 16.

22. Suicidal ideation and attempted suicide are higher during late-adolescence and young adulthood than any other period of life, and firearms are used in more than half of all suicide attempts. Ex. E at 17.

23. Heightened impulsivity, recklessness, susceptibility to peer influence, short-sightedness, and difficulties in self-control of late-adolescents, relative to adults, make gun-carrying among people between the ages of 18 and 20 inherently riskier than it is among people who are 21 and older. Ex. E at 6.

24. 18-to-20-year-olds are more likely than adults to focus on the potential rewards of a given decision than on potential costs, including the risks to self and others including potential punishment. Ex. E at 9-10.

Respectfully submitted: February 28, 2025

>PHILIP J. WEISER
>Attorney General
>
>*s/* Joseph G. Michaels
>JOSEPH G. MICHAELS*
>Assistant Solicitor General
>
>*s/* Peter G. Baumann
>PETER G. BAUMANN*
>Senior Assistant Attorney General
>Colorado Attorney General's Office
>1300 Broadway, 6th Floor
>Denver, Colorado 80203
>Telephone: (720) 508-6000
>Email: joseph.michaels@coag.gov
>          peter.baumann@coag.gov
>*Attorneys for Defendant Governor*
>  *Jared S. Polis*
>*Counsel of Record