# Exhibit B - Cornell Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01077-PAB

ROCKY MOUNTAIN GUN OWNERS,
TATE MOSGROVE, and
ADRIAN S. PINEDA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## DECLARATION OF SAUL CORNELL

---

    I, Saul Cornell, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

### BACKGROUND AND QUALIFICATIONS

    I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City. I have a master's degree in History and a Ph.D. in History, both from the University of Pennsylvania. In addition to teaching constitutional history at Fordham College, I teach seminars in constitutional law at Fordham Law School. I have been a Senior Visiting Research Scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. Prior to my time at Fordham University, I was a Professor of History at The Ohio State University, the Thomas Jefferson Chair at the University of Leiden in the Netherlands, and an Assistant Professor in the Departments of History at The Ohio State University and the College of William and Mary. A copy of my complete curriculum vitae (CV) is attached.

My scholarship on the Second Amendment and the history of firearms regulation has been widely cited by state and federal courts.[1] I have published two dozen articles on this topic that have appeared in leading law reviews and top peer-reviewed legal history journals.[2] I authored the chapter on the right to bear arms in the *Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]

I have given numerous invited lectures, presented papers at faculty workshops, and participated in conferences on the Second Amendment and the history of firearms regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

I have also provided expert witness testimony in both state and federal courts in firearms-related matters, including *Rocky Mountain Gun Owners v. Hickenlooper*, No. 2013-CV-33879 (Colo. Dist. Ct. 2017), *Chambers v. City of Boulder*, No. 2018-CV-30581 (Colo. Dist. Ct. 2021), *Zeleny v. Newsom*, No. 17-CV-07357-RS (TSH) (N.D. Cal. 2020); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019); *Baird v. Bonta*,

---

[1] *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 791 n.11, 796 n.16, 797-98 (9th Cir. 2021) (en banc); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1327 (S.D. Cal. 2020). For a complete list of court citations, see my attached CV.

[2] Particularly relevant publications include Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). A full list of relevant publications is also included in my CV.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn. 2021);
*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019); *Duncan v. Bonta*, No. 3:17-cv-
01017-BEN-JLB (S.D. Cal. 2017); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v.
Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE
(C.D. Cal. 2017); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal.
2021); *Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022); *Nat'l
Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v. Dykes*, No. 3:23-cv-
00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw.
2022). A list of my publications and other cases in which I have testified as an expert witness is
also included in the attached CV.

I am being compensated for services performed in the above-entitled case at an hourly rate
of $750 for reviewing materials, participating in meetings, and preparing reports, $1,000 per
hour for depositions and court appearances, and a flat per-day fee of $500 for travel. My
compensation is not in any way dependent on the outcome of this or any related proceeding, or
on the substance of my opinion.

### SUMMARY OF CONCLUSIONS

Counsel for the Defendant has asked me to provide an expert opinion on the history of
firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the
regulation of sales of and access to firearms of those below the age of 21, including those old
enough to participate in the militias. In the body of my report below, I provide evidence and
reasoning for the following opinions:

In their pleadings and preliminary injunction briefing, Plaintiffs assert an uncontroversial
fact about the history of the militia in the eighteenth century and much of the nineteenth century:
governments compelled some minors to serve in the militia and participate in related
community-based forms of law enforcement. But the fact that government forced individuals to

3

participate in the militia does not demonstrate the existence of a constitutional *right* to keep,

bear, or acquire firearms for those under the age of 21. Rather, this fact shows that governments

have imposed a constitutional duty and obligation upon generations of Americans, including

some minors, to contribute to public defense. Imposing a legal obligation on individuals does not

establish that a right existed; it demonstrates that the opposite was the case. Failure to comply

with this legal obligation resulted in punishment. Militia laws gave governments broad power

over minors, but they did not confer an individual rights claim that minors might make against

government regulation. In the Anglo-American constitutional tradition, rights and duties are

correlates, not synonyms. [4]

During the Revolutionary and Founding eras (1776–1799), minors or "infants" (those

below the age of twenty-one, which was the age of legal majority at the time) were not

independent legal actors claiming the full panoply of rights, including the right to keep and bear

arms. This was so even though militia laws obligated some minors to join the militia and perform

related activities, including participating in peacekeeping as mandated by the common law and

statutes of the era. Revolutionary-era and later Founding-era militia statutes requiring militia

service and the bearing of arms by those under the age of 21 created legal obligations or duties

that governments enforced by fines and possible imprisonment, but they did not articulate any

individual rights for infants under the age of 21 to purchase, receive transfer, or bear arms

outside of these situations.

The decision to impose duties upon members of a particular age group, those 18-20, to

serve in the militia was a policy choice made by states and the federal government; it did not

assert a fixed constitutional principle.  This fact is clear from the plain text of the Second

---

[4] Ori Herstein, "Legal Rights", The Stanford Encyclopedia of Philosophy (Spring 2023 Edition),
Edward N. Zalta & Uri Nodelman (eds.), URL =
<https://plato.stanford.edu/archives/spr2023/entries/legal-rights/>.

Amendment which originally defined the militia as "composed of the body of the people." As the debates of the First Congress make clear, Congress chose to do this so that it would retain plenary authority to decide the composition of the militia and alter it to meet the demands of the nation's defense requirements.[5] There was no constitutional requirement that any subset of the population serve in the militia. And these requirements were adjusted over time to the changing needs of the individual states and the federal government.

Firearms regulation is a core component of state police power which is central to the scheme of ordered liberty in American law.[6] Moreover, the scope of state police power is greatest when protecting the health and safety of minors. Given these facts, it is not surprising that there is a long history of state regulations targeting minors and guns. The case law *Heller* probed from antebellum America analyzed the permissible scope of firearms regulation in terms of the police power. The history of arms regulation therefore requires an understanding of the police power and its role in firearms regulation over the long arc of American history.

In her concurrence in *Bruen*, Justice Barrett discussed the lively academic debate among originalists, including Second Amendment originalists, regarding the relative weighting of historical evidence from 1791 and 1868, in ascertaining the scope of permissible regulation. Posing the issue in these terms presents a false choice. In *Heller*, Justice Scalia's majority opinion noted that "constitutional rights are enshrined with the scope they were thought to have

---

[5] Saul Cornell, A Well Regulated Militia: The Founding Fathers and the Origins of Gun Control in America (2008).

[6] On Founding era conceptions of liberty, JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." See *Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

when the people adopted them."[7] The same holds true for the police power, which is not simply inalienable, but was understood in the Founding era to be a right of the people to regulate their own internal police.  Thus, Scalia's observation holds true for both the right to bear arms and the right to regulate them consistent with the legitimate scope of the police power.  The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[8]  The phrase "internal police" had already become common, particularly in state laws establishing towns and defining the scope of their legislative authority.[9] By the early nineteenth century the term was a fixture in American law.[10] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[11] The Founding era's police right and the Marshall Court's doctrine of the police power would become fixtures in American law.

---

[7] *District of Columbia. v. Heller*, 554 U.S. 570, 684 (2008).

[8] PA. CONST. OF 1776, Ch. I, art iii.

[9] For other examples of  similar constitutional language, *see*  N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[10] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[11] 10 ENCYCLOPÆDIA AMERICANA 214 new edition (Francis Lieber ed.).

The legal concept of "police"—the power of the people, acting through government, to enact and enforce laws to protect public health, safety and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[12] By the era of the American Revolution, the concept had become foundational in Anglo-American law.[13] References to the regulation of internal police were included in many of the early state constitutions drafted after the American Revolution.[14]

By the eve of the Civil War, a strong consensus in American law had emerged on the broad scope of the police power.[15]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote that the police power:

> is not susceptible of an exact limitation but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[16]

Rather than view it as a fixed body of power, most judges in the pre-Civil War period viewed it as a reservoir from which the people could draw authority to enact laws necessary to

---

[12] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

[13] Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007).

[14] See, e.g., MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

[15] *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*, 46 U.S. 504 (1847) (License Cases); *Commonwealth v. Alger*, 61 Mass. 53 (1851); *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[16] *Thurlow v. Com. of Mass.*, 46 U.S. 504, 592 (1847).

promote the public health, welfare, and morality of society.[17] The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states and local municipalities.[18]

Given the centrality of police power jurisprudence to early American law it was only natural that early state cases adjudicating gun regulation used this framework to resolve the constitutionality of laws.[19] *State v. Reid*, a case prominently featured in *Heller*, offers a clear statement of the centrality of the police power analysis to judicial decisions regarding arms regulation.[20] The *Reid* Court observed that the state's concealed carry prohibition was not only a legitimate exercise of police power authority, it was at the very core of this power: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[21] Understanding historical state regulation of minors and firearms therefore necessitates a close examination of the history of the police power.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states, local municipalities and the federal government on federal land and buildings.[22] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only

---

[17] *Id.*

[18] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[19] *See Heller*, 554 U.S. at 629.

[20] *State v. Reid*, 1 Ala. 612 (1840).

[21] *Id.*, at 616.

[22] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

possible because Federalists offered their Anti-Federalist opponents strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[23]

The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities.  The slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[24]

The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland.*[25]  Nor was Marshall unique in highlighting the centrality of this idea to American law. [26] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety.[27]

---

[23]  Saul Cornell,  THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[24] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864,  https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[25] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[26]  In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340)  464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[27]ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man:*

Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War

era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision

that became a foundational text for lawyers, judges, and legislators looking for guidance on the

meaning and scope of the police power. Shaw described the police power in the following

manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all
> manner of wholesome and reasonable laws, statutes and ordinances, either with penalties
> or without, not repugnant to the constitution, as they shall judge to be for the good and
> welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive
> and realize the existence and sources of this power, than to mark its boundaries, or prescribe
> limits to its exercise. There are many cases in which such a power is exercised by all well-
> ordered governments, and where its fitness is so obvious, that all well regulated minds will
> regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage
> of gunpowder.[28]

The period after the Civil War, including the period after the adoption of the Fourteenth

Amendment (1868), did nothing to diminish the centrality of police power analysis to judicial

resolution of questions about the scope of regulation. As had been true in pre-Civil War

America, the states' interests in preserving the peace and in protecting minors gave them broad

authority to regulate arms. The level of state regulation intensified to respond to new and

unprecedented problems created by firearms in an increasingly urban and modern society that

lacked the community-based forms of peacekeeping and law enforcement typical of pre-

industrial and pre-modern societies. The increasingly complicated nature of American law led to

---

*The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005);
MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN
GOVERNMENT (2005); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN
GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

[28] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state
jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

new models of regulation, including more laws governing minors and their access to weapons. States and localities made expanded use of the authority they had held since the Founding to regulate firearms. States and localities adopted new administrative mechanisms, including permitting and licensing schemes, to address the continuing problems posed by firearms. Regulation and rights continued to be seen as inextricably linked with one another.

The trajectory of gun regulation continued into the next century. The most significant change in government regulation in the twentieth century was the expansion of federal regulation of inter-state commerce during the New Deal. This power enabled the federal government to enact a range of laws about the sale and transfer of firearms and further limited the ability of minors to access guns.

Across the broad arc of American history, from the from the Founding era and through the modern day, governments have regulated firearms. The scope of permissible regulation for those under the age of 21 are longstanding and firmly rooted in the American historical and legal tradition. The law has never considered minors fully independent legal actors who possessed the same rights as adults. Given this irrefutable fact, state limits on the ability of minors to acquire and use firearms is indisputably consistent with the original public understanding of the Second Amendment right and its various state analogs.

Counsel for Defendant provided me with the operative complaint in this matter, the briefs the parties filed in support of and in opposition to Plaintiffs' motion for preliminary injunction. Otherwise, my report is based on my independent research. In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions. The materials cited are a subset of the relevant materials I have consulted to understand the contours of American constitutional history.

## OPINIONS

### I.   INTRODUCTION

American law, particularly the law governing the family, derived from English common law. A central principle inherited from this common law tradition was the legal distinction between adults and "infants"; there was no legal category of "young adult" under English common law or the American law of domestic relations. Those between the ages of eighteen and twenty (and indeed all under the age of 21) were considered "minors" or "infants" from the time of the nation's founding up through the latter half of the twentieth century.[29] The proper historical framing of the issue before the Court thus should be: "Did the Second Amendment recognize a right of infants, meaning those under 21, to keep and bear arms?" The answer to that question is simple: no.

This report explains the interpretive methodology and sources necessary to understand the history of the right to keep and bear arms in the United States and American firearms regulation, and focuses additional attention on the way state, federal, and even local law regulated minors and arms. The scope of materials examined is extensive, in both chronological and substantive scope; it includes a wide variety of legal texts, from statutes, regulations, and case law to popular legal guidebooks and commentary from legal scholars.

The ability to regulate firearms and gun powder is central to the conception of ordered liberty that defined American law from its earliest days. Based on a careful review of the materials consulted in this report, I conclude that infants could not assert an independent right to purchase or own a gun outside of the context of participation in a militia in the founding era, or, indeed, for most of American history. The historical record demonstrates that infants were

---

[29] Note these two terms, "infant" and "minor," are used interchangeably throughout this report. On the role of common law in shaping American law's treatment of those below the age of majority, see T. E. James, *The Age of Majority*, 4 AM. J. LEGAL Hist. 22 (1960); Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55 (2016).

typically only entrusted with firearms when under the supervision of a parent or a guardian, or when serving in militias or other community-based peace keeping activities such as the hue and cry.

After reviewing the arguments Plaintiffs have made thus far in the case, I conclude that there is no evidence to support the claim that infants under the age of 21 had a constitutional right to keep and bear arms in the Founding era. The fact that early American militia laws imposed duties upon able-bodied males under 21—the legal age of majority at the time—to serve in militias does not demonstrate the existence of a robust or unfettered right to purchase, receive transfer of, keep, or bear arms. Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors entirely within their parents, guardians, or masters.  Thus, when properly contextualized, the available historical evidence supports just the opposite conclusion from that posed by Plaintiffs:  At the time of the Founding, and in the periods that followed, minors had no constitutional right to purchase, receive transfer of, keep, or bear arms. Many states chose as a matter of policy to require infants to participate in the militia and other law enforcement activities, but this did not instantiate a constitutional right.

Nonetheless, given the centrality of militia laws to Plaintiffs' erroneous argument about the historical Second Amendment rights of minors, this report explores the nature of such laws in considerable detail. It also offers several important but neglected contexts for understanding the history in which the militia laws were passed and implemented. Early American militia statutes reflected the importance of the militia in early America and the persistent problem states and the federal government faced in properly arming the militia. Minors did not arm themselves; they depended on parents and guardians to outfit them with the necessary arms, and in some instances depended on the state to provide arms. These arms were provided so that minors required to serve in the militia would be able to meet their legal obligations as defined by early American

13

militia statutes.  Given the legal limits on minors, the economic realities of early America, and the problems of arming the militia the Plaintiff's claim are entirely without merit and rest on a set of discredited myths about early American history.[30]

The report then surveys the considerable authority states and localities have historically exercised under their police power to regulate the ability of minors to acquire or use dangerous weapons. The exercise of that power was not static, but proved extremely flexible, allowing states and localities to craft new laws to address the shifting threats to public safety posed by the proliferation of weapons and other changes in society, including the increasing availability of deadly weapons to minors occasioned by the rise of the market economy and other changes in society such as urbanization. Finally, the report takes note of the development of modern federal firearms regulation. Firearms law's complexity has increased as society has become more complex, and modern government and the administrative state have grown to deal with these changes. This process began at the end of the nineteenth century and the pace of this transformation quickened in the twentieth century. The use of permit schemes, fees, and taxes were among the new legal tools used after the Civil War to achieve the goals of regulating arms to further the goals of ordered liberty.[31]

## II.    MATERIALS REVIEWED AND METHODOLOGIES USED

My evaluation of these legal historical materials draws on the most recent scholarship on the Second Amendment and the right to bear arms, as well as the existing case law. I employ the

---

[30] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006); Pamela Haag, GUNNING OF AMERICA : BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE. (2016).

[31]  There is a rich literature on the growth of the modern administrative state and regulation, Morton Keller, REGULATING A NEW SOCIETY PUBLIC POLICY AND SOCIAL CHANGE IN AMERICA, 1900–1933 (1996) at 160-162; Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301 (2015). Firearms regulation mirrored other forms of regulation and took advantage of these new methods and institution.

accepted historical and legal methodologies for interpreting legal sources from the Founding era

and later periods of American history, including the era of the Fourteenth Amendment's adoption

and implementation. This report analyzes the public meaning of the Second Amendment, the

Fourteenth Amendment, the various state constitutional provisions on the right to keep and bear

arms, state statutes, local ordinances, court decisions, and popular and learned legal

commentaries.[32] The goal of surveying such a wide range of sources is to ascertain the various

public understandings of how these different legal and constitutional texts were interpreted when

the Bill of Rights was ratified, when individual laws and ordinances were enacted, and when the

Fourteenth Amendment was adopted and interpreted by courts.[33]

 Historical inquiries by courts must be supplemented by careful examination of the

relevant scholarship and evidence if they are to avoid the dangers of "law office history."[34]

Courts must proceed carefully when tackling complex historical questions, particularly those that

span across more than five hundred years.[35] Avoiding the trap of "law office history" requires a

sophisticated approach to the historical record and the relevant legal sources.[36]

 Modern legal history—the methodology I use in this report—approaches the past with a

more holistic model of meaning, recognizing that legal meanings, including those relevant to

---

[32] For a discussion of the minimum standard for undergraduate history majors, see MARY LYNN RAMPOLLA, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed., 2015); MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, see THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). On the methods of originalism, see Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

[33] J.H. HEXTER, REAPPRAISALS IN HISTORY 194–45 (1961).

[34] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965).

[35] *Bruen*, 142 S. Ct. at 2130 n.6.

[36] HEXTER, REAPPRAISALS IN HISTORY 194–45.

understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, must be rigorously contextualized.[37] This approach requires analyzing more than traditional legal texts to understand the social, cultural, and intellectual contexts that shaped the law. Any effort to understand the Second Amendment and the history of gun regulation must canvass a variety of historical topics, including such diverse and distinctive sub-fields as legal history, social history, cultural history, economic history, and military history. The eminent English legal historian Frederic Maitland was one of the first modern scholars to recognize that true historical inquiry, particularly the history of the law, requires unraveling multiple webs of meaning. As Maitland sagely noted: "such is the unity of all history that anyone who endeavours to tell a piece of it must feel that his first sentence tears a seamless web."[38]

In *District of Columbia v. Heller*, and more recently in *Bruen,* the Supreme Court directed courts and litigants to look to history  when evaluating the scope of permissible regulation under the Second Amendment.[39] At the time *Heller* was decided, there was relatively little scholarship on the history of gun regulation, but in the decade since the decision was published, a burgeoning body of scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American legal tradition.[40] My report draws on this important body of

---

[37] The best illustration of this method is the three volume *Cambridge History of Law in America*. *See* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[38] Frederic William Maitland, *A Prologue to a History of English Law*, 14 L. QUARTERLY REV. 13 (1898).  For a more recent exploration of Maitland's idea of the web of meaning, see Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[39] *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[40] Cornell & DeDino, *supra* note 2; Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017). For an effort to synthesize

new scholarship and the breadth of digital sources now available to scholars in order to

understand and contextualize the rights implicated—and not implicated—in this case.

*Heller* did not undertake the arduous and laborious task of doing the historical research

necessary to understand the full scope of the legal tradition of arms regulation.  Rather, it left this

project to lower courts and future scholars. Justice Scalia's characterization of the limits of

*Heller's* foray into history in the majority opinion is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today of the full
> scope of the Second Amendment, nothing in our opinion should be taken to cast
> doubt on longstanding prohibitions on the possession of firearms by felons and
> the mentally ill, or laws forbidding the carrying of firearms in sensitive places
> such as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.[41]

*Heller* also made clear that the right to keep and bear arms was not absolute:

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the nineteenth-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose.[42]

*Heller* identified an illustrative set of examples of "presumptively lawful regulations."[43]

This list was not exhaustive, but only a sketch of the many ways guns and gunpowder have been

regulated by government, a legacy that is deeply anchored in text, history, and tradition.[44] Thus,

---

the new scholarship on regulation and apply it using *Heller's* framework, see JOSEPH BLOCHER &
DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE
FUTURE OF HELLER (2018).

[41]*Heller*, 554 U.S. at 626–27.

[42] *Id.* at 626.

[43] *Id.* at 627 n.26.

[44] *Id.* at 626.

*Heller* directed courts to look at the Founding era, antebellum America, and Reconstruction when examining the scope of the right.[45]

In *McDonald v. City of Chicago*, this analysis was refined in Justice Alito's majority opinion. In addition to discussions of the Founding period, he included references to the modern Supreme Court's substantive due process jurisprudence and its focus on the central role of historical tradition in understanding the scope of cherished rights in the American legal tradition:

> In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan* [v. *Louisiana,* 391 U. S. 145,149 (1968)], or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg,* 521 U.S. 702, 721 (1997).[46]

In *Bruen*, Justice Kavanaugh reiterated *Heller*'s centrality to the future of Second Amendment jurisprudence.[47] The dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[48]

---

[45] On the notion of constitutional modalities, and the relevance of the categories of history, text, and tradition, see P. BOBBITT, CONSTITUTIONAL INTERPRETATION (1991). Of course, other scholars may have different terminology for these modes of analysis, but these jurisprudential categories largely overlap these six forms. *E.g.*, Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189 (1987); Robert Post, *Theories of Constitutional Interpretation*, in LAW AND THE ORDER OF CULTURE 13–41 (R. Post ed., 1991).

[46] *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010).

[47] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26; *Bruen* (Kavanaugh, concurring)

[48] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the*

Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[49] The Court underscored that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

## A.    THE LEGAL STATUS OF INFANTS UNDER THE COMMON LAW: THE FOUNDING ERA AND BEYOND

The first step in evaluating the status of Second Amendment rights for those aged 18–20 and other minors in the Founding era is to consider the common law treatment of the legal capacities and rights of persons under the age of legal majority at that time. Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[50] This legal fact did not change until the latter half of the twentieth century.[51] In fact, across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in

---

*Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[49]  *Id.*

[50]  ZEPHANIAH SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).

[51]  Hamilton, *supra* note 29 at 57-8.

which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians. The power of fathers or guardian under this system of patriarchy exceeded the power of the monarch over his subjects. For example, for minors there was no right of petition or other rights enjoyed by English subjects and later by American citizens.[52] Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment. There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).[53]

In many respects, the situation of minors under 21 resembled that of married women under coverture. Under the doctrine of coverture, a married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[54] Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[55]

---

[52] Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142 (1986).

[53] John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449 (2008); ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (1987).

[54] J.H.BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed. 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate,* 26 YALE JOURNAL OF LAW AND FEMINISM 165,167 (2014).

[55] 1 William Blackstone, COMMENTARIES *442.

Indeed, an influential eighteenth-century English treatise on the law of domestic relations noted that the comparison between a femme covert and minors was frequently made by writers on the law: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[56] Given the irrefutable fact that minors were legally "disabled" in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is erroneous.

The American Revolution set in motion a process of change that republicanized the rights of minors by giving society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.[57] This change did not endow minors with full legal rights under the law, but it did diminish the near absolute power that fathers (or parents more generally) and guardians had over minors living under their authority. The term "young adult" is profoundly anachronistic; there was no legal category of "young adult" in the Founding era. Nor did such a category emerge in the next century following the adoption of the Second Amendment. In fact, the idea of a "young adult" is a very recent development in American society and law.[58]

The subject of minors' legal status was explored at considerable length by Zephaniah Swift, an esteemed Connecticut jurist in the Founding era, and author of one of the first legal treatises published after the adoption of the Constitution. Swift captured the central legal fact governing persons below the age of majority at the time of the Founding: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—

---

[56] Anon., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

[57] Jeffrey Shulman, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014).

[58] On the emergence of the category of young adult in contemporary legal theory, see Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016).

minors." Swift noted: "by common law an infant can bind himself by his contract for
necessaries, for diet, apparel, education and lodging," but little else.[59] During the decades after
the American Revolution, courts became more involved in monitoring contractual arrangements
involving minors and adopted a more aggressive role in protecting the interests of minors, even if
it meant voiding contracts. This new supervisory role narrowed the range of contractual freedom
of minors acting without consent. Thus, minors were subject to far greater state supervision than
any other legal entity involved in the marketplace during the early years of the republic.[60]

The influential early nineteenth century legal author and jurist James Kent discussed the
legal status of minors in 1836 in his influential *Commentaries on American* law: "The necessity
of guardians results from the inability of infants to take care of themselves; and this inability
continues, in contemplation of law, until the infant has attained the age of twenty-one years."[61]
When some radical Jacksonian Democrats suggested that the age of majority for voting ought to
be lowered for those who had served in the militia, leading Federalists in the New York state
constitutional convention mocked them. Federalist Elisha Williams, a delegate from Columbia
County, wondered if his democratic opponents wished to enfranchise "brave infants" by giving
them the right to vote.[62] Extending full rights to minors was literally treated as a joke by
Federalists sitting in the constitutional convention.

John Bouvier, author of the first American law dictionary, shared the views of Swift and
Kent, and his 1858 explanation of the legal significance of the age of majority followed their
lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps

---

[59] SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT, 213.

[60] HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN
REVOLUTION IN AUTHORITY (2012).

[61] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

[62] CORINNE T. FIELD, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE
FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.

universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[63] Bouvier's statement captures the widespread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full panoply of rights under American law.[64]

## B.    Constitutional Rights Claims in a Patriarchal Society

The most elemental task of the historian is to recognize anachronisms and avoid them in any analysis. Contemporary law, including attitudes towards the rights of minors are a product of the Warren Court's rights revolution, including the landmark decision of *Tinker v. Des Moines*.[65] But, the claim that minors enjoy broad rights claims, an indisputable fact about modern law, was not true in the Founding era. Justice Thomas originalist critique of *Tinker* correctly notes that minors enjoyed few rights in the Founding era.[66]

One of the most illuminating discussions of this issue occurred in an obscure case adjudicated by Justice Joseph Story while he rode circuit. Story was among the most influential early American jurist of the Marshall Court era and his conception of the status of minors offers a useful guide to modern jurists seeking to understand the original meaning of the Second Amendment, an inquiry that necessitates recovering the way the text would have been read by

---

[63] JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[64] Field, *supra* note 62.

[65] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503 (1969); Saul Cornell, "Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record, 40 Yale L. & Pol'y Rev. inter Alia 1, 22 (2021). On Tinker's significance in modern constitutional law, see *Constitutional Law Symposium: The Constitution Inside the Schoolhouse Gate--Students' Rights Thirty Years After Tinker v. Des Moines School District,* 48 DRAKE L. REV. 433 (2000).

[66] *Morse v. Frederick*, 551 U.S. 393, 418-19 (2007) (Thomas, J., dissenting).

judges in the early republic. [67] Story opined that the rights of parents and minors were entirely

within the purview of  "mere municipal rules of the state, and may be enlarged, restrained, and

limited as the wisdom or policy of the times may dictate."  Moreover, he expressly noted that

when it came to the rights of minors the state's power to define the age of majority was plenary:

> Can there be a doubt, that the state legislature can, by a new statute, declare a minor
> to be of full age, and capable of acting for himself at fourteen, instead of twenty-one
> years of age? Can it not emancipate the child altogether from the control of its
> parents? It has already, in the case of paupers, taken the custody from the parents,
> and enabled the overseers of the poor to bind out the children as apprentices, or
> servants, during their minority, without consulting the wishes of the parents.

While many modern Americans might recoil at the harshness of the Story's judgment and

its disparagement of the rights of minors,  his views reflected common assumptions at the

time that this case was decided.  Patriarchalism, not radical egalitarianism was the legal

norm during the Founding era.

### C.    Patriarchy and Rights: The Original Understanding

 It is impossible to understand the legal conception of "infant" at the time of the

enactment of the Second Amendment without recognizing the patriarchal nature of English

common law and its early American variants.[68] Johns Hopkins historian Toby Ditz summarizes

the centrality of the legal concept of patriarchy to family law and governance in the Founding

era:

> Historians have begun to use the concept "household patriarchy" to describe
> community organization in eighteenth century America. Household patriarchy
> refers to both internal and external aspects of domestic organization. It describes

---

67 *U S v. Bainbridge*, 1 Mason 71 (1816); R. KENT NEWMYER, SUPREME COURT
JUSTICE JOSEPH STORY: STATESMAN OF THE OLD REPUBLIC  (1985).

68 The absorption of the common law in America and the development of different variants of
common law in the colonies and states has generated a rich scholarly literature, for a useful
overview, see Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in
Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

authority relations in which heads, and not others within households, have the formal right to make final decisions about internal matters. Patriarchal household heads speak for their dependents in dealings with the larger world. The civic status of household dependents is an indirect or secondary one; the community reaches them primarily through the actions and voices of the heads.[69]

Individuals below the age of legal majority served in the militia, and participated in community-based efforts to keep the peace, but these public safety duties were undertaken in a supervised setting under the authority of parents, guardians, or other adults authorized under the color of law.[70] Further, the circumstances under which an infant could participate in community forms of keeping the peace were defined by the patriarchal structure of local communities and the peacekeeping mechanism instantiated by law. As Princeton historian Laura Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept was based in a long-standing, highly gendered construction of government authority, which subordinated everyone to a sovereign body, just as all individual dependents were subordinated to specific male heads of household. [71]

It is also important to understand the social history of the Founding era, particularly the way economic and social realities shaped family formation in this period. Male minors under 21 living under the authority of their fathers faced significant hurdles in establishing their own independent households. The laws governing settlement and residency for Massachusetts are revealing in this regard: they imposed an age requirement of 21, as well as a variety of different

---

[69] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820*, 47 WILLIAM & MARY Q. 235, 236 (1990).

[70] The Statute of Winchester, adopted in 1284 in the Reign of Edward I, required male members of the community between 15 and 40 to join the "hue" and "cry" and participate in community law enforcement, see 1 STATUTES OF THE REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue" and "cry" were the only means to deal with most forms of ordinary crime. See LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[71] Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-Revolutionary United States*, 1 UC IRVINE L. REV. 565, 570 (2011).

wealth requirements, to establish residency in the commonwealth.[72] Moreover, acquiring the

necessary economic resources to establish independence was increasingly difficult during the era

of the American Revolution.  Indeed, most adult men in Concord, the town virtually synonymous

with the Minuteman ideal of a well regulated militia, were forced by economic necessity to

postpone establishing their own households until their mid-twenties, a decision necessitated by

the difficulty of acquiring enough land to establish an independent farmstead. Although these

persons were no longer minors in the eyes of the law after turning 21, they still remained under

the patriarchal authority of their fathers as a practical matter in most respects until they could

leave home because of the economic realities they faced.[73]

      Community-based law enforcement also existed in a patriarchal framework. The

involvement of minors in such activities was, as Professor Edwards notes, embedded in the

patriarchal structure of local communities.[74] A popular South Carolina justice of the peace

manual published in 1788, the year the Constitution was adopted, captured the dominant view of

the era when it described the categories of person "who shall not be a constable" as including

"infants," "madmen," and "idiots."[75] The author of this popular legal guide, John Fauchereaud

---

[72] Persons residing outside of a properly governed household, i.e., a home headed by a white
male patriarch, could be banished from early New England towns, a process known as "warning
out," see  Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-
Century Massachusetts*, 62 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: LAW
IN COLONIA MASSACHUSETTS 1630–1800 152, 190 (1984).

[73] Robert A. Gross, THE MINUTEMEN AND THEIR WORLD *(*1976); Mary Babson Fuhrer,
*The Revolutionary Worlds of Lexington and Concord Compared* 85 THE NEW ENGLAND
QUARTERLY 78 (2012).

[74] Edwards, *The Peace supra* note 71.

[75] JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788).
Grimké was one of the state's most eminent lawyers and became one of its most influential
jurists.  For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*,
SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016),
https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

Grimké, was among the state's most distinguished and influential jurists. The fact that he included infants old enough to participate in the militia and local law enforcement in the same category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire arms at the time of the Founding. Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.[76]

One final body of evidence raises further doubts about the claim that Founding era Americans believed that young men below the age of majority could be trusted with firearms without proper supervision, or that they had unfettered rights to keep, bear, and acquire them: the stringent rules prohibiting firearms ownership and use enacted by colleges in the Revolutionary era. College was one of the very few circumstances where minors lived outside of their parents' or a guardians' direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of in *loco parentis*.[77]

Harvard's campus rules adopted in the era of the American Revolution prohibited guns on campus:

> XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls,

---

[76] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[77] Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform,* 44 VAND. L. REV.1135 (1991).

Yard or near the College, he shall be fined not exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence. [78]

Although Harvard was a private entity, its role in early Massachusetts society straddled the public and private spheres.[79] Other colleges in the Founding era adopted similar restrictions as Harvard. Yale College prohibited students from possessing any guns or gun powder.[80] The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus. The rule was emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[81] A similar law governed students at the University of North Carolina, another public university founded in the same period. The university prohibition was total: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a

---

[78] 31 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: COLLECTIONS 338, 358 (1935).

[79] Thus, the Massachusetts Constitution of 1780 instructed the citizenry "to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge. MASS. CONST. ch. V, § 1. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, 1780-1807) at 580. Harvard students and faculty were exempted from militia obligations but during the American Revolution Harvard College did create a militia company, *see* Conrad E. Wright, *Creating a Fellowship of Educated Men: Forming Gentleman at Pre-Revolutionary Harvard*, *in* YARDS AND GATES: GENDER IN HARVARD AND RADCLIFFE HISTORY 17–38 (Laurel Ulrich ed., 2004).

[80] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 p.26 (1800).

[81] *The Minutes of the Senate Academicus* 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976), https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf.

sword, dirk, sword-cane." [82]  College regulations from this era further demonstrate the fact that norms governing American society in the era of the Second Amendment's ratification opposed the view that unsupervised minors were to be trusted with free access to firearms.

The figure of Thomas Jefferson looms large in modern discussions about the meaning of the Second Amendment.[83]  Although Jefferson was among the Founding generation's most ardent defenders of an expansive vision of the right to keep and bear arms, even he took a dim view of allowing guns at the University of Virginia, the institution he helped found.  The rules at Mr. Jefferson's university were exceedingly strict on this point:

> No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school.[84]

The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them:  fathers, guardians, constables, justices of the peace, or militia officers.

## D.    PROTECTING ORDERED LIBERTY IN AMERICA: EARLY AMERICAN MILITIA LAWS IN HISTORICAL CONTEXT

---

[82] ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

[83] David Thomas Konig, *Thomas Jefferson's Armed Citizenry and the Republican Militia*, 1 ALB. GOV'T L. REV. 250 (2008).

[84] UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/. Jefferson and his good friend James Madison, the primary architect of the Second Amendment, attended the meeting in which this policy was adopted.

Militia acts designated a specific subset of the white male population to serve in the militia.   By including some older infants in the militia ranks, the statutes creating and regulating these militias and the concomitant duties they imposed on citizens implemented policy goals aimed at arming and expanding the ranks of able-bodied militiamen, but they did not embody or establish a constitutional *right* that might be claimed by minors outside of this very narrow context defined by the relevant statutes. Nor did these statutes alter the legal age of majority; they simply implemented a policy goal of the states and later the federal government.

Although many states chose to include minors for policy reasons, the composition of the militia was always dictated by strategic imperatives.  If a state felt it was necessary to exclude minors because of the economic burden it placed on families or because younger Americans were viewed as less effective soldiers, there was nothing to prevent a legislature from implementing such changes. Thus, New Jersey changed the legal definition of the militia in 1821: "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace."[85] Kansas excluded minors by framing its constitutional provision on the militia as follows: "The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[86] In applying a text, history, and tradition approach it is vital to distinguish between constitutional requirements and policy preferences. The Second Amendment imposes constitutional requirements but it is entirely agnostic regarding policy preferences.

---

[85] An Act to exempt minors from Militia Duty in time of peace, in Josiah Harrison, Ed., *A Compilation Of The Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820* 266 (1833). By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of satire and ridicule, see David, Tatham, *David Claypoole Johnston's Militia Muster*, 19 *AMERICAN ART JOURNAL* 4 (1987).

[86] Kan. Const. of 1859, art. 8, § 1.

Understanding original meaning requires distinguishing between the sometimes over heated political rhetoric found in newspapers and the more sober legal realities stated in laws and judicial opinions.[87]  The ideal of a broadly inclusive vision of the militia, at least as far as white males were concerned, was venerated in public orations, pamphlets, and newspaper essays, but a close look at the statutes enacted by various states and the federal government in the decades after the adoption of the Second Amendment reveals a different legal reality.[88] Instead of mandating a universal and broadly inclusive militia in the text of the Constitution, the Framers wisely chose to give Congress plenary power to define the composition of the militia. There was no textual mandate in the Constitution that compelled future generations to include minors if such a policy was deemed to be undesirable. If a particular future Congress believed that the labor of  minors were needed elsewhere or governments concluded that minors were not well suited to the military tasks required for national defense, there was no legal ground for minors to claim a right to participate in the militia or acquire the weapons needed for militia service.

The drafting history of the Second Amendment makes the distinction between constitutional law and policy clear. An early draft of the text of the amendment defined the militia as composed of the "body of the people," but this universalistic language was struck out to allow future legislatures greater flexibility in creating an effective militia.[89] Thus, as a matter

---

[87] Saul Cornell, *Reading the Constitution, 1787-91: History, Originalism, and Constitutional Meaning*, 37 Law & Hist. Rev. 821 (2019).

[88] *See* Bernard Bailyn, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (1967); J. G. A. Pocock, THE MACHIAVELLIAN MOMENT: FLORENTINE POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION (1975); Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 69 (2008); Lawrence Delbert Cress, CITIZENS IN ARMS: THE ARMY AND MILITIA IN AMERICAN SOCIETY TO THE WAR OF 1812 (1982); Noah Shusterman, IN ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

[89] Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV. 103, 108, 120-125 (2000) (notes the significance of this tension between American political

of constitutional law the composition of the militia was left to Congress to determine as it saw fit. Plaintiff's argument does not read the text of the Second Amendment, it effectively rewrites the text, reinserting language that was deliberately excised from the text.

Rhetorical praise for the militia did not mean that the members of the First Congress that drafted the Second Amendment were universally supportive of this ideal. Nor is it surprising that those most familiar with American military matters in the era of the Second Amendment, including virtually all the Federalist Founders, believed that America's heavy dependence on the militia had been a strategic mistake in the American Revolution, one that had severely hampered the struggle for independence.[90] George Washington's private correspondences contain withering comments about the inadequacy of the militia, and the necessity of creating an effective professional army. He wrote home to a cousin the following observations: "I assured [Congress] that the longer they delayed raising a standing army, the more difficult and chargeable would they find it to get one, and that, at the same time that the militia would answer no valuable purpose." The performance of the militia led Washington to lament that "the conduct of the militia, whose behavior and want of discipline has done great injury to the other troops, who never had officers, except in a few instances, worth the bread they eat."[91] When Congress finally debated the structure of the militia in the First Congress, there were deep divisions over the organization and structure of the militia. Many—particularly those who had served with Washington in the Continental Army—recognized that the militia, including the revolutionary-era militia, was never, as some pamphleteers and newspaper essayists proclaimed, an effective

rhetoric and constitutional law in the Founding era). On the distinction between legal meaning and ordinary public meaning in originalist theory, see William Baude & Stephen E. Sachs, *Grounding Originalism*, 113 NW.U.L.REV. 1455 (2019).

[90] On the importance of distinguishing between Federalist and Anti-Federalist views of the militia, see Cornell, A WELL REGULATED MILITIA, *supra* note 5, at 41-70.

[91] *From George Washington to Lund Washington, 30 September 1776*, NAT'L ARCHIVES, https://founders.archives.gov/documents/Washington/03-06-02-0341.

fighting force that included the whole body of the people in arms. Those most familiar with the militia's performance during the Revolution, Federalists, the group primarily responsible for drafting the first ten amendments, thus feared placing the future security of the nation in the hands of a universal militia. Many in the First Congress, including the many Federalists serving, shared Washington's concerns and doubted the wisdom of continuing to conceive of the militia in the expansive terms that Whig republican theory demanded—a body of independent yeoman drawn from the ranks of all able-bodied white men of the nation. Despite a close vote on the issue in Congress, the first federal militia act rejected calls to create an elite select militia, and instead carried forward the model of earlier colonial laws and defined membership in the militia broadly, but did little to guarantee that such a militia would be properly armed.[92] The debates over the future of the militia in Congress reveal a tension between the ideals espoused in popular rhetoric and the reasoned consideration of America's military leaders.

The notion that the composition of the militia, including the participation of minors, was hard wired into our constitutional order at the Founding thus is simply mistaken both as a historical matter and a matter of Founding era constitutional law. The composition of the militia was always shaped by political and military imperatives, not determined by fixed constitutional rules. To insist otherwise as plaintiffs do is contradicted by the both intention of the framers of the amendment and the clear meaning of the constitutional text of the Second Amendment. The size of the militia, its composition, and the rules for its training have never been constitutionally fixed, but have varied across American history, changing to respond to the needs of national defense.[93]

---

[92] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[93] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation. These laws imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[94] American citizens did not decide which weapons to bring to muster. Failure to acquire the officially proscribed type of weaponry could result in fines.[95] As far as the militia was concerned, all guns were not created equal in the eyes of the law. Government policy was designed to force Americans, in some cases minors under 21, to acquire the type of weapons the government deemed essential for a well regulated militia.[96]

To accomplish its policy objectives governments laid the structure and rules governing the militia in abundant detail. Militia laws were often among the longest statutes written by early American legislative bodies.[97] These laws not only prescribed the types of armaments needed to participate in the militia; they also described the range of penalties for those who did not acquire or maintain the weapons in good working order.[98] Tennessee's enforcement mechanism involved the institution of the court martial:

---

[94] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

[95] For a sampling of Founding-era militia statutes, see Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county).

[96] Sweeney, *supra* note 92.

[97] An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27-42 (1776).

[98] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2-3.

The commissioned and staff officers of the infantry are hereby required to meet at the place holding their battalion musters at eleven o'clock on the day preceding said muster armed with a rifle, musket, or shot gun and dressed in the uniform prescribed by law, for the purpose of being trained at regimental drills and the commanding or senior officer, present shall call, or cause the roll to be called, and make a return of all delinquents to the next regimental or battalion court martial.

§ 3. The regimental courts martial shall have power to fine delinquents, field or staff officers, and it shall be the duty of the commanding or senior officer present at any regimental or battalion or drill muster to make a return of all such delinquents.

Militia weapons, including the privately owned weapons used by many to meet this legal obligation, enjoyed a special constitutional status under American law, and were exempted from a variety of civil processes.  The misuse of these weapons carried stiff penalties. Connecticut's militia act levied a host of fines on those who reported to muster without arms or with arms not in good working order.

That the Fines and Penalties incurred for Non-appearance and deficiencies of Arms, Ammunition and Accoutrements shall in future be as follows. Each non-commissioned Officer, Drummer, Fifer or Trumpeter who shall neglect to appear at the Time and Place appointed for regimental or battalion exercise or review being legally warned thereto shall forfeit and pay a fine of three dollars for each days neglect and for each days neglect to appear at the time and place appointed for company Exercise or Inspection, being legally warned thereto, shall forfeit and pay a Fine of One Dollar and Fifty Cents, and each Private belonging to any Company of Militia, shall for Non-appearance on days of Regimental or Battalion Exercise or Review, being thereto legally warned, forfeit and pay a Fine of Two Dollars for each Day's neglect and for Non-appearance at Time and Place for company Exercise or Inspection he shall forfeit and pay a Fine of One Dollar for each Day's neglect; and for deficiencies of Arms, Ammunition and Accoutrements required by Law, each non-commissioned Officer and Private shall forfeit and pay for each Day of Review or Exercise the he shall be deficient, the following Fines, viz. For a Gun or pair of Pistols, each Seventy-five cents; for Sword, Bayonet or Cartridge Box, each Fifty Cents; and for each of the other Articles required by law, Twenty-five Cents.[99]

---

[99] 1799 Conn Acts 511, An Act For The Militia, § 4.

These laws did not erect a barrier against government intrusion into the most private sphere of American life—the home—in fact, militia statutes achieved the opposite goal: they gave government sweeping powers over Americans and their guns. Weapons were subject to government inspection. Indeed, although militia weapons were often privately owned, they were among the most heavily regulated forms of private property in early American law.[100]

Militia statutes also prescribed penalties and punishments for failing to report to muster properly armed and for misuse of weapons once an individual appeared at muster.[101] A 1794 Rhode Island statute adopted a few years after the Second Amendment was framed is illustrative of the punishments that could be meted out:

> That every non-commissioned officer or private who shall neglect to appear at the regimental Rendezvous, shall forfeit the sum of Six Shillings and for every day he shall neglect to appear at the company parade, he shall forfeit Four Shillings and Sixpence. And if he shall not be armed and equipped according to other said Act of congress, when so appearing, without sufficient excuse, he shall, for appearing without a gun, forfeit one shilling and sixpence; without bayonet and belt six pence; without a Bayonet and Belt, Sixpence; without a Cartouch-Box and Cartridges.[102]

Once they had mustered, members of the militia were subject to military discipline and punishment.[103] Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as whipping.[104] During this era, the goal of achieving good military

---

[100] Cornell & DeDino, *supra* note 2, at 508-10.

[101] Act effective May 5th, 1794, 1794 R.I. Pub. Laws 14, 21, (organizing the militia of the state); Act of Dec. 28, 1792, 1795 N.H. Laws 525 (adding to a prior act regulating the state militia); Act of 1799, § 4, 1799 Conn. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

[102] Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21.

[103] *Houston v. Moore*, 18 U.S. 1 (1820).

[104] Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (Prohibiting whipping a common form of punishment used by the military in the eighteenth century).

discipline justified a range of discipline and punishment for failure to comply with mandatory *duties* that is hard to reconcile with the idea that these laws offer evidence of a *right* that might be asserted against government, as I discuss next.

### E.    DUTIES, NOT RIGHTS: UNDERSTANDING THE LEGAL SIGNIFICANCE OF AND NEED FOR EARLY AMERICAN MILITIA LAWS

Importantly, interpreting early American militia laws requires reading these statutes as Founding era Americans would have understood them. These laws imposed a legal *obligation* on Americans; they did not create or assert a *right* against government regulation. Indeed, these laws were a highly intrusive form of government regulation.[105] Militia statutes gave government broad authority to compel individuals to engage in specified actions or face punishment, as just discussed.[106] Thus, when these laws are understood within their historical context, they demonstrate that those serving in the militia, including minors, did not have a freestanding and robust right to acquire, keep, and bear whatever arms they desired for whatever purpose. Rather, these laws compelled individuals to purchase or bring to muster the specific type of weapons the government wished them to use and punished individuals severely for any infractions of the laws regulating the militia.

And, as listed in Table 1, the responsibility for acquiring weapons fell on those who were legally responsible for minors, not the minors themselves.[107]  Parents and guardians were singled out as the persons responsible for acquiring militia weapons for their minor children or charges under the age of 21. For example, New Hampshire's 1792 militia law was explicit that parents

---

[105] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. See, e.g., Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984); Leif Wenar, *Rights*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

[106] Cornell & DeDino, *supra* note 2, at 508-10.

[107] *See* Table 1 (identifying five such Founding era laws).

and guardian had a legal obligation and suffered the penalties for failing to acquire the necessary weapons for militia participation: "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements."[108] And even when such obligations were not expressly included by statute, the common law definition of infants meant that minors were impaired from making binding legal contracts in many instances. Any legal proceeding that would attempt to prosecute minors for such a failure would have to proceed against the legally responsible adult in charge of the minor's household.  Finally, in the cash poor economy of the period, at a time when government faced a consistent problem arming the militia with military quality weapons, many minors had to fall back on government supplied weapons to meet their obligations.[109]

Thus, the claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms makes neither legal nor historical sense. This claim rests almost entirely on an ahistorical and anachronistic misreading of the original meaning of these documents.[110]

Pennsylvania's 1793 revision of the state's militia statute further reveals how much power the state had over militia members and the process by which they acquired weapons. In 1793, shortly after Congress adopted the first ten Amendments during the First Congress,

---

[108] An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792); see also, An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176.

[109] SWIFT, *supra* note 59, at 213, 217; Sweeney, *supra* note 92.

[110] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

Pennsylvania enacted the following act modifying the nature of its militia law by exempting

minors from having to purchase weapons:

> I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of
> this or any other of the United States, residing in this commonwealth, who is or
> shall be of the age of eighteen years and under the age of forty-five years, except
> as hereinafter excepted, shall severally and respectively be enrolled in the militia.
> . . .
>
> II. And be it further enacted. . . [that certain categories of persons] shall be, and
> are hereby, excepted from military duty, notwithstanding their being above the
> age of eighteen and under the age of forty-five years. And also all young men
> under the age of twenty-one years, and all servants purchased bona fide and for a
> valuable consideration, shall be exempted from furnishing the necessary arms,
> ammunition and accoutrements, as are required by the fifth section thereof, and
> shall be excepted from militia duties and fines during such minority or servitude,
> except in cases of rebellion, or an actual or threatened invasion of this or any of
> the neighboring states. [111]

This Pennsylvania statute illustrates that there was no fixed constitutional requirement that

minors participate in the militia, nor was it a constitutional requirement that they acquire

weapons. Both of these legal obligations were dictated by the policy choice that individual states

and the federal government made in response to the need to promote public defense, as discussed

above.[112] Many states exempted students from militia service, and individual states were free to

exempt any other sub-category of minors, or all minors if they wished, if such a policy furthered

the goal of strengthening the militia or any other relevant state goal.[113] A state could choose to

---

[111] Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania).

[112] Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 (only requiring those between the ages of twenty-one and forty-five to be enrolled in the militia); Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 (same).

[113] Delaware adopted a similar provision to Pennsylvania in 1806, exempting minors enrolled in the militia from acquiring weapons, Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816). In 1829

exempt minors from the requirement to purchase weapons if such a policy was expedient, or exclude them from the militia entirely. There was no legal or constitutional requirement that militia include any minors if excluding them served the constitutional needs of maintaining a well regulated militia.

Further, imposing mandatory service upon minors under 21 in the militias was a matter of necessity given the structure of the early American family and the labor market. Militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted. The labor of sons was vital to the survival and prosperity of family farms and apprentices were essential to artisan modes of production. Given the strong economic pressures on small farm owners and artisans in a pre-industrial society, market forces could easily have led families to oppose allowing sons to join the militia voluntarily.[114] Thus, at the time of the Second Amendment's enactment these legal and social facts meant that it was necessary for the states to enact laws requiring able-bodied minors under 21 to participate. Without such laws, it is likely that few minors would have been enrolled in the militia because of the opposition of those who needed their labor, i.e., parents, guardians, and masters. The individual states and federal government had the power to, and did, coerce individuals to participate in the militia, even if such participation posed an economic hardship to individuals, their families, or legal guardians. And the states flexed that power by threatening punishment: Delaware's 1776 militia law, for example, expressly recognized this problem and included a provision that levied a fine on any "Masters, Guardians, and Parents" who "restrained" militia eligible minors from enrolling.[115]

---

New Jersey exempted all militia-eligible minors from participation during peace time, Act of Nov. 6, 1829, 1829 N.J. Laws 3.

[114] Gross, *supra* note 73.

[115] Delaware, An Act establishing a Militia in this State. Law and Statutes, 4 (1776).

Rather than provide historical proof that infants under 21 had expansive rights and strong legal claims against government interference with any firearms rights, then, the various militia laws and common law requirements mandating that individuals assist in keeping the peace evidence only the considerable power early American governments had to compel individuals, including minors under the age of 21, into service where the militia was concerned.

F.    THE ECONOMICS OF EARLY AMERICAN FIREARMS: THE PROBLEM OF ARMING THE MILITIA

Militia statutes in the Revolutionary era and early Republic grappled with another problem that America faced for much of its early history as a nation: how to arm Americans with the military-quality weapons essential for a well regulated militia. Americans were far better armed than any people in the English-speaking world in the eighteenth century and early nineteenth century, but early American governments faced a persistent problem: the arms citizens preferred were not the heavy military-quality muskets needed for militia service. Instead, most Americans owned or wanted light hunting muskets or fowling pieces—firearms that were not the standard weapons of the eighteenth-century militia and the one required by the various state militia statutes. Guns in early America were essential tools in an agrarian society and American consumer preferences reflected this basic fact.[116]

Ground warfare in the Founding era involved close combat; a soldier had to be able to attach a bayonet to a musket and his weapon had to be sturdy enough to function as a bludgeon if needed.[117] The light muskets and fowling pieces that Americans found most useful on their

---

[116] Sweeney, *Firearms Ownership and Militias*, *supra* note 92.

[117] Jeremy Black, A MILITARY REVOLUTION? MILITARY CHANGE AND EUROPEAN SOCIETY, 1550-1800 (1991); Wayne E. Lee, *Early American Ways of War: A New Reconnaissance, 1600-181*5 44 THE HISTORICAL JOURNAL 269 (2001); Stephen Conway, *The British Army, "Military Europe," and the American War of Independence 67* THE WILLIAM AND MARY QUARTERLY 69 (2010).

farms were therefore of limited value to the militia.[118] Thus, arming the militia remained a persistent problem for states and the federal government in the era of the Second Amendment's adoption.[119] In fact, fully half of Americans lived in a household in which a military-grade musket was not available for those required to participate in the militia. And despite persistent efforts by both the states and the federal government to enact laws forcing households to purchase muskets and other military-quality weapons, Americans continued to prefer weapons better suited to the realities of living in an agrarian society, guns which were more useful for putting food on the table.[120]

The economic burden of the militia on American families was another fact that shaped government policy. This concern was voiced forcefully during the debate over the first militia Act in Congress. Thomas Fitzsimmons, a Federalist representative from Pennsylvania, expressed his concern that militia service was an onerous tax on Americans, and that it would prove to be an undue burden for most families.[121] During this debate, Congress seriously considered abandoning the idea of a broadly inclusive militia in favor of a smaller, more select, better trained, and better equipped force, but ultimately this proposal failed. Instead, Congress settled on a compromise:  the first federal militia act carried forward a broadly inclusive idea of a militia, but did not take the necessary action to properly arm and equip the militia.[122]

---

[118] *Id.*

[119] Kevin M. Sweeney, and Saul Cornell, *All Guns Are Not Created Equal,* THE CHRONICLE OF HIGHER EDUCATION, February 1, 2013.

[120] *Id.*

[121] 1 ANNALS OF CONG. 3 (1790–91).

[122] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

### G.    THE POLICE POWER AND REGULATION OF MINORS' ACCESS TO ARMS, 1776-1900

Police power regulations also impacted minors' relationship to arms and gun powder. As was true for other applications of the police power, the enactment of specific laws aimed at minors depended on the practical and public perceptions of the need for government regulation in a particular area.

Gun violence was not a pressing issue of public concern at the time that the Second Amendment was enacted. Firearms in the eighteenth century were not ideally suited for individual self-defense outside the home against unexpected threats or for committing crimes. Flintlocks and muzzle loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity. Given these facts there was little need for modern style gun control laws because gun violence was not a serious problem. Government arms policy at the time of the Second Amendment was driven by the opposite problem: too few military guns in the hands of members of the militia.  One consequence of these facts about firearms role in early American society directly impact government policy: laws were  not designed to restrict access to weapons but encourage citizens to acquire a specific type of weapon needed for militia service. Public policy, both at the state and federal level, aimed to encourage the ownership of military quality weapons needed for militia service and regulation was designed to further this objective.[123]

Modern-style arms control measures targeting weapons better suited for crime and inter-personal violence, and not especially useful for militia service, did not emerge in American law until technological changes and economic efficiencies made more accurate and more easily concealable weapons widely available in the nineteenth century. The market revolution of the

---

[123] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).

Case No. 1:23-cv-01077-PAB-NRN    Document 82-2    filed 02/28/25    USDC Colorado
pg 45 of 85

Jacksonian period (1828-1854) transformed American life, making a host of consumer goods—
from wooden clocks to firearms—widely available for the first time. The impact of this inter-
connected set of changes in production, consumption, and technology transformed gun culture by
making a variety of weapons, including pistols, more common.[124] At the time of the Second
Amendment, 90% of the guns owned by Americans were long guns.[125] Cheap handguns become
widely available for the first time in American history in the early decades of the nineteenth
century. In response to the perception that these guns posed a particular danger, states began
passing laws to deal with the negative consequences of these weapons, including new limits on
public carry.[126]

By the time of the Civil War, many states had enacted a variety of laws to deal with the
problem of gun violence, including the special dangers firearms posed by guns and minors. In
1856, for example, Alabama adopted a provision focusing on the specific problem posed by the
sale of pistols and other concealable weapons to minors, which imposed a substantial financial
penalty:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or
> knife or instrument of the like kind or description, by whatever name called, or air
> gun or pistol, shall, on conviction be fined not less than three hundred, nor more
> than one thousand dollars."[127]

Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male
minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more

---

[124] *Id.*

[125] Sweeney, *Firearms Ownership and Militias supra* note 92.

[126] Cornell, *supra* note 2. For a good example, see Of Miscellaneous Offences, ch. 7, § 4, 1841
Ala. Acts 148, 148–49.

[127] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

than one thousand dollars."[128] Kentucky also enacted a similar law, but carved out an exception when a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[129]

The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color is itself instructive. As historian Randolph Roth's work demonstrates, the Slave South was the most violent region of the nation in the period before the Civil War. Although some laws enacted in this period and in this region were driven by racial animus, other laws, including laws targeting minors were not. Laws prohibiting concealed carry were one type of racially neutral modern style gun control regulation. Southern states also took the lead in enacting gun-control-type measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[130]

Cities and towns also used their police power authority to regulate arms. In 1803, New York city singled out guardians for punishment for firearms infractions committed by minors under their charge.[131] In 1817, Columbia, South Carolina enacted a law that allowed for the

---

[128] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

[129] *1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.*

[130] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F.121 (2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On southern homicide rates, see Randolph Roth, AMERICAN HOMICIDE 180-249 (2009).

[131] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

seizure of weapons used by minors within the city limits.[132] And in 1857, the city of Louisville, Kentucky passed an ordinance stating that "[n]o person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[133]

Additional changes in firearms technology and society also impacted the regulation of guns and minors.[134] There was a  growing perception in post-Civil War America of the threat guns posed to minors and society.  In response to this perception the scope of firearms regulation of minors increased in the post-Civil War era.  Although the scope of regulation increased, this change was not a radical departure from earlier American law. Post-Civil War America carried forward the antebellum tradition of robust regulation of firearms, including regulating minors and firearms.

Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted western states, expressly asserted that the right to keep and bear arms did not preclude robust legislative power to regulate, making explicit a point that the pre-Civil War case law had firmly established. It is worth comparing Utah's formulation, among the most robust of

---

[132] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

[133] No. 68. An Ordinance as to Retailing Gun Powder, in Oliver H. Strattan, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY 175 (1857).]

[134] Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017)

the new post-Civil War provisions, with Pennsylvania's 1776 arms-bearing provision, the first
one adopted after American Independence.

- Pennsylvania 1776: "That the people have a right to bear arms for the defence
  of themselves and the state; and as standing armies in the time of peace are
  dangerous to liberty, they ought not to be kept up; And that the military
  should be kept under strict subordination to, and governed by, the civil
  power." [135]

- Utah 1895: "The people have the right to bear arms for their security and
  defense, but the legislature may regulate the exercise of this right by law."[136]

The language employed by Utah, and other states focused on the right of regulation and was
consistent with the well-established view of the scope of the police power. The new language
formulation of the right to keep and bear arms included in these constitutions underscored the
breadth of the state's police power authority in arms regulation. Further, at the Utah
constitutional convention, there was a vigorous debate over a proposal to change the age at
which individuals could be compelled to participate in the militia from 18 to 21. Although there
was some disagreement over the wisdom of changing the policy, there was little disagreement
that if such a policy was desirable, the state had ample authority to make the change. The
contours of this debate make clear that the there was no constitutional necessity compelling
states to either require or prohibit minors from participating in the militia. The decision remained
one that was dictated by military necessity, not constitutional imperative.[137]

The broad latitude to regulate arms was acknowledged by the major constitutional
commentators of the period as well. John Norton Pomeroy, one of the era's most distinguished
constitutional authorities, observed that the right to keep and bear arms posed no barrier to

---

[135] PA. DECLARATION OF RIGHTS, 1776 cl. XIII

[136] UTAH CONST. of 1895 art. I, § 6

[137] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake
City ... (1898) at 815-819.

government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[138]

The Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[139] Among the most pressing concerns of Republicans in the era of the Fourteenth Amendment's adoption (1868) was the problem of protecting the lives and rights of African Americans in the South, including the right of such people to keep and bear arms.[140] Support for this goal did not mean that Republicans opposed strong gun regulations.[141] Quite the opposite was the case across the South. In fact, rather than mark a retreat from robust gun regulation, Reconstruction marked an intensification of efforts to regulate firearms—a development spurred in part by the rise of para-military groups such as the Ku Klux Klan and their violence against free persons and Republicans.[142]

The robust regulation of firearms during Reconstruction, aimed to limit minors' access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept. Exercises of the police power

---

[138] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3 d., (1899) at 4.

[139] For a more detailed discussion, see Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[140] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 *HARVARD L. REV. FORUM* 238 (2014).

[141] RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003).

[142] Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South,* 17 STAN. L. & POL'Y REV. 615 (2006). One of the most horrifying examples was the Colfax massacre. See Leeanna Keith, THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR, AND THE DEATH OF RECONSTRUCTION (2008).

in this regard were seen as consistent with the scope of the Second Amendment's reach as it had been understood at the Founding. The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the states' ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[143] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[144]

The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[145] Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained 21 during this period).[146] The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[147] Some of these laws targeted children younger than 16, but others singled out anyone below the age of 21. For example, Indiana's state

---

[143] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[144] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

[145] Cornell and Florence, *supra* note 143.

[146] On the growing perception of the threat guns posed to minors in the post-Civil War era, see Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017).

[147] Misdemeanors. Section 53., *in* L. W. MOULTRIE, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition

to Minors":

> Be it enacted by the General Assembly of the State of Indiana, That it shall be
> unlawful for any person to under the age of twenty-one years, any pistol, dirk, or
> bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or
> carried, concealed upon or about the person, or to sell, barter, or give to any
> person, under the age of twenty-one years, any cartridges manufactured and
> designed for use in a pistol. § 2. Be it further enacted, that any person who shall
> violate any of the provisions of the foregoing section shall be deemed guilty of a
> misdemeanor, and upon conviction thereof, shall be fined in any sum not less than
> five dollars, nor more than fifty dollars.[148]

Wisconsin adopted a statute that prohibited minors from going armed or acquiring pistols

and revolvers:

> SECTION 1: It shall be unlawful for any minor, within this state, to go armed
> with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or
> other public police officers, to take from any minor, any pistol or revolver, found
> in his possession.

> SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any
> other person, to sell, loan, or give any pistol or revolver to any minor in this
> state.[149]

Henry Campbell Black, the author of *Black's Law Dictionary* and a leading post-Civil

War legal authority, described the police power as "inalienable" and echoed the view of a long

line of jurists who noted that the scope of the power was not easily defined, and that

determination of its limits was best left to courts on a case-by-case basis.[150] Christopher G.

Tiedeman, a conservative critic of the police power, nonetheless acknowledged the scope of its

legitimate purview: "police power of the State extends to the protection of the lives, limbs,

---

[148] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.

[149] 1883 Wis. Sess. Laws 290.

[150] Henry Campbell Black, Handbook of Constitutional Law, 334–344 (2d ed., 1897).

health, comfort and quiet of all persons, and the protection of all property within the State."[151]
Other Reconstruction-era commentators on the scope of the police power were more explicit
about the reach of the police power over firearms.

Indeed, Lewis Hochheimer, one of the leading authorities on the rights of infants in this
period, noted that the regulation of firearms was an area of the law in which the police power
was at its greatest reach regarding minors. Infants were not entirely beyond the protection of the
Bill of Rights, but he was quick to point out that the need to protect those below the age of
majority meant some regulations that were impermissible if applied to adults were perfectly legal
when regulating infants. [152] Total prohibitions on the sale of dangerous weapons were one such
an example. In this instance, the broad power to protect the welfare of minors gave government
extraordinary latitude in regulating their conduct.[153] In fact, Hochheimer noted that the scope of
state regulatory authority was at its zenith when regulating arms and minors.

This principle is evident in an 1883 Missouri statute that banned weapons in places where
young people might gather, such as schools, places of worship, and other venues in which people
gathered for "education, literary, or social purposes." In addition, the law also expressly
prohibited loaning, giving, or selling any "deadly weapon" to a minor.

> If any person shall carry concealed, upon or about his person, any deadly or
> dangerous weapon, or shall go into any church or place where people have
> assembled for religious worship, or into any school room or place where people
> are assembled for education, literary or social purposes, or to any election precinct
> on any election day, or into any court room during the sitting of court, or into any
> other public assemblage of persons met for any unlawful purpose other than for
> militia drill or meetings called under the militia law of this state, having upon or
> about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or
> other deadly weapon, or shall in the presence of one or more persons exhibit any

---

[151] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED
STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

[152] Lewis HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3ed., (1899) at 4.

[153] *Id.*

such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.[154]

A Kansas statute prohibited selling, trading, giving, or loaning pistols or revolvers to minors:

Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[155]

The language of a Louisiana law was even more comprehensive: "That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years."[156]

A Nevada law focused on the danger posed by minors carrying guns in public:

Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred

---

[154] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[155] 1883 Kan. Sess. Laws 159, § 1.

[156] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[157]

In his review of the history of gun regulation, political scientist Robert Spitzer concluded that laws limiting the ability of minors to obtain and use arms without appropriate supervision were among the most common firearms regulations in the post-Civil War period. After surveying hundreds of laws in the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s."[158] In fact, he concluded that restrictions on minors' access and use of arms were more common than limits on felons.[159]

In addition to the vigorous state level regulation described above, many states and localities also enacted robust laws addressing the potential problem firearms posed to public safety by implementing tax or permit schemes that took advantage of the expansion of the size of state and local governments during the post-Civil War era. States and localities used these new administrative tools to address a variety of different problems created by firearms. An Evanston, Illinois law handled the danger posed by permissive public carry with a permit law:

> It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of

---

[157] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. 1077 (David E. Baily and John D. Hammond, 1885).

[158] Spitzer, *supra* note 40 at 60.

[159] *Id.,* at 60.

two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.[160]

The new tools of the administrative state, including permit schemes and taxes, were employed to help states and localities implement the regulations they believed necessary to advance the goals of promoting public health and safety.[161]

## H.    THE MODERN ERA OF GUN REGULATION, 1900-1930

At the dawn of the twentieth century, Congress took up the task of militia reform. The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia. In place of the traditional civic republican model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National Guard system was created. The new militia would be professionalized and—most importantly—controlled more tightly by the federal government.[162]

The militia was divided into the organized militia, the National Guard, and a more amorphous, unorganized Militia. In an influential article published in the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer in the Office of the Judge Advocate General, reviewed the legal changes that facilitated this transformation. One key development was the change in the policy preferences of the individual states about minors and the militia.

---

[160] Concealed Weapons, §531131-132, George W. Hess, REVISED ORDINANCES OF THE CITY OF EVANSTON: ALSO SPECIAL LAWS AND ORDINANCES OF GENERAL INTEREST (1893).

[161] On the transformation of American law and the rise of the modern regulatory state, see Herbert Hovenkamp, *Appraising the Progressive State*, 102 IOWA L. REV. 1063, 1068-75 (2017), William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081-83 (1994), and Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301, 304-05 (2015).

[162] For a discussion of how the modern national guard replaced the ideals at the core of the Founding era militia, see Richard R. Uviller R & William Merkel, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND AMENDMENT FELL SILENT (2002).

The most significant trend was the increasingly popularity of laws that required parental permission for minors to participate in the militia. Among the states enacting such laws were Connecticut, Idaho, Louisiana, Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South Dakota, Texas, Oregon, West Virginia. The decisions of these states to follow this path only underscores a fact that the previous history had made clear: there was no set age requirement for the militia hardwired into the American constitutional system. States were perfectly at liberty to raise, lower, or prohibit the participation of minors as they deemed necessary. Defining who would participate in the militia remained a practical policy choice, not a constitutional imperative.[163]

The pace and scope of gun regulation outside of militia regulation also quickened in the twentieth century. New laws were introduced to address novel problems created by advances in firearms technologies, rising levels of gun crime and perceptions of gun violence, including increased threats to minors.[164] Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.[165]

Prohibitions on machine guns and some semi-automatic weapons illustrated the far-reaching scope of such laws.[166] Repeating rifles emerged in the late nineteenth century, but fully automatic and semi-automatic weapons did not achieve sufficient market penetration to pose a serious problem until the early decades of the next century. As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the antebellum era, the

---

[163] S. T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J. 471, 476 (1917).

[164] On changes in technology and perceptions of crime and gun regulation, see Spitzer, *supra* note 40 at 60. On the perception of growing threats to minors, see Carlson and Cobb, *supra* note 134.

[165] ERNST FREUND, THE POLICE POWER 246–47 (1904).

[166] Spitzer, *supra* note 40 at 60.

concern over more powerful "gangster weapons" did not emerge the moment such laws entered the marketplace.  As had been true during earlier periods of American history there was some time lag between technological change, market saturation, and government intervention to stem the unintended negative consequences of these changes.  Thus, the passage of new regulations did not occur in tandem with changes in firearms, but often trailed technological developments. Legislation was only necessary once new weapons became popular enough to cause a problem that required government action. This pattern repeated itself in the case of rapid-fire weapons, including semi-automatic and fully automatic guns. As these weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms.[167]

Nothing better illustrates this dynamic than the popular concerns about "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a machine gun that was popularly associated with the Saint Valentine's Day Massacre and criminals such as Machine Gun Kelly.[168] Political scientist Robert Spitzer's overview of the history of firearms regulation underscores this point:

> So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

Such laws targeting fully automatic and semi-automatic rapid-fire weapons were a classic example of the flexibility of the police power. Michigan's law is illustrative of these laws:

> It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without

---

[167] Spitzer, *supra* note 16 at 60.

[168] On the history of gun regulation up to and including the act, see ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA (2001).

reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [169]

Silencers posed another problem that prompted new regulations. Minnesota's law banning silencers was typical of these statutes:

§ 1. Use of silencers prohibited. No person shall within the state of Minnesota sell or offer or expose for sale, or have in possession for use upon or in connection with any rifle, shot-gun, revolver, or other firearm or have in possession for purposes of sale any silencer for a shotgun, revolver, rifle or other fire-arm. [170]

Other states, including New York and Connecticut, passed permit laws.[171]

Unsurprisingly, the proliferation of new weapons impacted the calculus of public policy decisions about the scope of regulation or arms necessary for minors. By the early 1930s, the number of laws limiting minors' ability to acquire and use weapons increased by 50 percent, as compared to the late nineteenth century.[172]

Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[173] An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons prohibiting the sale, barter or gift to persons:

---

[169] *Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751.*

[170] Minn. Laws 55, An Act to Prevent the Sale, Offering or Exposing for Sale or Having in Possession for the Use or for Purpose of Sale within this State, of Silencer for Shot-gun, Revolver, Rifle or Other Firearm, Defining a Silencer and Providing Penalties for Violation, Ch. 64, §§ 1-4 (1913).

[171] N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. Ch. 195, § 2 (1911); Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, Ch. 252, § 3 (1923).

[172] Spitzer, *supra* note 40 at 60.

[173] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[174]

In his classic treatise *The Police Power* (1904), the distinguished legal scholar, Ernst Freund noted that the scope of the police power in relation to minors was extensive, and he singled out limits on access to firearms as an illustration of this power.[175] And in *Glenn v. State* (1911), the Georgia Court of Appeals observed that "the police power of the states makes a special charge of minors."[176]

In fact, the police power's scope was at its greatest when the health and safety of minors was at issue, a fact evident in this 1917 Oregon law:

Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.[177]

Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns. For example, the City of Chicago forbade issuing firearms permits to all minors:

It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the

---

[174] Weapon— Furnishing to Minor, § 450, 1905 Ind. Acts 688 (1905).

[175] FREUND, *supra* note 10 at 187, 247.

[176] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

[177] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms.

general superintendent of police to grant such permit upon the payment of a fee of one dollar.[178]

The City of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors. The law equated minors with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy access to guns.

> If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.[179]

Harkening back to traditional parental authority, some jurisdictions allowed an exception for guns used while under the supervision of a parent. For example, a 1903 South Dakota law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents

---

[178] Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6.

[179] Joplin Code of 1917, Art. 67, § 1201, Brandishing, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible.

or guardians."[180] But these exceptions only underscored the fact that minors were not viewed as completely responsible citizens, or fully independent legal actors who could claim Second Amendment rights on their own.

## I.    FIREARMS REGULATION: A PERVASIVE FEATURE IN AMERICAN LAW (1934-2021)

The very first issue of the Duke law journal, *Law and Contemporary Problems* (published in 1934), focused on federal involvement in the prevention of crime and included a comprehensive review of firearms regulation in America. It explained that the most common forms of regulation were restrictions on public carry, restrictions on the purchase of arms (including purchase by minors, who still included those aged 18–20 at that time), and prohibitions on dangerous or unusual weapons. [181] The essay also noted that the use of license or permit requirements for purchase of a firearm expanded in the post-Civil War era and became a standard feature of gun regulation in the twentieth century.[182] Indeed, by 1938, a comprehensive review of firearms regulation concluded that the vast majority of states had either banned the public carry of concealed weapons or adopted a restrictive permitting scheme.[183] Localities, especially large urban areas, in the final decades of the nineteenth century and the early decades of the next century increased the level of regulation of arms, including limits on minors. Another wide-ranging legal survey of firearms regulation published in 1950 found little had changed in the ensuing decades between the publication of the two comprehensive reviews discussed above and post-World War Two-era gun regulations.[184]

---

[180] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

[181] John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400 (1934).

[182] *Id.*

[183] Sam B. Warner, *Uniform Pistol Act,* 29 AM. INST. CRIM. L. & CRIMINOLOGY 529 (1938).

[184] F.J.K., *Restrictions on the Right to Bear Arms: State and Federal Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

One of the most significant developments in gun regulation in the twentieth century was the growth of federal firearms regulation, beginning with the New Deal. As with the state measures addressed above, the threat posed by organized crime and the proliferation of dangerous "gangster weapons," most notably the machine gun, increased public enthusiasm for additional gun control measures. Repeated popular demands for some type of federal involvement finally bore fruit in 1934, when Congress enacted the first comprehensive federal firearms law. In contrast to traditional state police power-driven legislation, federal regulation of firearms after the New Deal necessarily focused on interstate commerce. The National Firearms Act of 1934 regulated firearms dealers and imposed a series of taxes on classes of weapons, including machine guns. The Act sought to limit access to this class of weapons, which was closely identified with criminal behavior.[185]

Later in the twentieth century, popular concern over crime and civil unrest led to the passage of the federal Gun Control Act of 1968.[186] In addition to revising the federal licensing scheme for the manufacture, importation, and sale of firearms, the act prohibited a variety of persons from purchasing handguns, including minors, who continued to be defined as those below the age of 21. In addition, federal licensees were prohibited from selling firearms to out-of-state residents, minors, felons, persons under indictment for felonies, fugitives, and certain other categories of persons.[187]

The Firearm Owners' Protection Act of 1986 loosened some restrictions on ammunition and prohibited the creation of a federal firearms registry, but it added additional categories of persons who were barred from possessing firearms, including illegal aliens, dishonorably

---

[185] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of June 30, 1938, 15 U.S.C. §§ 901–09.

[186] William J. Vizzard, *The Gun Control Act of 1968*, 18 St. Louis Univ. Pub. L. Rev. 79 (1999).

[187] 18 U.S.C. § 922(b)(1) and § 922(c).

discharged members of the armed forces, and U.S. citizens who renounce their citizenship.[188] The Brady Handgun Violence Protection Act of 1993 (Brady Act) created a background check system for the purchase of firearms from federally licensed dealers.[189]  Notably, neither the 1986 nor the 1993 federal legislative amendments lowered the age for the sale of handguns to those under 21, even after the Twenty-Sixth Amendment was adopted and ratified in 1971, setting the voting age at 18.

The next major turning point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings.[190] California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[191] Currently, eight states have passed similar laws. [192]

Current efforts to improve the effectiveness of firearms regulation include additional regulation focused on limiting the access to firearms by those under the age of 21, on top of those regulations already imposed by the 1968 federal Gun Control Act.[193] A recent survey of age restrictions on the acquisition of guns by minors reported the following conclusions:

> As of January 1, 2020, 17 states and the District of Columbia have minimum age requirements that exceed the federal minimum for the purchase of a handgun from unlicensed persons, and eight states and the District of Columbia have minimum age requirements that exceed the federal minimum for handgun

---

[188] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (1986).

[189] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103-159, 110 Stat. 3009 (1993).

[190] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

[191] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[192] Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020).

[193] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

possession. Several states also have minimums that are higher than the federal law for long gun purchase and possession.[194] (Footnotes omitted).

Restrictions on minors' ability to acquire and use firearms are longstanding. *Heller*'s non-exhaustive recitation of examples of presumptively lawful and longstanding regulations expressly referenced laws prohibiting felons and the mentally ill from acquiring firearms. The bulk of these laws as well as those expressly limiting minors' access to firearms date from the early twentieth century.[195]

The scope of the police power regarding firearms and gunpowder has been among the most expansive in any area of the law. In the case of minors, the legitimate reach of the police power is at its peak. For more than a century, state and federal judges have recognized that minors are among the categories of persons whose access to guns must be carefully regulated. More recently, the United States Court of Appeals for the Fifth Circuit observed that "[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms."[196] The United States Court of Appeals for the Eleventh Circuit held that "the states have never been without power to regulate 18-to-20-year-olds' access to firearms."[197] Federal courts have concluded that laws restricting minors' access to firearms are deeply rooted in American history and tradition.[198]

---

[194] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

[195] Thomas M. Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 29 (1st ed. 1868), concluded that laws preventing felons from acquiring firearms were justified on grounds too obvious to elaborate.

[196] *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012); *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

[197] *Nat'l Rifle Ass'n of Am. v. Bondi*, 61 F.4th 1317, 1332 (11th Cir. 2023).

[198] *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012).

## CONCLUSIONS

A review of the historical record, in context, reveals that "infants"—individuals below the legal age of majority, which has been 21 for most of American history—have never had an unfettered constitutional right to keep, bear, and acquire arms. This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history. For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties supervised by militia officers.

Those under the age of 21 never enjoyed an autonomous individual right to purchase, acquire, own, or use firearms for most of American legal history. In fact, for most of American history, the law did not consider such minors as fully autonomous legal individuals in any meaningful sense. The legal status of infants under American law in the Founding era was an inheritance from English common law. This bedrock principle of Anglo-American law was unaltered by the American Revolution, the adoption of the Constitution, or the addition of amendments, including the Second Amendment and the Fourteenth Amendment. Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority. In fact, the concept of "young adult" is a recent development in American culture and has no grounding in earlier Anglo-American law—and thus it has no bearing on assessing the scope of the Second Amendment right as it was originally understood at the time of its ratification and in the ensuing years.

The central fact asserted by Plaintiffs in this case is uncontroversial: in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related community-based forms of law enforcement. But the existence

64

of such duties does not provide any concomitant evidence of the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, it demonstrates that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.

Failure to meet this legal obligation could result in a variety of punishments. In several states, the law expressly punished parents or guardians if they failed to acquire the necessary arms required by law to participate in the militia. In those states in which such a provision was not included in law, the common law would have governed, and legal proceedings against minors would have targeted parents or guardians. Plaintiff's argument not only confuses rights with obligations, but it conflates specific public policy choices made by states and the federal government about the composition of the militia with fixed constitutional principles about the role of the military in the American constitutional scheme of government and the scope of individual rights. State and local governments were free to expand or contract the age restrictions on participation in the militia in response to the needs of public defense and safety. When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal. If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers. The scope of state police power is greatest when protecting the health and safety of minors. Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns. Most states have had laws regulating arms, including regulations of minors, for more than a century. Many of these laws date to the era of the Fourteenth Amendment and regulate the conduct of those under 21. Public

perception that minors were especially at risk to harm from firearms intensified in the post-Civil War era.  Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions. In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of June, 2023.

_Saul Cornell_
_____
Saul Cornell

**Table 1**
**Founding Era Laws Requiring**
**Parents to Supply Militia Arms for Minors in their Household**

| State | Year | Source | Statutory Text |
|---|---|---|---|
| New Hampshire | 1776 | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . . |
| Delaware | 1785 | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | [E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . . |
| Massachusetts | 1793 | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | [A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . . |
| Vermont | 1797 | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . |
| North Carolina | 1806 | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346–47 (1883). | And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipment's above mentioned . . . |

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ❋ Bronx, NY 10458 ❋ 203 826-6608 (c) ❋ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 <u>Choice</u> Outstanding Academic Book
- 2000 Pulitzer Nomination History

## Book Publications

<u>The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution</u>
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

<u>The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller</u>
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

<u>Visions of America: A History of the United States</u> [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

<u>"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control</u> (Oxford University Press, 2006) (paperback edition  2008)

<u>Whose Right to Bear Arms Did the Second Amendment Protect?</u>  (Bedford/St. Martins Press, 2000) (Paperback 2000)

<u>The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828</u>  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, <u>Retrieving the American Past:  Documents and Essays on American History</u>, (Pearson, 1994-2008)

### <u>Scholarly Articles, Book Chapters, and  Essays:</u>

**"**History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  <u>University  of California, Davis Law Review</u>  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 <u>Yale Law & Policy Review Inter Alia</u> 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

 "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## **Book Reviews:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

## **Journal Manuscript Referee:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
    SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved" *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," *To the Point,* NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## **Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)
.
United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief*, Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief*, Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## **Law Review Symposia Organized**

**Second Amendment:**

"The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms" 17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning" 84 *Fordham L. Rev.* 915 (2015).