IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action 23-cv-01077-PAB-NRN**

ROCKY MOUNTAIN GUN OWNERS,
ADRIAN S. PINEDA, and
MATTHEW M. L. NEWKIRK,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

**PLAINTIFFS' RESPONSE TO THE
GOVERNOR'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs submit the following response to the Governor's motion for summary judgment.[1]

**RESPONSE TO THE GOVERNOR'S STATEMENT OF FACTS**

Plaintiffs respond to the State's "Statement of Undisputed Facts" as follows:

1.    Plaintiffs admit that in the colonial era, 18-to-20-year-olds, like women and racial minorities, lacked full civil rights. Plaintiffs admit that 18-to-20-year-olds

---

[1] Plaintiffs make the arguments set forth herein to preserve them for further review. See *United States v. Herrera-Perez*, 38 F. App'x 532, 534 (10th Cir. 2002) (citing *McKnight v. Gen. Motors Corp.*, 511 U.S. 659, 660 (1994)). Plaintiffs incorporate their Preliminary Statement set forth on pages 1-2 of their February 28, 2025 Motion for Summary Judgment.

1

were often, but not always, subject to their parents' authority in the colonial era. See response to paragraph 2.

2. Denied. The age of majority at the Founding lacked meaning without reference to the particular right in question. The relevant age of majority depended on the capacity or activity. 1 William Blackstone, *Commentaries* 463-65 (noting the different capacities which individuals assumed at different ages). See also *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 435 (4th Cir.), as amended (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

3. Denied. See response to paragraph 2.

4. Plaintiffs admit that the statutes referred to by the State say what they say.

5. Plaintiffs admit that following the American revolution, minors had the ability to avoid certain contracts. Plaintiffs are not aware of any authority that minors were not allowed to enter into contracts if the other contracting party was willing to accept that risk, and the State does not cite any. There is no dispute that young adults could at the time of the Founding buy firearms up front for cash (*Nat'l Rifle Ass'n v. Bondi*, 2025 WL 815734, *56-57 (11th Cir. Mar. 14, 2025) (Brasher, J., dissenting)), which is what Colorado law prohibits.

6. Denied. The State implies that such college regulations were age based. They were not. The regulations applied to all enrolled students regardless of age. *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 596 (5th Cir. 2025).

7. Plaintiffs admit that these universities regulated the possession and use of firearms for all students regardless of age. *Id.*

8. Plaintiffs admit that militia members were subject to military discipline during their time of service.

9. Plaintiffs admit that during the Founding era, militia members were subject to military discipline during their time of militia service. Plaintiffs deny that militia members were supervised by their parents during their time of militia service.

10. Plaintiffs admit that six state laws enacted between 1810 and 1826 required parents to furnish firearms for young men's militia duty. *Reese*, 127 F.4th at 597. However, requirements that parents furnish firearms for their sons' militia service do not mean that the military-age young men lacked the right to keep and bear (or obtain) such arms themselves. *Id.*

11. Plaintiffs admit that certain laws referred to by Professor Spitzer on pages 7 to 9 of his declaration existed. Plaintiffs deny that such laws are relevant to this matter.

12. Plaintiffs admit that certain laws referred to by Professor Spitzer on pages 9 to 10 of his declaration existed. Plaintiffs deny that such laws are relevant to this matter.

13. Plaintiffs admit that the laws referred to in this paragraph say what they say. Plaintiffs deny that such laws are relevant to this matter.

14. Plaintiffs admit that the laws referred to in paragraph 14 existed. Plaintiffs deny that such laws are relevant to this matter.

15. Plaintiffs admit that the laws referred to in paragraph 15 existed. Plaintiffs deny that such laws are relevant to this matter.

16. Denied. "The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar." *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting). Plaintiffs deny that technological innovations are relevant with respect to the acquisition of constitutionally protected weapons in common use. *Worth v. Jacobson*, 108 F.4th 677, 697 (8th Cir. 2024).

17. Plaintiffs admit that the laws referred to in paragraph 17 existed. Plaintiffs deny that such laws are relevant to this matter.

18. Plaintiffs deny that scientists' views of the brain in the twentieth century, which the State cites in support of its interest-balancing policy arguments, are relevant to the Court's resolution of this case.

19. Plaintiffs deny that scientists' current views of the brain, which the State cites in support of its interest-balancing policy arguments, are relevant to the Court's resolution of this case.

20. Plaintiffs deny that scientists' current views of the brain, which the State cites in support of its interest-balancing policy arguments, are relevant to the Court's resolution of this case.

21. Plaintiffs deny that scientists' current views of neurobiology, which the State cites in support of its interest-balancing policy arguments, are relevant to the Court's resolution of this case.

22. Plaintiffs deny that psychological evidence, which the State cites in support of its interest-balancing policy arguments, is relevant to the Court's resolution of this case.

23. In paragraph 23, the State essentially states that 18-to-20-year-olds should be stripped of their Second Amendment rights because they are not responsible. This argument is specifically precluded by Supreme Court precedent. *United States v. Rahimi*, 602 U.S. 680, 701 (2024). Therefore, the evidence is not relevant to the Court's resolution of this case.

24. See response to paragraph 23.

## ARGUMENT

### I. The State's Policy Arguments are Irrelevant

When the Second Congress enacted the Militia Act of 1792, it put 18-year-old men on notice that they would be expected to acquire arms and, if necessary, take them up and bleed and die in defense of American freedom. Today, 234 years later, nothing has changed. An 18-year-old Colorado native in the Army may be called on to operate a M2 .50 caliber "Ma Deuce" heavy machine gun on an Abrams main battle tank in defense of his country. And if he is wounded while doing so and honorably discharged from the Army and comes home to Colorado, he will be put in jail for purchasing a single shot .22 rifle for plinking tin cans.[2] A 20-year-old woman living in an off-campus apartment while attending CU Boulder cannot buy a shotgun to defend herself in her own home.

---

[2] SB23-169's exemption for members of the armed forces applies only to active-duty service members. C.R.S. § 18-12-112.5(1)(a.5)(I).

The State begins its motion with policy arguments that it believes support its decision to deprive 18-to-20-year-olds of their Second Amendment right to keep and bear arms for self-defense. Mot. 1. It expands on those policy arguments later. Mot. 14-15. The thrust of the State's policy argument is that 18-to-20-year-olds are too irresponsible to be trusted with firearms because their brains are insufficiently developed.

The State's policy arguments are irrelevant to the Court's determination of its motion for two reasons. First, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court ruled policy arguments like those advanced by the State are out of bounds in Second Amendment cases. The Court stated: "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17. Second, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Court held that the government may not deprive a class of citizens of their Second Amendment rights merely because the government believes they are not "responsible." *Id.* at 701.

6

## II. SB23-169 is Not a Presumptively Lawful Regulation of Commercial Sales

### A. SB23-169 is Not Exempt from the *Bruen* Test

The State argues that SB23-169 is a presumptively lawful regulation of commercial sales. Mot. 5-11. Plaintiffs acknowledge that under the law of the case doctrine, the Court is bound by the Tenth Circuit's decision in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024). However, Plaintiffs incorporate all of their prior arguments (including their arguments in their motion for summary judgment) and arguments in this section to the contrary in order to preserve them.

This State's argument is based on a fundamental misunderstanding of *Heller* and *Bruen*. In *Heller*, the Court stated its opinion should not be taken to cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms," which it described as "presumptively lawful." *Id*. 554 U.S. at 626–27 and n.26. The State relies on this language to argue that SB23-169 is exempt from the *Bruen* test. But *Heller's* "presumptively lawful" language must be read in light of *Bruen*, which clarifies the test for assessing all Second Amendment claims, and no part of that test involves presuming lawfulness. See *Bruen*, 597 U.S. at 24. Instead, once the plain text is implicated, it is the government's burden to prove that the law is consistent with the history and tradition of firearms regulation. *Id*. Nothing in *Bruen* suggests that regulations on commercial sales are subject to a different test. *Bruen* did not alter *Heller*; it simply made clear that *Heller* was only stating that it presumed restrictions of the type it listed would be found lawful to some extent when the proper

7

analysis was conducted. This language should not be construed to preclude the government from meeting their burden under either prong of the *Bruen* test.

### B. The State's Argument Proves Too Much

The State's argument that all regulations of commercial firearms sales are exempt from the *Bruen* test surely proves too much because the argument has no limiting principle. The State seems to be under the impression that it has absolute authority to regulate all commercial firearms sales free from any constitutional restraints.[3] If that is so, what prevents the State from enacting a statute that prohibits the commercial sale of firearms on any day except the 30th day of each month? For that matter, what prevents the State from prohibiting the commercial sale of firearms to anyone? Under the State's logic, both statutes would be constitutional because they merely regulate commercial sales. As the Ninth Circuit observed in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017), "if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" altogether. *Id.* at 688 (internal citation and quotation marks omitted). Such an overall ban would obviously "be untenable under *Heller*." *Id.* The ban would not be untenable because of the burden it imposes on firearms sellers. Rather, it would be untenable because

---

[3] Plaintiffs acknowledge the State's argument that its regulation cannot be employed for "abusive ends." Mot. 17-18. But the novel "abusive ends" test announced in *RMGO* is obviously an interest-balancing test of the sort plainly prohibited by *Bruen*. In other words, according to the State, SB23-169 does not employ abusive ends because it promotes certain government interests. Plaintiffs also acknowledge that this Court is bound by that novel test.

8

such a "total prohibition would severely limit the ability of citizens to acquire firearms." *Id.* (emphasis added). Thus, the State's argument fails. Yes, the State has the authority to impose conditions and qualifications on the commercial sale of arms. But as *Teixeira* recognized, that authority is not without limits, and it may not be exercised in a way that effectively precludes a class of law-abiding citizens from exercising their right to acquire firearms.

### C. *RMGO* is Not Law of the Case Regarding Private Sales

SB23-169 is not, as the State argues, merely a commercial regulation of the sort contemplated by *Heller*. The statute prohibits non-commercial as well as commercial sales. C.R.S. § 18-12-112(2)(e). This issue was not addressed by the Tenth Circuit in *RMGO*. See, *id.* 121 F.4th at 120 n. 6 ("Our holding is limited to the one type of law or regulation from the *Heller* safe harbor list implicated here – laws imposing conditions and qualifications on the *commercial* sale of arms.") (emphasis added). Therefore, *RMGO* is not law of the case with respect to private sales. This Court's prior analysis remains valid with respect to issues not addressed in *RMGO* and nothing prohibits the Court from enjoining SB23-169's prohibition on private purchases by 18-to-20-year-olds.

### D. SB23-169 is Not Primarily a Regulation of Commercial Sales

As the Fourth Circuit noted in a similar case, an age-based prohibition on purchase is not a condition or qualification of "sale."

> A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records. . . . Here, though, the restrictions operate as a total ban on *buying* a gun from a licensed dealer that has met the

9

> required conditions and qualifications to sell arms. There is nothing a law-abiding 18- to 20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21.

*Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 34 F.4th 14 F.4th 322 (emphasis in original) (citing *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). SB23-169 does not base its prohibitions on 18-to-20-year-olds because they are in the business of selling firearms. Rather, this Court was correct when it noted earlier that SB23-169 categorically bans an entire group of law-abiding citizens from purchasing firearms based on age. The Fifth Circuit agrees with this analysis. "In our view, as pointed out above, the [*RMGO*] court committed a category error in its analysis that a complete ban of the most common way for a young adult to secure a firearm is not an abridgement of the Second Amendment right and therefore subject to *Bruen's* test . . . We fail to see how a purchase ban unknown at the time of the founding can evade *Bruen* analysis." *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 590, n. 2 (5th Cir. 2025). Again, Plaintiffs acknowledge that this Court is bound by *RMGO* at least with respect to SB23-169's prohibition of commercial purchases.

### III. There is No Founding-Era Tradition of Depriving 18-20-Year-Olds of Their Right to Keep and Bear Arms

The State asserts that there is a tradition dating back to the Founding of depriving 18-to-20-year-olds of their right to keep and bear arms. No such tradition exists. See *Reese*, 127 F.4th at 600 (restriction on 18-to-20-year-olds' Second Amendment rights unconstitutional in light of our Nation's historic tradition of firearm regulation); *Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428, 445

10

(3d Cir. 2025) (restriction on 18-to-20-year-olds' Second Amendment rights is not consistent with the principles that underpin Founding-era firearm regulations); and *Worth v. Jacobson*, 108 F.4th 677, 698 (8th Cir. 2024) (state's evidence not sufficient to demonstrate that restriction on 18-to-20-year-olds' Second Amendment rights is within this nation's historical tradition of firearm regulation).

The holdings in these cases are not surprising. According to an article by the State's own expert, prior to 1791 there were zero laws prohibiting the possession or purchase of firearms by minors. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History in The United States and Second Amendment Rights*, 80 Law & Contemp. Prob. 55, 59 (2017). As *Lara* noted, Pennsylvania was not able to point "to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns." *Id.* 125 F.4th at 444.

In stark contrast to the complete absence of laws prohibiting 18-to-20-year-olds from purchasing or possessing firearms in the Founding era stand the early militia laws that *required* men 18 years of age and older to obtain firearms. Congress passed the Second Militia Act on May 8, 1792, a mere five months after the Second Amendment was ratified on December 15, 1791. The Second Militia Act stated that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be *of the age of eighteen years* and under the age of forty-five years (except as herein exempted) shall severally and respectively be enrolled in the militia[.]" Second Militia Act of 1792 § 1, 1 Stat. 271 (1792) (emphasis added). The

11

Act also required each of these 18-year-old militia members to "provide himself with a good musket or firelock ... or with a good rifle[.]" *Id.* § 1.

Shortly thereafter, *every state* revised its existing militia laws to conform with the federal statute, adopted a militia age of 18, and required militia members to arm themselves.[4] Surely there can be no Founding-era tradition of regulations prohibiting 18-to-20-year-olds from acquiring firearms when the laws of the time unanimously imposed on them an affirmative duty to do exactly that. Even though some of the Founding-era militia laws required parents or guardians to supply arms to their minor sons, nothing in those statutes prohibited those 18-to-20-year-olds from purchasing or otherwise acquiring guns on their own.[5]

Judicial opinions from shortly after the Founding era support the conclusion that 18 was considered the "age of maturity" for the purpose of acquiring and possessing firearms. In 1831, the Supreme Judicial Court of Massachusetts declared: "[w]e think that under our militia laws for all purposes connected with the performance of military service, the age of maturity is eighteen." *In re Dewey*, 11 Pick. 265, 271-72 (Mass. 1831). In 1847, the Supreme Court of Appeals of Virginia wrote:

> We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms; and that it is the military age recognized by the whole legislation of Congress, and of the State of Virginia, and of all the States of the Union, perhaps without exception.

---

[4] See *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 672 F. Supp. 3d 118, 140 n. 31 (E.D. Va. 2023) (collecting state militia laws).

[5] It appears that these provisions were adopted out of concern that 18-to-20-year-olds would be unduly financially burdened if required to outfit themselves, not because they were legally prohibited from doing so. *Fraser*, 672 F. Supp. at 141 (citing 2 *Annals of Congress* 1851, 1856 (debates of December 16, 1790)).

*United States v. Blakeney*, 44 Va. (3 Gratt.) 405 (1847).

The court expressly rejected the argument advanced by Colorado that the arbitrary line of majority is dispositive regarding the matter of bearing arms:

> It seems to me obvious that the enlistment of a minor capable of bearing arms, does not fall within the general rule of the municipal law, in regard to the incapacity of infants under the age of twenty-one years, to bind themselves by contract. . . . The party is subject to no incapacity by any arbitrary rule in regard to discretion . . .

*Id.* 409–10.

In David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019), the authors conducted an exhaustive survey of the nation's history and tradition regarding the rights of 18-to-20-year-olds to keep and bear arms. At the end of this survey, their conclusion was that "[m]assive and uncontradicted evidence from the Founding Era shows that 18-to-20-year-olds did have the right to keep and bear arms, and indeed were required by law to exercise that right." *Id.* at 603.

## IV.   The State's Proposed Analogues Do Not Satisfy *Bruen*

Despite the complete absence of Founding-era analogues, the State insists it can discriminate against 18-20-year-olds in the exercise of their constitutional rights because the common law age of majority was twenty-one at the time of the Founding. This is wrong. First, the State supposes that under common law twenty-one was the age of majority for all purposes. It was not. Rather, at common law, "the relevant age of majority [] depended on the capacity or activity." *Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022) (citing William

13

Blackstone, *Commentaries*, 463–64, 465 (1765)). "In other words, 'the age of majority – even at the Founding – lacks meaning without reference to a particular right,' because, '[f]or example, a man could take an oath at age 12, be capitally punished in a criminal case at age 14, and serve as an executor at age 17.'" *Id.*

Moreover, the State's assertion that the legal threshold of majority status is an absolutely dispositive determinant for when constitutional rights inhere is not supported by any Supreme Court case and has been contradicted by numerous cases. As discussed above, minors have constitutional rights. For example, in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), the Court struck down a law that prohibited the sale of violent video games to children. The court held that "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." 564 U.S. at 794 (internal citation and quotation marks omitted).

The State stretches to find analogous regulations by pointing to the fact that certain colleges prohibited firearms on their premises. Mot. 13. But these college rules applied to only a tiny fraction of the population. In 1789, there were approximately 1,000 students enrolled in higher education in the United States out of a total population of 3.8 million. Arthur M. Cohen and Carrie B. Kisker, *The Shaping of American Higher Education: Emergence and Growth of the Contemporary System*, 14 (2d ed. 2010). The State's burden is to demonstrate an "enduring" and "broad" "American tradition of state regulation." *Bruen*, 597 U.S. at 69. It is unclear

14

why the State believes school rules that affected less than 0.03% of the population reflect a broad tradition of firearm regulation in the nation generally. Such "localized restrictions" do not establish a tradition of "broadly prohibiting" 18-to-20-year-olds from acquiring firearms. *Id.* at 66.

Moreover, these restrictions on students at universities are inapplicable to the *Bruen* analysis because the basis for these restrictions (i.e., the "why" question mandated by *Bruen*) was not the authority of government to curtail the exercise of constitutional rights but the *in loco parentis* authority of schools charged with the care of their students, a concept that made particular sense at the time given the very young age of the students. *See* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1136 n.5. (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of age and younger."). In this capacity, schools could require things of their students that would, if commanded by the government outside the *in loco parentis* context, violate their constitutional rights. See *Worth*, 108 F.4th at 695.

The State points to several post-Founding-era laws to justify SB23-169. However, as Justice Barrett explained in her concurrence in *Rahimi*, "for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function." *Rahimi*, 602 U.S. at 737-38 (Barrett, J., concurring). Thus, "the constitutional right to keep and

15

bear arms should be understood according to its public meaning in 1791." *Lara*, 125 F.4th at 441.

Five post-*Bruen* circuit court decisions have dealt with the Second Amendment rights of 18-to-20-year-olds. None of the circuit courts have relied on nineteenth-century and later laws to uphold restrictions on Second Amendment rights, and three of the courts have expressly rejected such laws as relevant to the Second Amendment analysis. See *Reese*, 127 F.4th at 600 (rejecting nineteenth-century laws as relevant to analysis); *Lara*, 125 F.4th at 441 (same); and *Worth*, 108 F.4th at 697 (same).

## V. Changing Societal Conditions and Technology do Not Make Up for the Fact That There Are No Founding-Era Analogues

The State appears to argue that because of changes in societal conditions and firearms technology, it is exempt from establishing a Founding-era analogous to SB23-169. Mot. 13. This is not correct. In *Worth*, the court specifically rejected the argument that the market revolution after the Founding era was relevant to its analysis. *Id.*, 108 F.4th 696-97. Instead, the issue is whether 18-to-20-year-olds desire to exercise their right to keep and bear arms in common use *today*. *Id.*

## VI. *Bondi* Was Wrongly Decided

In *Nat'l Rifle Ass'n v. Bondi*, 2025 WL 815734 (11th Cir. Mar. 14, 2025), the court upheld Florida's restriction on 18-to-20-year-olds' Second Amendment rights on the ground that people under age 21 had the right to void their contracts during the Founding era. *Bondi* was wrongly decided for the reasons set forth in the dissenting opinions in that case.

16

First, it is undisputed that in the Founding era, people under 21 could enter a long-term contract or a contract to pay on credit and later repudiate it. See 2 James Kent, *Commentaries on American Law* 191 (1827) (noting that contracts with minors were "voidable only, and not absolutely void"). Colorado still has that policy for anyone under 18. However, "[i]t is hard to see how the existence of this contract defense establishes a 'comparable tradition of regulation' of 'arms-bearing' with a 'relevantly similar' 'how and why' to [the State's] ban on purchasing firearms." *Bondi*, at *50 (Brasher, J., dissenting). There is no dispute that young adults could at the time of the Founding buy firearms up front for cash. *Id*. at *56-57. And that is what the Colorado law prohibits.

Also, as discussed above, even this contract defense was not absolute. "[A] contract for military service, which at the Founding required a firearm, could be enforced against someone under twenty-one-years-old, even if it was entered into against the will of his parents." *Id*. at *57, citing *United States v. Blakeney*, 44 Va. (3 Gratt). 405, 418 (1847) (per Baldwin, J.) (enforcing contract because "at the age of eighteen, a man is capable intellectually and physically of bearing arms").

Moreover, there is a complete mismatch between the common law rules that the *Bondi* majority relied on and the Colorado statute. "Historically, people under the age of twenty-one had the right to void certain contracts if sued to perform. . . . But these transactions were not prohibited – either criminally or civilly. And the enforceability of contracts was a matter for the civil courts and private suits, not criminal law." *Id*. at *57. Furthermore, Colorado's ban is not comparably justified.

17

As set forth in the State's own motion, the justification for Colorado's ban is to prevent misuse of firearms by 18-to-20-year-olds. "That justification . . . has no comparison in the voidability-of-contract regime on which the [State] relies. 'The right of an infant to avoid his contract is one conferred by law for *his protection* against his own improvidence and the designs of others.'" *Id*. at *58, citing *Putnal v. Walker*, 61 Fla. 720, 55 So. 844, 845 (1911) (added emphasis in original).

The provisions of some militia laws requiring parents to provide arms to their sons actually undermine the State's case. "To the extent those laws reflect a Founding-era policy on age and firearms, they reflect the policy that eighteen-to twenty-one-year-olds *should be armed*." *Id*. at 59 (emphasis in original).

The *Bondi* majority's inference that as a practical matter people under 21 could not purchase firearms in the Founding era is undermined by the very precedents it cited: "Indeed, in *Saunders Glover & Co. v. Ott's Administrator*, a case that the majority cites, the minor-defendant purchased a pistol and powder on credit, and the court determined that the merchant-plaintiff could not collect payment from the minor-defendant on the voided account. 12 S.C.L. (572) 572 (1822). Thus, the majority's inferred economic effects failed to materialize." *Id*. at 46 (Branch, J. dissenting).

Finally, even under the *Bondi* majority's own reasoning, its conclusions are unsupportable. *Bondi* concludes that because 18-to-20-year-olds had no capacity to contract, they did not have Second Amendment rights. But they did have a capacity to contract for certain items, including necessities. As set forth above, surely that

18

which the militia laws required young men to possess was a necessity. *Bondi* cites one case indicating that *pistols* were not a necessity. But the Militia Act of 1792 required each militia member to "provide himself with a good musket or firelock." 1 Stat. 271, §1 (1792). The same section of the Act that imposed this requirement also stated that "every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes." *Id*. The purpose of this exemption from levy, as with all such exemptions, is to protect a debtors' interest in necessary property.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington